No. 19-14844-BB

# In the United States Court of Appeals for the Eleventh Circuit

---

UNITED STATES OF AMERICA,
*Appellee*

v.

TARAS HODIVSKY, JR.,
*Appellant*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
D.C. NO. 1:19-CR-0080 (HON. KRISTI K. DUBOSE)

---

APPELLEE'S MOTION TO DISMISS APPEAL

---

RICHARD W. MOORE
United States Attorney
Southern District of Alabama

OLIVER MCDONALD
Assistant United States Attorney
Southern District of Alabama
63 South Royal Street, Suite 600
Mobile, Alabama 36602
(251) 441-5845

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

*United States v. Taras Hodivsky*, No. 19-14844-BB

Pursuant to 11th Cir. R. 26.1-1, the Appellee adopts the Appellant's Certificate of Interested Persons, adding the following party:

McDonald, Oliver – Assistant United States Attorney

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Appellee,** | ) | |
| | ) | |
| **v.** | ) | **USCA NO. 19-14844-BB** |
| | ) | |
| **TARAS HODIVSKY, JR.** | ) | |
| | ) | |
| **Appellant** | ) | |

## <u>UNITED STATES' MOTION TO DISMISS APPEAL</u>

The United States, by and through Richard W. Moore, the United States Attorney for the Southern District of Alabama, moves to dismiss Appellant Taras Hodivsky, Jr.'s appeal, in which he argues only that the district court erred when it denied his motion to suppress. After the district court's suppression decision, Hodivsky pled guilty and did not reserve his right to appeal the denial of his motion to suppress. Further, Hodivsky waived his right to appeal, which included waiving his right to appeal the suppression decision. His appeal should be dismissed based on his unconditional guilty plea or, alternatively, his waiver of appeal.

Hodivsky's appeal should be dismissed without further briefing or other proceedings. Fed. R. App. P. 27; 11th Cir. R. 27-1, 31-1(c), and 42-4. The United States further asks that this Court stay the briefing schedule pending resolution of this motion. *See* 11th Cir. R. 31-1(c) ("[T]he filing of a motion to dismiss a criminal appeal based on an appeal waiver in a plea agreement shall postpone the due date for filing appellee's

1

brief until the court rules on such motion."). Should the Court deny this motion to dismiss, the United States seeks permission to file its responsive brief within 30 days from the date of the order denying the motion.

## I.    Statement of Facts

On April 24, 2019, a grand jury charged Hodivsky with advertising child pornography (18 U.S.C. § 2251(d)), distribution of child pornography (18 U.S.C. § 2552A(a)(2)), and possessing child pornography involving a prepubescent minor (18 U.S.C. § 2256(8)(A)). [Doc. No. 23.] Hodivsky moved to suppress evidence found on his phone when law enforcement executed a search warrant. [Doc. No. 37.] The district court denied his motion after a hearing. [Doc. Nos. 57 (order denying motion), 99 (hearing transcript).]

Hodivsky pled guilty to advertising child pornography and possessing child pornography. [*See* Doc. No. 63.] Through his written plea agreement, Hodivsky confirmed that he understood his rights to plead not guilty, proceed to trial, cross-examine witnesses, produce evidence in his own defense, and not be compelled to incriminate himself. [Doc. No. 59 at 1.] The agreement indicated that he had discussed the facts of his case with his attorney, that his attorney had explained the essential legal elements of the charge, and that he was satisfied with his attorney's "faithful[ ], skillful[ ], and diligent[ ]" representation. [*Id.* at 2.] The agreement further confirmed that Hodivsky had not been coerced to plead guilty and that he understood the maximum penalty for the offense. [*Id.* at 3–6.]

2

Hodivsky's written plea agreement also included a waiver of appeal and collateral attack.  [*Id.* at 11–12.]  Hodivsky agreed to "knowingly and voluntarily waive[ ] the right to file any direct appeal or any collateral attack, including a motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255."  [*Id.* at 11.]  The bargained-for waiver of appeal had limited exceptions: Hodivsky retained his ability to argue that his sentence exceeded the statutory maximum or Guidelines range, or that he had been denied the effective assistance of counsel.  [*Id.* at 11–12.]

In a factual resume accompanying his plea, Hodivsky admitted to the underlying conduct.  [Doc. No. 60.]  The investigation began when a seven-year-old girl made a credible allegation that Hodivsky had sexually abused her.  [*Id.* at 2.]  State law enforcement charged him with first-degree rape and sexual abuse of a child under age 12, and arrested him.  [*Id.* at 2–3.]  Officers seized Hodivsky's cell phone during the arrest and obtained a warrant to search it.  [*Id.* at 3.]  The search revealed 2,430 still images depicting child sexual exploitation, half of which depicted pre-pubescent children engaged in sex acts or exposing their genitalia.  [*Id.*]  Officers also found 13 videos depicting child sexual exploitation.  [*Id.*]  The National Center for Missing and Exploited Children verified that 454 of the images were of 125 different previously-identified child victims.  [*Id.*]  Also on the cell phone was an application that Hodivsky used to communicate with other consumers of child pornography and to trade the material.  [*Id.* at 3–4.]  Officers next executed a search warrant at Hodivsky's home, where they seized another cell phone.  [*Id.* at 4.]  That phone contained 802 images

depicting sexual exploitation of children, including prepubescent children engaged in sex acts and sadistic or masochistic conduct. [*Id.*] The National Center for Missing and Exploited Children confirmed that 104 of those images came from 27 different previously-identified victims. [*Id.*]

At his change-of-plea hearing, Hodivsky assured the district court that he understood his plea agreement, including the waiver of appeal. [Doc. No. 63 at 4–7.] The court made clear that the plea agreement "provides that you are waiving your right to appeal this conviction and the sentence." [*Id.* at 7.] It asked, "[d]o you understand that?" [*Id.*] Hodivsky responded, "[y]es, ma'am." [*Id.*] The court next described the exceptions to the waiver of appeal: "The only reason you could appeal is if I go above the guidelines, you received ineffective assistance of counsel, or I went above the statutory maximum." [*Id.*] The court again asked whether Hodivsky understood the waiver of appeal, and he replied, "[y]es, ma'am." [*Id.*] Hodivsky admitted that the factual resume attached to his plea agreement was accurate and entered a plea of guilty. [*Id.* at 9–13.]

At sentencing, the Court concluded that Hodivsky had an offense level of 42, criminal history category of I, and Guidelines range of 360 months. [Doc. No. 100 at 2.] He did not object to that calculation, and the court imposed a 360-month prison sentence. [*Id.* at 2, 9; *see* Doc. No. 72 at 2.]

This appeal followed.

## II.    Hodivsky's Appeal Should Be Dismissed

Hodivsky's sole claim on appeal is that the district court erred when it denied his motion to suppress.   App. Brief at 11–14.[1]   He does not argue that his plea was unknowing or involuntary, or that his waiver of appeal is completely unenforceable. Rather, he says that this Court can review the district court's suppression decision because that issue is not within the scope of his waiver of appeal.   *Id.* at 15–16.

Hodivsky's appeal should be dismissed for two independent reasons.   First, Hodivsky waived any non-jurisdictional defects in the proceedings—including any error in the district court's suppression decision—when he entered a knowing and voluntary guilty plea.   Second, the district court's suppression decision is squarely within the scope of his waiver of appeal.   His appeal should be dismissed for both reasons.

### A.    By His Plea, Hodivsky Waived Any Error in the Suppression Decision

First, Hodivsky's appeal should be dismissed because, by entering an unconditional guilty plea, he waived any error in the suppression decision.   "A guilty plea, since it admits all the elements of a formal criminal charge, waives all non-jurisdictional defects in the proceeding against a defendant."   *United States v. Brown*, 752 F.3d 1344, 1347 (11th Cir. 2014) (quoting *United States v. Fairchild*, 803 F.2d 1121, 1124 (11th Cir. 1986)).   A court's decision on a motion to suppress does not implicate its jurisdiction, so it is among the issues that a defendant waives through a knowing and

_____

[1]         References to page numbers in Hodivsky's brief are to the printed numbers at the bottom of the page, not the electronic pagination at the top.

voluntary plea. *United States v. Charles*, 757 F.3d 1222, 1227 n.4 (11th Cir. 2014); *accord United States v. Ruiz*, 811 F. App'x 540, 542 (11th Cir. 2020) (unpublished).

A defendant may negotiate with the United States to reserve their ability to appeal a suppression decision as part of their plea agreement. But, the "only" way to preserve appellate review of a non-jurisdictional issue is by entering a "conditional plea," which "must be in writing and must be consented to by the court and by the government." *United States v. Pierre*, 120 F.3d 1153, 1155 (11th Cir. 1997).

Hodivsky does not contest the voluntariness of his plea. Neither does he assert that he specifically reserved his right to appeal the suppression decision. Indeed, the plea agreement did not expressly reserve Hodivsky's ability to appeal the court's suppression decision, and neither the district court nor the United States consented to such a provision. [*See* Doc. No. 59.] To the contrary, Hodivsky waived his right to appeal and acknowledged understanding that his waiver meant that he could "only" appeal if the court sentenced him in excess of the Guidelines range or statutory maximum, or if he argued that he was denied the effective assistance of counsel. [*See* Doc. Nos. 59 at 11–12, 63 at 7.]

Accordingly, Hodivsky waived the only issue he raises on appeal through his unconditional guilty plea. *Charles*, 757 F.3d at 1227 n.4. His appeal should be dismissed.

## B.   Hodivsky Expressly Waived His Right to Appeal His Current Claim

Hodivsky also waived his right to appeal the district court's suppression decision when he expressly waived his right to appeal. "[K]nowingly and voluntarily entered plea

6

agreements containing appeal waivers are like contracts in which the government and the defendant have bargained for a deal." *United States v. Bascomb*, 451 F.3d 1292, 1296 (11th Cir. 2006). "Defendants and the government alike benefit from the ability to bargain and undermining the enforceability of such bargains harms all parties that use them." *Id.* at 1296–97. Therefore, so long as an appeal waiver is "voluntarily and knowingly entered into as part of a valid plea agreement, and that agreement is accepted by the court, the waiver is enforceable." *Id.* at 1297.

A record is adequate to show a knowing and voluntary waiver of appellate rights if "*either*: (1) the district court specifically questioned the defendant about the waiver during the plea colloquy, or (2) the record clearly shows that the defendant otherwise understood the full significance of the waiver." *United States v. Grinard-Henry*, 399 F.3d 1294, 1296 (11th Cir. 2005).

Here, Hodivsky does not argue that his waiver of appeal was unknowing or involuntary, but it nevertheless bears mention that his waiver was knowing and voluntary. Hodivsky assured the district court that he understood his plea agreement, which included the waiver of appeal. [Doc. No. 63 at 7.] The court specifically discussed the waiver of appeal, and Hodivsky indicated that he understood that the "only" claims he could raise on appeal were that his sentence was longer than his Guidelines range, that his sentence was longer the statutory maximum, or that he was denied his right to counsel. [*Id.*]

The court's comprehensive warnings and explanations to Hodivsky, as well as Hodivsky's clear response that he understood the terms and effects of his plea agreement, are sufficient for this Court to enforce his waiver of his appellate rights. *See United States v. Benitez-Zapata*, 131 F.3d 1444, 1446 (11th Cir. 1997). This conclusion is particularly appropriate when viewing the plea colloquy in connection with the unambiguous language of the plea agreement. *See Bascomb*, 451 F.3d at 1294.

Since Hodivsky knowingly and voluntarily agreed to the waiver of appeal in the plea agreement, the only remaining question is whether his appeal raises issues that were excluded from the waiver. The sole claim raised in Hodivsky's brief is squarely within the scope of his waiver.

This Court interprets plea agreements "like contracts" and interprets them "consistent with the parties' intent." *United States v. Hardman*, 778 F.3d 896, 900 (11th Cir. 2014). It "eschews both a hyper-technical reading of the written agreement and a rigidly literal approach in the construction of the language." *Id.* (quotation omitted). It construes ambiguous terms against the United States. *Id.*

Here, Hodivsky's plea agreement provided that he "waive[ed] the right to file *any* direct appeal." [Doc. No. 59 at 11 (emphasis added).] The plea agreement went on the make clear that Hodivsky would reserve his ability to make certain arguments on appeal appeal—that the length of his sentence exceeds the Guidelines range or the statutory maximum, or that he was denied the effective assistance of counsel—but he did not reserve the right to appeal the outcome of his suppression motion. [*Id.* at 11–12.]

8

The district court reiterated the scope of Hodivsky's waiver of appeal at his change-of-plea hearing.  It warned Hodivsky that his plea agreement included a waiver of appeal providing that the "only" issues he could raise on appeal would be a sentence that exceeded his guidelines range or statutory maximum, or ineffective assistance of counsel.  [Doc. No. 63 at 7.]  Hodivsky acknowledged understanding that provision of the agreement: "Yes, ma'am."  [*Id.*]  Neither Hodivsky's written plea agreement nor the district court identified the suppression decision as one of the "only" issues that he could appeal after his plea, so the waiver unquestionably included the suppression decision.

Nevertheless, Hodivsky contends that his waiver of appeal does not preclude him from contesting the district court's suppression decision.  App. Brief at 15–16.  He claims that he did not "specifically" waive his ability to appeal the outcome of the suppression decision, so that decision must be outside of the scope of his waiver.  *Id.* As noted, however Hodivsky waived his right to file "any" appeal other than those identified as reserved.  [Doc. No. 59 at 11–12.]  He acknowledged understanding the district court's explanation that he could "only" appeal based on an argument that his

sentence exceeds his Guidelines range or statutory maximum, or that he was denied the effective assistance of counsel.[2] [Doc. No. 63 at 7.]

Hodivsky's reliance on this Court's decision in *United States v. Bushert*, 997 F.2d 1343 (11th Cir. 1993) is not to the contrary. As Hodivsky notes, that case stands for the proposition that a waiver of appeal is not enforceable unless the defendant knows that they are giving up their appellate rights. App. Brief at 15 (citing *Bushert*, 997 F.2d at 1350). As already emphasized, though, Hodivsky acknowledged understanding his waiver of appeal and that he could "only" appeal based on a sentence that exceeded his Guidelines range or statutory maximum, or based on an ineffective assistance of counsel argument. [Doc. No. 63 at 7.] There was no need for the plea agreement or district court to specifically address whether the waiver included the suppression decision, since that was not one of the "only" issues Hodivsky reserved a right to appeal.

As part of his bargained-for plea agreement, Hodivsky agreed to waive his right to appeal the claim he raises in his brief. His appeal should therefore be dismissed.

## III.   CONCLUSION

Through his unconditional guilty plea, and again through his waiver of appeal, Hodivsky waived his right make his sole claim on appeal. It should be dismissed.

---

[2]       Hodivsky incorrectly asserts that the district court only mentioned that he retained his ability to appeal based on ineffective assistance of counsel and a sentence that exceeded the statutory maximum, and he concludes that the court's explanation was therefore incomplete. App. Brief at 16. In fact, the court also informed him that he could appeal his sentence if the court "go[es] above the guidelines." [Doc. No. 63 at 7.]

Respectfully submitted,

RICHARD W. MOORE
UNITED STATES ATTORNEY
By:

/s/ Oliver McDonald
Oliver McDonald
Assistant United States Attorney
63 South Royal Street, Suite 600
Mobile, Alabama 36602
Telephone: (251) 441-5845
Fax: (251) 441-5277

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Fed.

R. App. P. 27(d)(2)(A).  This motion contains **2,494** words.

/s/ Oliver McDonald
Oliver McDonald
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on **August 10, 2020**, a true and correct copy of the

foregoing has been served upon appellant by placing same in the United States Mail,

postage prepaid and properly addressed, to: William Bradford, 160 St Emanuel Street,

Mobile, Alabama 36602.

/s/ Oliver McDonald
Oliver McDonald
Assistant United States Attorney

DOC 23

12

KSC

FILED IN OPEN COURT

APR 24 2019

CHARLES R. DIARD, JR.
CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIM. NO.  19-00080 |
| | * | USAO NO. 19R00134 |
| v. | * | MAG NO. 19-MJ-00069 |
| | * | VIOLATIONS: 18 USC § 2251(d) |
| | * | 18 USC § 2252A(a)(2) |
| TARAS HODIVSKY, JR. | * | 18 USC § 2252A(a)(5)(B) |
| | * | |

## SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES:**

### COUNT ONE

Between on or about October 16, 2016 and January 20, 2019, in the Southern District of

Alabama, Southern Division, and elsewhere, the defendant,

### TARAS HODIVSKY, JR.,

knowingly made, printed, published, and caused to be made, printed, and published, a notice and

advertisement seeking and offering to receive, exchange, buy, produce, display, distribute, and

reproduce a visual depiction the production of which involved the use of a minor engaging in

sexually explicit conduct and which the depiction was of such conduct, and the defendant knew

and had reason to know that such notice and advertisement would be transported using any

means and facility of interstate and foreign commerce and in and affecting interstate and foreign

commerce by any means including by computer and such notice and advertisement was

transported using any means and facility of interstate and foreign commerce and in and affecting

interstate and foreign commerce by any means including by computer.

In violation of 18 U.S.C. § 2251(d) and 2.

## COUNT TWO

Between on or about October 16, 2016 and January 20, 2019, in the Southern District of Alabama, Southern Division, and elsewhere, the defendant,

**TARAS HODIVSKY, JR.,**

knowingly distributed and attempted to distribute any child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), that had been shipped and transported using any means and facility of interstate and foreign commerce.

In violation of Title 18, United States Code, Section 2252A(a)(2) and (b) and 2.

## COUNT THREE

On or about January 24, 2019, in the Southern District of Alabama, Southern Division, and elsewhere, the defendant,

**TARAS HODIVSKY, JR.,**

knowingly possessed material which contains an image of child pornography, as defined in Title 18, United States Code, Section 2256(8)(A), that involved a prepubescent minor, and which had been shipped and transported using any means and facility of interstate and foreign commerce and was produced using materials that have been mailed, and shipped and transported in and affecting interstate and foreign commerce by any means, including by computer.

In violation of 18 U.S.C. § 2252A(a)(5)(B).

A TRUE BILL

FOREMAN UNITED STATES GRAND JURY
SOUTHERN DISTRICT OF ALABAMA

2

RICHARD W. MOORE
UNITED STATES ATTORNEY

By:

_____
Kacey Chappelear
Assistant United States Attorney

_____
Sean P. Costello
Assistant United States Attorney
Chief, Criminal Division                    APRIL 2019

3

FILED IN OPEN COURT

APR 24 2019

CHARLES R. DIARD, JR.
CLERK

12

## PENALTY PAGE

**CASE STYLE:**      **UNITED STATES v. TARAS HODIVSKY, JR.**

**DEFENDANT:**      **TARAS HODIVSKY, JR. (ALL COUNTS)**

**USAO NO.**      **19R00134**

**AUSA:**      **Kacey Chappelear**


**CODE VIOLATIONS:**

**COUNT 1:**      **18 USC § 2251(d) – Advertising of child pornography**

**COUNT 2:**      **18 USC § 2252A(a)(2) – Distribution of child pornography**

**COUNT 3:**      **18 U.S.C. § 2252A(a)(5)(B) - Possession of child pornography**


**PENALTIES:**

**COUNT 1:**      **15 - 30 yrs/ $250,000 / life SRT/$100SA/$5000SA**
                  **25-50 yrs imprisonment if prior qualifying conviction.**
                  **35-life if two prior qualifying convictions.**

**COUNT 2:**      **5 - 20 yrs/ $250,000 / life SRT/$100SA/$5000SA**
                  **15-40 yrs imprisonment if prior qualifying conviction.**

**COUNT 3:**      **20 yrs/$250,000/5 yrs to Life SRT/$100 SA/$5000SA/Up to**
                  **$17,000SA**

FILED IN OPEN COURT

APR 24 2019

CHARLES R. DIARD, JR.
CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

UNITED STATES OF AMERICA      *
                            *    **CRIMINAL NO. 19-CR-00134**

**v.**                               *
                            *

**TARAS HODIVKSY, JR.**

## NOTICE IN ACCORDANCE WITH CRIMINAL L.R. 7
## REGARDING SUPERSEDING INDICTMENT

Comes Now the United States, by and through the United States Attorney for the

Southern District of Alabama, Richard W. Moore, and Assistant United States Attorney, Kacey

Chappelear, and hereby files this Notice in accordance with Criminal L.R. 7 regarding the

Superseding Indictment filed in the above captioned case.

The differences between the Indictment and the Superseding Indictment are that the

Grand Jury has indicted the defendant with additional counts of Advertising Child Pornography

and Distribution of Child Pornography (Counts 1 and 2).

                           Respectfully submitted,

                           RICHARD W. MOORE
                           UNITED STATES ATTORNEY
                           by:

                           *s/* Kacey Chappelear
                           Kacey Chappelear
                           Assistant United States Attorney
                           United States Attorney's Office
                           63 South Royal Street, Suite 600
                           Mobile, Alabama 36602

DOC 37

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CRIM NO. 19-0080-KD |
| | ) | |
| TARAS HODIVSKY, JR., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Pursuant to Rule 12, Fed. R. Crim. P., and the scheduling Orders of the Court, Defendant TARAS HODIVSKY, JR. ("Hodivsky"), by and through his attorney of record, respectfully moves the Court for an Order suppressing the following items of evidence which the Government may attempt to use in the prosecution of this case:

(1)      Any and all evidence seized from Hodivsky's cell phone by reason of the unconstitutional Search Warrant issued by the District Court of Baldwin County, Alabama on or about January 30, 2019 ("the Search Warrant");

(2)      Any and all evidence that is the fruit of (or derivative of) the unconstitutional Search Warrant, including any and all evidence which is derivative of the evidence unlawfully seized by reason of the unconstitutional search of Hodivsky's cell phone; or

(3)    *Alternatively*, should the Court not suppress all evidence,

then the Court should suppress all evidence other than images or videos

*actually stored* on Hodivsky's cell phone where the search of the cell

phone exceeded the scope of the Search Warrant.

First, the Search Warrant did not establish probable case to search Hodivsky's cell phone because there was no nexus between the offenses with which Hodivsky was charged and the "stored electronic data" authorized by the Search Warrant. Second, the scope of the Search Warrant is unconstitutionally broad, inviting the State to search all information on Hodivsky's cell phone without probable cause that all of the information on Hodivsky's cell phone constituted evidence of the charged offenses.

In the alternative, Hodivsky moves the Court for an Order suppressing all evidence seized from his cell phone by reason of the Search Warrant which exceeds the scope of the Search Warrant. The actual search of all information on Hodivsky's cell phone exceeded the scope of the Search Warrant, which, *at best*, authorized only a search of "photos" and "videos" on the cell phone. *See*, *e.g.*, *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 2310 (1990) (if a search exceeds the scope of terms of a warrant, any subsequent seizure is unconstitutional).

## I.    <u>FACTUAL BACKGROUND</u>

On January 17, 2019, Detective John Gleaton (Summerdale, Alabama Police Department) ("<u>Det. Gleaton</u>" herein) interviewed the alleged victim at the Baldwin County Child Advocacy Center. The alleged victim stated that she had been subject to sexual contact by Hodivsky. The alleged victim stated that Hodivsky showed her "pornographic

pictures or movies depicting sexual acts on his phone." <u>See</u> <u>redacted</u> *Affidavit in Support*; Jan. 22, 2019; **Exh. A**. Det. Gleaton made an *Affidavit in Support of Application for Search Warrant* on January 22, 2019, in which he stated there was probable cause to search "digital devices such as phones, computers, digital storage devices such as cards or micro SD cards that could contain pornographic images." <u>See</u> **Exh. B**. Det. Gleaton checked the box indicating that the property "Constitutes, or is expected to constitute, evidence of a criminal offense under the laws of the State of Alabama or a political subdivision thereof, to-wit: Rape 1st Degree, 13a-6-61, and/or Sexual abuse of a child less than 12 years old 13-6-69.1." *Id.*

Det. Gleaton obtained a Search Warrant executed by the Baldwin County District Court on January 22, 2019. <u>See</u> **Exh. C**. The Search Warrant was executed on January 24, 2019. The *Search and Return Inventory* included "1 cell phone Galaxy S9," which was recovered on January 24, 2019 at 9:26 a.m. <u>See</u> **Exh. D**.

Hodivsky was arrested and taken into custody on each of the foregoing charges on January 22, 2019. <u>See</u> **Exhs. E** and **F**.

On January 30, 2019, Det. Gleaton executed a second *Affidavit in Support* and *Application for Search Warrant*. This time, the *Affidavit* alleged:

● "Additionally the victim told of pornographic images or video shown to her by the defendant on his cell phone. These images if displayed on an electronic device would likely still be present on the device." <u>See</u> **Exh. G**; *Affidavit in Support*.

The *Application for Search Warrant* requested:

- "The cell phone of Taras Hodivsky, Jr. containing stored electronic data, evidence of the crimes alleged in this case." See **Exh. H**.

- Once again, the "crimes alleged in this case" included Rape 1st Degree "and/or" Sexual abuse of a child less than 12 years old. *Id.*

The subsequent *Search Warrant*, issued on January 30, 2019, authorized a search of:

- "The cell phone of Taras Hodivsky, Jr. containing stored electronic data, evidence of crimes alleged in this case. Electronic devices store images and videos and would also show any of the stored pornographic images that were said to have been shown to the victim by the defendant." See **Exh. I**.

The *Search Warrant Return and Inventory* states that Det. Gleaton found "digital evidence of child and adult pornography images and video on the phone." See **Exh. J**.

In order to obtain the "digital evidence of child and adult pornography," the police used a "Cellebrite" program to extract every single piece of available data from Hodivsky's cell phone. This digital extraction was not limited to photographs and videos. Rather, it included call logs, audio files, text messages, third party applications, and any other information which could possibly be extracted from the cell phone.  Thus, it is apparent that the police viewed the Search Warrant as a general authorization to extract any and all available information from Hodivsky's cell phone, whether or not such information was related to the pending charges against Hodivsky and whether or not the information was actually stored on his cell phone. Consequently, for the reasons set forth herein, Hodivsky

moves the Court to suppress any and all information obtained by the police as a result of the unconstitutional Search Warrant, as well as any and all evidence which may be considered the "fruit" of the unconstitutional Search Warrant.

## II.    ARGUMENT

**A.    The warrant was not supported by sufficient probable cause because there was no nexus between Hodivsky's cell phone and the elements of the alleged offenses.**

The Search Warrant (and the evidence submitted to support it) did not establish probable cause to believe that evidence of the offenses being investigated – Rape in the 1st Degree and Sexual abuse of a child less than 12 – would be found on the cell phone.

Police are required to obtain a warrant before searching a cell phone seized incident to an arrest. *Riley v. California*, 573 U.S. 373, 403 (2014). *Riley v. California* expressly recognized the substantial privacy interests that persons have in their cell phones: "A phone not only contains in digital form may sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form – unless the phone is." *Riley*, 573 U.S. at 396-97.

The Fourth Amendment requires that warrants be issued only upon probable cause. An affidavit submitted in support of a warrant must establish probable cause, which requires a nexus between the charged offense and the evidence sought. "Probable cause to search … requires some nexus between [the property to be searched] and the alleged crime." *Warren v. Hayden*, 387 U.S. 294, 307 (1967); *United States v. Joseph*, 709 F.3d 1082, 1100 (11th Cir. 2013). "A police officer's expectation, based on prior experience and the specific circumstances of the alleged crime, that evidence is likely to

be found in a suspect's residence satisfies probable cause." *United States v. Bradley*, 644 F.3d 1213, 1263 (11th Cir. 2011).

In sharp contrast to the instant case, in *United States v. Golden*, 2012 WL 4936515, *3-4 (M.D. Ala. 2012), the court found there was a nexus between the defendant's cell phone and the alleged crime where the child stated that she "heard something clicking and saw flashes of light," and "believed that [the defendant] was taking pictures of her." Because the seized electronic devices "could reasonably be believed to contain evidentiary materials ***by which the alleged crime might be proven***," there was a sufficient nexus and thus probable cause to obtain a search warrant for the defendant's cell phone. *Id.* (emphasis supplied.) The *Golden* case makes it abundantly clear that the nexus must be between the evidence sought and the crimes ***for which the defendant is under investigation*** – not crimes which ***could be*** investigated or charged depending on the results of the search warrant.

In *United States v. Oglesby*, __ F.Supp.3d __, 2019 WL 1877228 (S.D. Tex. Apr. 26, 2019), the court considered a similar situation to that presented here. In *Oglesby*, the defendant (Oglesby) was charged as a felon in possession after being arrested for burglary and evading arrest. Police found a cell phone in Oglesby's front seat, and obtained a search warrant for it. The affidavit in support of the warrant included the officer's opinion that information on the phone "could contain evidence related to this offense and this investigation." *Oglesby*, 2019 WL 1877228, *4. The search revealed photos and videos of Oglesby with firearms. Police also extracted GPS data indicating that Oglesby was making purchases from a local gun store. This information led directly

to the felon-in-possession charges against Oglesby. Oglesby moved to suppress the evidence obtained from the search of the phone.

The court found that there was an insufficient nexus between the officer's affidavit and the evidence sought to support the crime of burglary. "The fact that there is probable cause to believe a person has committed a crime does not automatically give the police probable cause to search his house for evidence of that crime." *Id.* at *6, *quoting United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982). And *Riley v. California* stands for the proposition that the protections given to a cell phone must be at least equal to, if not greater than, the protections set out for houses. *Id.* at 5. The court concluded that the fact that a phone was present at the crime scene, plus the officer's generalizations about phones containing evidence of crimes, was not sufficient to establish a nexus between the cell phone and the charged offense of burglary. Because of the lack of probable cause for obtaining the search warrant, the evidence collected during the search of the phone was due to be suppressed. *Oglesby*, 2019 WL 1877228, *7.

Here, the only "nexus" to Hodivsky's cell phone is the apparent statement of the alleged victim in which she "told of pornographic images or video shown to her by the defendant on his cell phone." See **Exh. G**. From this statement, Det. Gleaton obtained a warrant to search all "stored electronic data" on the cell phone for "evidence of crimes alleged **in this case**." However, on January 30, 2019 Hodivsky was not charged with **any** crime that involved showing pornographic images to a minor child. The elements of § 13A-6-61 (Rape 1st degree) and 13A-6-69.1 (Sexual abuse) contain no element of the offense for which the display of pornographic images is required to be proved by the State. Had Det. Gleaton alleged in his *Affidavit* that the victim claimed that Hodivsky took

her picture, or took a video of her, or used his cell phone in any other manner for the actual commission of the alleged offenses, then this would be a different matter entirely. *See Golden*, *supra*. In that **hypothetical case**, Hodivsky's cell phone might have contained evidence by which the alleged crimes might be proven. *See United States v. Golden*, *supra*.

In this case, however, the police were required to establish some type of nexus between the images and/or videos sought from Hodivsky's cell phone and the formal charges against him. Or, the police could have levied additional charges against Hodivsky which might have provided the required nexus. *See*, *e.g.*, § 13A-6-111, Ala. Code 1975. But the police did not levy any additional charges against Hodivsky. Rather, they traveled under the existing charges of Rape 1st Degree and Sexual abuse of a minor under 12. Both of these charges do require some degree of physical contact between the defendant and the victim. See 13A-6-61; § 13A-6-69.1. Neither offense, however, has the use of pornographic images or videos as an element. There can be no nexus between the evidence sought and the offenses charged and, thus, no probable cause for the issuance of the Search Warrant for Hodivsky's cell phone. For this reason alone, any and all evidence obtained from the search of Hodivsky's cell phone – as well as any evidence which is the fruit of this search – is due to be suppressed.

**B.    The Search Warrant violated the Fourth Amendment because it was unconstitutionally overbroad and failed to state with particularity the items to be seized.**

"The Fourth Amendment also requires a warrant to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. Amend. IV.

Thus, "[a] warrant which fails to sufficiently particularize the place to be searched or the things to be seized is unconstitutionally over broad," and any evidence seized from the resulting search must be excluded from trial. *United States v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000). While a search warrant must contain sufficient specificity to guard against a general search, "the test is the reasonableness of the description. Elaborate specificity is unnecessary." *United States v. Strauss*, 678 F.2d 886, 892 (11th Cir. 1982)." *United States v. Carroll*, 886 F.3d 1347, 1351 (11th Cir. 2018). Further, the particularity requirement must be viewed in light of the nature of the activity under investigation. *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982); *and see*, *e.g.*, *United States v. Harvey*, 20915 WL 9685908 at *13 (N.D. Ga. 2015) (warrant sufficiently particularized where property to be seized **was limited to evidence of the crimes being investigated**); a*nd United States v. Brooks*, 2014 WL 292194, *11 (M.D. Fla. 2014) (scope of warrant restricted to evidence of child pornography-related crimes did not permit a "free-ranging" search).

"The purpose of the particularity requirement is to 'protect persons against the government's indiscriminate rummaging through their property' and to '[prevent] the searching for and seizure of items that there is no probable cause to believe are either contraband or evidence of a crime.'" *United States v. Winn*, 79 F.Supp.3d 904, 918 (S.D. Ill. 2015), *citing*, *inter alia*, *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). "By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Maryland v.*

*Garrison*, 480 U.S. 79, 84 (1987); *United States v. Vitek Supply Corp.*, 144 F.3d 476, 481 (7th Cir. 1998) ("This requirement ... ensures that the scope of a search will be confined to evidence relating to a specific crime that is supported by probable cause.").

In *Oglesby*, *supra*, the court rejected the Government's argument that simply identifying the phone to be search was sufficient "particularity" for the purpose of the search warrant. The court recognized that the "major, overriding problem" with the Government's argument was that police did not have probable cause to believe that **everything** on Oglesby's cell phone constituted evidence of the offense under investigation. *Oglesby*, 2019 WL 1877228, *7. The overbreadth of the warrant was particularly problematic in light of the Supreme Court's express recognition that a cell phone will "would typically expose the government to far more than the most exhaustive search of a house." *Id.*, *citing Riley v. California*, 573 U.S. 373, 396-97 (2014) (emphasis in *Riley*). "Obviously, the police will not have probable cause to search through and seize such an expansive array of data every time they search a cell phone." *Id.*

In *United States v. Winn*, 79 F.Supp.3d 904 (S.D. Ill. 2015), the court considered a constitutional challenge to a search warrant for "any and all files contained on" Winn's cell phone. The defendant was charged with public indecency for photographing young girls at a swimming pool and "fondling his genitals through his shorts." *Winn*, 79 F.Supp. at 910. Based on this charge, police obtained a warrant to search every item of data on Winn's cell phone. "Detective Lambert asked Investigator Robertson to do a complete phone dump, and Robertson used the Cellebrite UFED Touch machine to extract every bit of data from the cell phone that the machine could detect." *Id.* at 921.

Winn challenged the search warrant based, in part, on the overbreadth of the search warrant. The court agreed with Winn, noting that police did not have probable cause to search everything on the phone because there was not probable cause to believe that everything on the phone constituted evidence of the crime of public indecency. *Winn*, 79 F.Supp.3d at 919. Rather, there was probable cause to believe that only two categories of data – photos and videos – could serve as evidence of the offense with which Winn was charged.

> "The bottom line is that if Detective Lambert wanted to seize every type of data from the cell phone, then it was incumbent upon him to explain in the complaint how and why each type of data was connected to Winn's criminal activity, and he did not do so. Consequently, the warrant was overbroad, because it allowed the police to search for and seize broad swaths of data without probable cause to believe it constituted evidence of public indecency." *Winn*, 79 F.Supp.3d at 920.

Because the warrant did not limit the scope of date to the specific subset of data on Winn's cell phone that was relevant to the criminal activity at issue, the warrant was "overbroad in every respect and violated the Fourth Amendment." *Id.* at 922.

Here, as of January 30, 2019, Hodivsky was not under investigation for any offense related to possession of child pornography, nor was he under investigation for any offense for displaying pornography to a minor. Hodivsky was under investigation for Rape 1st Degree "and/or" Sexual abuse of a child under 12. None of the elements of either of these offenses involve photographs or videos – except insofar as Hodivsky might have actually taken photographs or videos of the alleged offenses using the cell phone. ***But there is no such allegation*** in Detective Gleaton's *Affidavit.* Nonetheless, the Search Warrant, on its face, provides unlimited authorization for Detective Gleaton to search Hodivsky's phone for all "stored electronic data, evidence of crimes alleged in this case." That is, the

Search Warrant did not particularly describe the items for which the State was searching, or state how those items might prove any element of the offenses with which Hodivsky was charged as of January 30, 2019. On its face the Search Warrant authorized a search of **everything** on Hodivsky's phone. If Detective Gleaton wanted to search **everything** on Hodivsky's phone, he was required to explain in his *Affidavit* how a particular item of data (*for example*, SMS message, third party applications, documents, emails, "cloud based" applications, voicemails, phone records, GPS data, calendars, contacts, etc.) on the phone was relevant to the alleged criminal activity. But, the Search Warrant allowed the State to seize all data on Hodivsky's phone without any probable cause that *all* of the data constituted evidence of the alleged Rape "and/or" sexual abuse. This is precisely the type of "rummaging through" Hodivsky's property in search of previously unsuspected crimes that the Fourth Amendment prohibits.

The Search Warrant seems to suggest that Detective Gleaton may search for "any of the stored pornographic images that were said to have been shown to the victim by the defendant." But this is ***not*** a limitation on the ***scope*** of the Search Warrant. Rather, this is merely a descriptor regarding the storage capability of "electronic devices." Neither the *Affidavit* nor the *Search Warrant* contain any specificity regarding the types of images or videos Hodivsky allegedly showed to the victim.[1] In order for the Search Warrant to comply with the strictures of the Fourth Amendment, it had to limit the scope of the search

---

[1] In fact, the statement in the *Affidavit* does not indicate whether the pornographic images were of adults or children. Irrespective of whether the images were of adults or children, there were offenses with which Hodivsky potentially could have been charged that would have been relevant to the use of a cell phone and provided the basis for a search warrant. *See*, *e.g.*, 13A-6-111, Ala. Code 1975.

to only those photographs which Hodivsky allegedly showed to the victim. Because the Search Warrant contained **no limitations of any kind**, it is facially invalid and all subsequent evidence must be suppressed.

**C.    Alternatively, the search of Hodivsky's cell phone plainly exceeded the scope of the Search Warrant, and any evidence that is not a photo or video actually stored on the cell phone should be suppressed.**

Assuming that (1) there was probable cause for issuance of the warrant; and (2) the warrant is sufficiently particular (neither of which Hodivsky concedes), the actual search of Hodivsky's cell phone clearly exceeded the scope of the Search Warrant, and therefore any evidence obtained that was not a photograph or a video **actually stored** on Hodivsky's phone is due to be suppressed.

"If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more." *Horton v. California*, 496 U.S. 128, 141, 110 S.Ct. 2301, 2310 (1990); *see also United States v. Jackson*, 120 F.3d 1226, 1228 (1997) (if a search exceeds the scope of terms of a warrant, any subsequent seizure is unconstitutional).

Here, assuming the Search Warrant is constitutionally valid, it authorized the police to search only a narrow subset of data on Hodivsky's phone, namely photographs and videos actually stored on the cell phone.[2] The Search Warrant did not authorize police to

---

[2] Hodivsky makes this argument out of caution. This is a strained interpretation of the Search Warrant, which gives substantial benefit of the doubt to law enforcement in terms of the breadth of the Warraent. The Search Warrant contains no clear limitation on the scope of data which can be extracted. The reference to photographs and videos is in Det.

search third party applications, "cloud based" applications, text messages, audio files, documents, or any other set of data or information on Hodivsky's cell phone.  After Detective Gleaton obtained the information from the Cellebrite extraction, all evidence was turned over to Agent Carolyn Middleton of the Federal Bureau of Investigation ("<u>Agent Middleton</u>" herein.)

According to her report, on March 20, 2019, Agent Middleton powered up Hodivsky's cell phone and began to examine third-party applications.  Specifically, Agent Middleton opened up the "*MEGA App"* which was contained on Hodivsky's cell phone and reviewed a Chat history.   <u>Agent Middleton obtained no search warrant for this examination</u>.  As result, the police the Cellebrite to extract ***all data and information on Hodivsky's cell phone***, including data and information which was located on a "cloud-based" application and not actually stored on Hodivsky's cell phone.  In discovery alone, the Government has already produced over 500 pages of information created by the Cellebrite program when the extraction was performed on Hodivsky's cell phone. Thus, not only did the police search the phone for images and videos stored on the phone – police searched every single aspect of the phone despite the limitation in the Search Warrant for "stored electronic data."  The MEGA App has been used by the Government for the purpose of issuing its *Superseding Indictment* in this case to include a charge for distribution of child pornography as well as advertising.  ECF Doc. 23. Assuming arguendo the Search Warrant is valid, it did not authorize a blanket extraction of all

---

Gleaton's *Affidavit*, but the Search Warrant contains no limitation on the types of data which were subject to search.

information on Hodivsky's cell phone. To the contrary, it was limited to images and videos *actually stored* on the cell phone.

The Cellebrite extraction and search of the MEGA App performed by the police plainly exceeded the scope of the Search Warrant, and therefore all evidence obtained in the unlawful execution of the Search Warrant is due to be suppressed.

**D.** **Evidence which is derivative of the unlawful search of Hodivsky's cell phone is also due to be suppressed.**

All of the "fruits" of the deficient Search Warrant should also be suppressed. "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search." *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (citations omitted.) Further, "the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Id.*

Here, all evidence found as a result of the Cellebrite extraction and physical examination of Hodivsky's cell phone must be suppressed. That is, every item of data produced by the Cellebrite extraction, including, without limitation, photos, videos, images, third party applications, cloud-based applications, and any other information obtained by reason of the unlawful search of Hodivsky's cell phone. The exclusion of evidence would also necessarily include any follow-up or ensuing searches of Hodivsky's cell phone, because any follow-up searches were necessarily predicated upon the results of the Cellebrite extraction of data from the cell phone.

### III.   **CONCLUSION**

For the foregoing reasons, Defendant Taras Hodivsky, Jr. respectfully moves the Court for an Order:

(A)    Suppressing all evidence obtained from the search of his cell phone, as well as any evidence that is derivative of this search, due to the lack of any nexus between the evidence sought and the offenses with which he was charged as of January 30, 2019, in violation of the Fourth Amendment;

(B)    Suppressing all evidence obtained from the search of his cell phone, as well as any and all evidence that is derivative of this search, due to the plain overbreadth of the Search Warrant in violation of the Fourth Amendment; or

(C)    Alternatively, suppressing all evidence which was obtained from the search of his cell phone that exceeded the scope of the Search Warrant by obtaining information which was not a "photo" or a "video" actually stored on Hodivsky's cell phone.

Respectfully submitted,


*/s/ D. Robert Stankoski, Jr.*
D. Robert Stankoski, Jr.
Attorney for Defendant
rob@stankoskimyrick.com
STA063


OF COUNSEL:

STANKOSKI MYRICK, LLC
Attorneys And Counselors
8335 Gayfer Road Extension
Post Office Box 529
Fairhope, Alabama 36533
251-928-0123 (o)
251-929-1000 (f)

CERTIFICATE OF SERVICE

I hereby certify that a complete copy of the foregoing has been furnished to the following counsel of record by electronic filing through the CM/ECF system, on this the 13th day of May, 2019 and has been served upon the following:


*Additional Counsel for Taras Hodivsky, Jr.*
Michael A. Pylant, Esq.
Post Office Box 1322
Fairhope, Alabama 36533



*Counsel for United States Attorney's Office*
Katherine Chappelear, Esq.
63 South Royal Street – Room 600
Mobile, Alabama 36602


*/s/ D. Robert Stankoski, Jr.*
D. Robert Stankoski, Jr.

| State of Alabama<br>Unified Judicial System<br><br>Form CR-1-a   Rev.2/95 | AFFIDAVIT IN SUPPORT OF<br>APPLICATION FOR SEARCH WARRANT | Case or<br>Warrant Number |
| --- | --- | --- |

IN THE _____Circuit/District_____ COURT OF _____Baldwin_____, ALABAMA
_(Circuit, District, or Municipal)_ _(Name of County or Municipality)_

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. ____Taras Hodivsky Jr.____
Defendant

After an Application for a Search Warrant was made or will be made to the Court, I, the undersigned, after being duly sworn to tell the truth and in support of the Application, hereby depose and say as follows:

I, Detective John Gleaton, am employed by the Summerdale Police Department, and have been a Law Enforcement Officer in State of Alabama for 30 years, and have investigated numerous cases involving sexual assault, child sexual abuse as well as crimes against persons. Due to my training, education and experience in sexual crimes against children, I have reason to believe that the evidence contained in the form of genetic material commonly known as DNA contained in a person's body is a unique method of identification that can be used as a known sample to match with evidence such as seminal fluid, hair, or epithelial skin cells that are found in the course of the commission of a sexual assault. Said evidence can be uniquely matched to the person who is the source of the evidence.

On January 17th 2019, in an interview at the Baldwin Child Advocacy Center, 7██████████related that she had numerous times been subjected to sexual contact by Taras Hodivsky Jr. in the shop area and other areas around the curtilage her residence at 17807 CR 28 in Summerdale. She described numerous times that she would go into the automotive shop of Mr Hodivsky, and that she was subjected to sexual contact. She described that this started while she was in kindergarden in the prevoius school year. The contact she described included oral genital, and vaginal contact that is likely and reasonable to expect to find bodily fluids containing genetic material in the areas that these crimes happened.

This Officer believes that a buccal swab of a known DNA sample from Mr. Hodivsky would tend to prove Mr. Hodivsky's involvement, or also exhonorate him as a suspect in this crime, and assist the State to bring the correct persons to justice for committing this crime.

_____
Affiant

Sworn to and subscribed before me on this the
__22__ day of ___Jan___ __2019__.

_____
Judge/Magistrate

EXHIBIT

A
_____

| State of Alabama<br>Unified Judicial System<br><br>Form CR-1-a    Rev.2/95 | AFFIDAVIT IN SUPPORT OF<br>APPLICATION FOR SEARCH WARRANT | Case or<br>Warrant Number |
| --- | --- | --- |

IN THE ___Circuit/District___    COURT OF ___Baldwin___    | ALABAMA
    *(Circuit, District, or Municipal)*                *(Name of County or Municipality)*

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____    v.    ___Taras Hodivsky Jr.___
                                                                          *Defendant*

        After an Application for a Search Warrant was made or will be made to the Court, I, the undersigned, after being duly sworn to tell the truth and in support of the Application, hereby depose and say as follows:

I, Detective John Gleaton, am employed by the Foley Police Department, and have been a Law Enforcement Officer in the State of Alabama for 30 years, and have investigated numerous cases involving sexual assault, child abuse and other crimes against children. Due to my training education and experience, I have reason to believe that the evidence contained in genetic material commonly known as DNA contained in a person's body is a unique method of identification that can be used as a known sample to match with evidence such as seminal fluid, hair, or epithelial skin cells that are found in the course of the commission of a sexual assault. Said evidence can be uniquely matched to the person who is the source of the evidence.

In the investigation of serial child molestation and sexual abuse, it is commonly recognized that serial child molesters tend to keep or retain items to remember their victims, they also when victimizing young children use pornography to desensitize or "groom" their victims to the sexual activity that otherwise would be foreign to the children.

On January 17th 2019, in an interview at the Baldwin Child Advocacy Center, 7 year old ▬▬▬▬▬ related that she had numerous times been subjected to sexual contact by Taras Hodivsky Jr. in the shop area and other areas around the curtilage her residence at 17807 CR 28 in Summerdale. She described numerous times that she would go into the automotive shop of Mr Hodivsky, and that she was subjected to sexual contact. She described that this started while she was in kindergarden in the prevoius school year. The contact she described included oral genital, and vaginal contact that is likely and reasonable to expect to find bodily fluids containing genetic material in the areas that these crimes happened. She also described being shown pornographic pictures or movies depicting sexual acts on his phone. Digital devices that are used to view such material often retain remnants of the images, evidence of the time and the videos viewed on the device.

This Officer believes that a search of this property belonging to Mr. Hodivsky would tend to prove the allegations made by the victim in this case, or could also exhonorate him as a suspect in this crime, and assist the State to bring the correct person to justice for committing this crime.

_____
                                 *Affiant*

Sworn to and subscribed before me on this the
__22__ day of __Jan__, __2019__.

_____
       *Judge/Magistrate*

**EXHIBIT**

**B**

| State of Alabama Unified Judicial System | **SEARCH WARRANT** | Case or Warrant Number |
|---|---|---|
| Form CR-1-b    Rev. 4/99 | | |

IN THE _____ Circuit/District _____ COURT OF _____ Baldwin _____, ALABAMA
(Circuit, District, or Municipal)                    (Name of County or Municipality)

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. _____ Taras Hodivsky Jr. _____
                                                      Defendant

TO ANY LAW ENFORCEMENT OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:

On this day, _____ Detective John Gleaton _____, proved that he (she) has
                                        (Name)

probable cause to believe and does believe that (Description of property to be searched for)

The person of Taras Hodivsky Jr. contains unique genetic material that if analyzed, would be a basis of comparison with

the genetic material recovered from the samples taken from the residence of ████████ who claims that

Taras Hodivsky Jr. has committed the crime of Rape 1st Degree.

This genetic material _____ is presently located or concealed in or upon (Description of the person,

place, premises and/or vehicle to be searched)

Taras Hodivsky's Person and can be collected with a minimally invasive buccal swab of his mouth, collecting a small amount

of DNA material contained in his saliva.

_____

_____

The property (Check applicable ground(s):

☐ was, or is expected to be, unlawfully obtained;

☐ was, or is expected to be, used as the means of committing or attempting to commit an offense contrary to the laws
   of the State of Alabama or a political subdivision thereof, to-wit: _____

☐ is, or is expected to be, in the possession of another with intent to use it as a means of committing a criminal offense,
   or is, or is expected to be, in the possession of another to whom it was delivered for the purpose of concealing it or
   preventing its discovery;

☑ constituted, or is expected to constitute, evidence of a criminal offense under the laws of the State of Alabama or a
   political subdivision thereof, to-wit:: Rape 1st degree, 13a-6-61, or Sexual abuse of a child less than 12 13a-6-69.1

NOW, THEREFORE, by virtue of the authority given to me by Rule 3, Alabama Rules of Criminal Procedure
(Ala.R.Crim.P.), you are hereby commanded to make a search of the above-described person or premises ☑ IN THE
DAYTIME ☐ AT ANYTIME OF THE DAY OR NIGHT and within __10__ days (not to exceed 10 days) in
Baldwin County ____, Alabama, for the above-described personal property and to make due return
of this Warrant, along with an inventory of any property seized, to the undersigned as required by Rule 3, Ala.R.Crim.P.

ISSUED to _John Gleaton_____ at _0900_ o'clock ____. M. on this

the _22_ day of _JAN_ 2019.

CIRCUIT COURT
BALDWIN COUNTY, AL
FILED - FAIRHOPE

JAN 30 2019

JODY W. CAMPBELL
CIRCUIT CLERK

_____
Judge/Magistrate

**EXHIBIT**

C

| State of Alabama<br>Unified Judicial System<br><br>Form CR-1-c    Rev. 2/95 | SEARCH WARRANT RETURN<br>AND INVENTORY | Case or<br>Warrant Number |
|---|---|---|

IN THE ___Circuit/District___ COURT OF _____Baldwin_____ , ALABAMA
    (Circuit, District, or Municipal)     (Name of County or Municipality)

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____     v.     ___Taras Hodivsky Jr.___
    Defendant

---

### RETURN UPON EXECUTION

I certify that I executed the attached Search Warrant as directed therein by searching the person, place, premises and/or vehicles described therein at __12 45__ o' clock __P M__ M. on the __22th__ day of __January__, __2019__, and (Check One)

☐ did not find or seize any property located thereon or therein.

☑ found and seized the following described property:

    1 Buccal Swab containing
    DNA / Genetic Material

I further certify that a copy of the Search Warrant, along with an endorsed copy of the inventory of property seized, was left with or served upon ___Taras Hodivsky Jr.___ in accordance with Rule 3, Ala.R.Crim.P.

_____     ___Summerdale Police Department___
Signature of Executing Officer     Agency of Executing Officer

---

### ACKNOWLEDGMENT OF RETURN

I, the undersigned Judge/Magistrate, certify that the foregoing return was made to me by ___John Gleaton___ on the __3 0__ day of __January__, __2019__.

_____
Judge/Magistrate

### ORDER

The Court hereby directs that this Search Warrant be filed with the Clerk of the Court of _____ as required by Rule 3, Ala.R.Crim.P.

_____     _____
Date     Judge/Magistrate

---

**EXHIBIT**

**D**

DOCUMENT 1
Case 1:19-cr-00080-KD-B   Document 322-2 Filed 05/13/23 Page 43 of 257   PageID 57
Case: 19-14844   Date Filed: 08/10/2020   Page: 43 of 257

19.755

W A R R A N T

STATE OF ALABAMA          BALDWIN COUNTY          DISTRICT COURT
AGENCY NUMBER:                    WARRANT NUMBER: WR 2019 800073.00
                                  OTHER CASE NBR:

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:          DC19-502
YOU ARE HEREBY COMMANDED TO ARREST   TARAS HODIVSKY JR   AND BRING
HIM/HER BEFORE THE DISTRICT  COURT OF BALDWIN COUNTY TO ANSWER THE STATE
OF ALABAMA ON A CHARGE(S) OF:
                RAPE 1ST DEGREE   CLASS: A  TYPE: F  COUNTS: 001
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN  THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_____ DAY OF _____ _____, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 22 DAY OF JANUARY, 2019.

BOND SET AT: (1) _____        BOND TYPE:

JUDGE/CLERK/MAGISTRATE OF DISTRICT  COURT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
CHARGES: RAPE 1ST DEGREE        13A-006-061            F  FELONY
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
NAME: TARAS HODIVSKY JR              ALIAS:
ADDRESS: 15394 HEARTHSTONE DR        ALIAS:
ADDRESS:
CITY: FOLEY              STATE: AL    ZIP: 36535 0000
                                     PHONE: 000 000 0000 EXT: 000

EMP:
DOB: ████████████          RACE: W    SEX: M    HAIR: BLN
EYE: BLU  HEIGHT: 6'00"  WEIGHT: 230
SID: 000000000   SSN: ██████████    DL NUM: ██████████
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                     E X E C U T I O N

   EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND
   (X)  PLACING DEFENDANT IN THE BALDWIN COUNTY JAIL
   ( )  RELEASING DEFENDANT ON APPEARANCE BOND


THIS ___22___ DAY OF ___January___ ___2019___

          SHERIFF
          BY

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
COMPLAINANT:  DET JOHN GLEATON
              SUMMERDALE PD
              502 WEST LEE STREET
              SUMMERDALE  AL  36580

OPERATOR: BRV      DATE: 01/22/2019

**EXHIBIT**

E

CIRCUIT COURT
BALDWIN COUNTY, AL
FILED
JAN 23 2019

JODY W. CAMPBELL
CIRCUIT CLERK

RECEIVED
JAN 23 2019
BALDWIN COUNTY
SHERIFF'S OFFICE

# W A R R A N T

STATE OF ALABAMA          BALDWIN COUNTY          DISTRICT  COURT

AGENCY NUMBER:                         WARRANT NUMBER: WR 2019 800074.00
                                       OTHER CASE NBR:  DC19-503

TO ANY LAWFUL OFFICER OF THE STATE OF ALABAMA:
YOU ARE HEREBY COMMANDED TO ARREST   TARAS HODIVSKY JR   AND BRING
HIM/HER BEFORE THE DISTRICT  COURT OF BALDWIN COUNTY TO ANSWER THE STATE
OF ALABAMA ON A CHARGE(S) OF:
                 SEX ABUSE-CHILD LESS   CLASS: B   TYPE: F   COUNTS: 001
AND HAVE YOU THEN AND THERE THIS WRIT WITH YOUR RETURN THEREON.

YOU WILL RECEIVE UNTO YOUR CUSTODY AND DETAIN HIM/HER UNTIL THE
_____ DAY OF _____ _____, OR UNTIL LEGALLY DISCHARGED.

DATED THIS 22 DAY OF JANUARY, 2019.

BOND SET AT: (1) _____   BOND TYPE:

_____
JUDGE/CLERK/MAGISTRATE OF DISTRICT  COURT

CHARGES: SEX ABUSE-CHILD LESS  13A-006-069.1          F  FELONY

NAME: TARAS HODIVSKY JR              ALIAS:
ADDRESS: 15394 HEARTHSTONE DR        ALIAS:
ADDRESS:
CITY: FOLEY              STATE: AL    ZIP: 36535 0000
                                     PHONE: 000 000 0000 EXT: 000

EMP:
DOB: ████████          RACE: W   SEX: M      HAIR: BLN
EYE: BLU  HEIGHT: 6'00"   WEIGHT: 230
SID: 000000000   SSN: █████████   DL NUM: █████████

# E X E C U T I O N

EXECUTED THE WITHIN WARRANT BY ARRESTING THE DEFENDANT AND
(X)   PLACING DEFENDANT IN THE BALDWIN COUNTY JAIL
( )   RELEASING DEFENDANT ON APPEARANCE BOND

_____

THIS   22   DAY OF   January          2019

                    SHERIFF _____

                    BY _____

                                       CIRCUIT COURT
                                       BALDWIN COUNTY, AL
                                       FILED

                                       JAN 25 2019

                                       JODY W. CAMPBELL
                                       CIRCUIT CLERK

COMPLAINANT:  DET JOHN GLEATON
              SUMMERDALE PD
              502 WEST LEE STREET
              SUMMERDALE  AL  36580

OPERATOR: BRV      DATE: 01/22/2019

**EXHIBIT**

**F**

exhibitsticker.com

RECEIVED

JAN 23 2019

BALDWIN COUNTY
SHERIFF'S OFFICE

| State of Alabama<br>Unified Judicial System<br><br>Form CR-1-a    Rev.2/95 | AFFIDAVIT IN SUPPORT OF<br>APPLICATION FOR SEARCH WARRANT | Case or<br>Warrant Number |
|---|---|---|

IN THE _____ Circuit/District _____ COURT OF _____ Baldwin _____, ALABAMA
    *(Circuit, District, or Municipal)*               *(Name of County or Municipality)*

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. _____ Taras Hodivsky Jr. _____
                                                           Defendant

        After an Application for a Search Warrant was made or will be made to the Court, I, the undersigned, after being duly sworn to tell the truth and in support of the Application, hereby depose and say as follows:

I, Detective John Gleaton, am employed by the Summerdale Police Department, and have been a Law Enforcement Officer in State of Alabama for 30 years, and have investigated numerous cases involving sexual assault, child sexual abuse as well as crimes against persons. Due to my training, education and experience in sexual crimes against children, I have reason to believe that the evidence contained in the form stored electronic data is contained on the listed items. Said data stays on the devices and is difficult to remove due to the methods of electronic data storage and deleting a data file does not insure it's destruction. Additionally electronic devices store many forms of information such as images, video, and location data in the normal use of said device. Recent Supreme court cases cite the enormity of personal information found on such devices and now require a search warrant to examine any such device due to people placing so much information on these devices.

On January 17th 2019, in an interview at the Baldwin Child Advocacy Center, 7 year old [redacted] related that she had numerous times been subjected to sexual contact by Taras Hodivsky Jr. in the shop area and other areas around the curtilage of her residence at 17807 CR 28 in Summerdale. She described numerous times that she would go into the automotive shop of Mr Hodivsky, and that she was subjected to sexual contact. Additionally the victim told of pornographic images or video shown to her by the defendant on his cell phone. These images if displayed on an electronic device would likely still be present on the device.

This Officer believes that a forensic examination of the electronic devices obtained from Mr. Hodivsky would tend to prove Mr. Hodivsky's involvement, or could possibly also exhonorate him as a suspect in this crime, and assist the State to bring the correct persons to justice for committing this crime.

_____
Affiant

Sworn to and subscribed before me on this the
30 day of _____, 2019

_____
Judge/Magistrate

**EXHIBIT**

**G**

exhibitsticker.com

CIRCUIT COURT
BALDWIN COUNTY, AL
FILED - FAIRHOPE

FEB 0 6 2019

JODY W. CAMPBELL
CIRCUIT CLERK

| State of Alabama Unified Judicial System<br><br>Form CR-1      Rev. 4/99 | APPLICATION FOR SEARCH WARRANT | Case or Warrant Number |
| --- | --- | --- |

IN THE ___Circuit/District___ COURT OF ___Baldwin County___, ALABAMA
    *(Circuit, District, or Municipal)*      *(Name of County or Municipality)*

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. ___Taras Hodivsky Jr.___
                                                             Defendant

I, the undersigned, hereby make application for the issuance of a search warrant as I have probable cause to believe and do believe that the following personal property, to-wit: (Fully describe property) The cell phone of Taras Hodivsky Jr. containing stored electronic data, evidence of the crimes alleged in this case. Electronic devices store images and videos and would also show any of the the stored pornographic images that were said to have been shown to the victim by the defendant. This phone a samsung galaxy s9 phone number 251-979-5348 is located or concealed in or upon (Fully describe person, place, premises, and / or vehicle to be searched) the evidence locker at the Summerdale Police Department where it was placed following his arrest pursuant to the previously issued search warrant that described digital media of the defendant.

and that the property (check appropriate ground(s):

☐ was, or is expected to be, unlawfully obtained;

☐ was, or is expected to be, used as the means of committing or attempting to commit an offense contrary to the laws of the State of Alabama or political subdivision thereof, to-wit:_____

☐ is, or is expected to be, in the possession of another with intent to use it as a means of committing a criminal offense, or is, or is expected to be, in the possession of another to whom it was delivered for the purpose of concealing it or preventing its discovery:

☑ Constitutes, or is expected to constitute, evidence of a criminal offense under the laws of the State of Alabama or a political subdivision thereof, to -wit: Rape 1st Degree, 13a-6-61, and/or Sexual abuse of a child less than 12 years old, 13-6-69.1

Applicant states that his (her) request is based upon the facts stated in the affidavit(s) attached hereto.

_1 - 30 - 2019_
Date

_[signature]_
Applicant

**EXHIBIT**

**H**

CIRCUIT COURT
BALDWIN COUNTY, AL
FILED - FAIRHOPE

FEB 06 2019

JODY W. CAMPBELL
CIRCUIT CLERK

| State of Alabama<br>Unified Judicial System<br><br>Form CR-1-b    Rev. 4/99 | SEARCH WARRANT | Case or<br>Warrant Number |
|---|---|---|

IN THE ___Circuit/District___ COURT OF ___Baldwin___, ALABAMA
    (Circuit, District, or Municipal)    (Name of County or Municipality)

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. ___Taras Hodivsky Jr.___
                                        Defendant

**TO ANY LAW ENFORCEMENT OFFICER AUTHORIZED TO EXECUTE THIS WARRANT:**
On this day, ___Detective John Gleaton___, proved that he (she) has
                                (Name)

probable cause to believe and does believe that (Description of property to be searched for)
The cell phone of Taras Hodivsky Jr. containing stored electronic data, evidence of the crimes alleged in this case.
Electronic devices store images and videos and would also show any of the the stored pornographic images that were said
to have been shown to the victim by the defendant.  This phone
a samsung galaxy s9 phone number 251-979-5348    is presently located or concealed in or upon (Description of the person,
place, premises and/or vehicle to be searched)
the evidence locker at the Summerdale Police Department  where it was placed following his arrest pursuant
to the previously issued search warrant that described digital media of the defendant.
_____
_____

The property (Check applicable ground(s):
  ☐ was, or is expected to be, unlawfully obtained;
  ☐ was, or is expected to be, used as the means of committing or attempting to commit an offense contrary to the laws
     of the State of Alabama or a political subdivision thereof, to-wit: _____
  ☐ is, or is expected to be, in the possession of another with intent to use it as a means of committing a criminal offense,
     or is, or is expected to be, in the possession of another to whom it was delivered for the purpose of concealing it or
     preventing its discovery;
  ☑ constituted, or is expected to constitute, evidence of a criminal offense under the laws of the State of Alabama or a
     political subdivision thereof, to-wit:: Rape 1st degree, 13a-6-61, or Sexual abuse of a child less than 12 13a-6-69.1

    NOW, THEREFORE, by virtue of the authority given to me by Rule 3, Alabama Rules of Criminal Procedure
(Ala.R.Crim.P.), you are hereby commanded to make a search of the above-described person or premises ☑ IN THE
DAYTIME ☐ AT ANYTIME OF THE DAY OR NIGHT and within ___10___ days (not to exceed 10 days) in
___Baldwin County___, Alabama, for the above-described personal property and to make due return
of this Warrant, along with an inventory of any property seized, to the undersigned as required by Rule 3, Ala.R.Crim.P.
    ISSUED to ___John Gleston___ at ___093ᴼ___o'clock ___ M. on this
the ___30___ day of ___JAN___ ___2019___

CIRCUIT COURT
BALDWIN COUNTY, AL
FILED - FAIRHOPE

FEB 0 6 2019

_____
Judge/Magistrate

JODY W. CAMPBELL
CIRCUIT CLERK

EXHIBIT

I

| State of Alabama<br>Unified Judicial System<br><br>Form CR-1-c    Rev. 2/95 | SEARCH WARRANT RETURN<br>AND INVENTORY | Case or<br>Warrant Number |
|---|---|---|

IN THE ___Circuit/District___ COURT OF _____Baldwin_____, ALABAMA
     (Circuit, District, or Municipal)               (Name of County or Municipality)

☑ STATE OF ALABAMA
☐ MUNICIPALITY OF _____ v. _____Taras Hodivsky Jr._____
                                               Defendant

### RETURN UPON EXECUTION

I certify that I executed the attached Search Warrant as directed therein by searching the person, place, premises and/or vehicles described therein at __2:35__ o'clock __P__ M. on the __5th__ day of __February__, __2019__, and (Check One)

☐ did not find or seize any property located thereon or therein.

☑ found and seized the following described property:

*Digital Evidence of child and Adult Pornography images and video on the phone*

I further certify that a copy of the Search Warrant, along with an endorsed copy of the inventory of property seized, was left with or served upon ___Mr. Taras Hodivsky, through Atty Michael Flood___ in accordance with Rule 3, Ala.R.Crim.P.

_____             ___Scottsdale Police Department___
Signature of Executing Officer            Agency of Executing Officer

### ACKNOWLEDGMENT OF RETURN

I, the undersigned Judge/Magistrate, certify that the foregoing return was made to me by ___John Gleston___ on the __6__ day of __Feb__, __2019__

_____
Judge/Magistrate

### ORDER

The Court hereby directs that this Search Warrant be filed with the Clerk of the _____ Court of _____ as required by Rule3, Ala.R.Crim.P.

_____         _____
Date                             Judge/Magistrate

**EXHIBIT**

**J**

CIRCUIT COURT
BALDWIN COUNTY, AL
FILED - FAIRHOPE

FEB 0 6 2019

JODY W. CAMPBELL
CIRCUIT CLERK

DOC 57

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| vs. | ) | CRIMINAL ACTION 19-00080-KD-N |
| | ) | |
| TARAS HODIVSKY, JR., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**ORDER DENYING MOTION TO SUPPRESS (DOC. 37)**</u>

This matter is before the Court on Defendant Taras Hodivsky, Jr.'s motion to suppress and the Government's response in opposition. After a careful review of the briefs, and with the benefit of a hearing on the motion, the Hodivsky's motion to suppress (Doc. 37) is **DENIED** for reasons stated on the record at the end of the hearing. Below, the Court provides a written summary of the ruling.

**I.      BACKGROUND**

A superseding indictment was filed against Hodivsky charging him with three counts: the making, printing, and publishing of notices and advertisements seeking or offering to receive child pornography in violation of 18 U.S.C. § 2251(d) (Count 1); distribution and attempted distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2) and (b) (Count 2); and the possession of material which contains an image of child pornography that had been shipped or transported using any means and facility of interstate and foreign commerce and was produced using materials that had affected interstate and foreign commerce in violation of 18 U.S.C. § 2252A(a)(5)(B) (Count 3). (Doc. 23). Hodivsky entered a plea of not guilty. (Doc. 28).

Hodivsky has moved to suppress evidence discovered as a result of a search of his cell phone, a Galaxy S9. (Doc. 37). Two warrants were applied for and issued in connection with the

1

cell phone. The first application is dated January 22, 2019. (Suppression Hearing, Defendant's Exhibit 1).  It applied for a search warrant to seize "digital devices such as phones, computers, digital storage devices, such as sd cards or micro sd cards that could contain pornographic images . . . ." Baldwin County District Judge William E. Scully, Jr. signed and issued this warrant to search specified property of Taras Hodivsky, Jr. for, among other items, the cell phone. The second warrant was dated January 30, 2019. (Suppression Hearing, Def.'s Ex. 3). In the second application, Detective John Gleaton of the Summerdale Police Department applied for a warrant to search "[t]he cell phone of Taras Hodivsky[,] Jr. containing stored electronic data . . . ." (Def.'s Ex. 3 at 1).  This warrant was also issued by Judge Scully.

The basis for the search and seizure of the cell phone derived from statements the alleged minor victim provided during the course of a forensic interview conducted on or about January 17, 2019. During the course of the forensic interview, according to Gleaton, the alleged victim relayed that during or around the time when Hodivsky would allegedly make sexual contact with her, Hodivsky would show her pornographic images or videos on his cell phone. In the second warrant application, Gleaton relayed that the alleged victim described "being shown pornographic pictures or movies depicting sexual acts on [Hodivsky's] phone." (Ex. 1 at 2). And the affidavit Gleaton submitted in support of his application for the second warrant relayed that "the [alleged] victim told of pornographic images or video shown to her by the defendant on his cell phone. These images[,] if displayed on an electronic device[,] would likely still be present on the device." (Ex. 3 at 2).

## II.     OVERVIEW OF THE ARGUMENTS

Hodivksy has moved to suppress the evidence discovered during law enforcement's search of the phone on several bases. He argues that (1) the search warrant failed to establish probable

cause because it did not provide a nexus (i.e., a link) between the elements of the offenses listed on the warrant applications and the data located on the cell phone; (2) the search warrant is overbroad (not sufficiently particular) because it permitted a search of the entire cell phone; and (3) law enforcement exceeded the search warrant's scope by going beyond what was "actually stored" on the phone, (Doc. 37 at 13), to search the contents of a third-party application—the MEGA App.

The Government disagrees with each of Hodivsky's arguments. And, in any event, it argues (persuasively) that even if Hodivksy successfully challenged the warrant's probable cause, the good faith exception established in United States v. Leon, 468 U.S. 897 (1984), would not require the evidence to be suppressed.

## III.    ANALYSIS

### a.  The nexus requirement is satisfied.

Hodvisky contends the warrant was not supported by probable cause because it failed to establish a nexus between his cell phone and the elements of the crimes listed in the search warrant's application. The application for both warrants listed only two offenses: First Degree Rape, in contravention of Alabama Code 13A-6-61, and Sexual Abuse of a Child Less Than 12 Years Old, in violation of Alabama Code 13A-6-69.1. Hodivsky maintains that since showing pornographic images and videos to a minor does not support an element of either crime, the requisite nexus was not established. (Doc. 37 at 7–8).

The Court is unpersuaded. "A sufficient basis for probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Noriega, 676 F.3d 1252, 1261 (11th Cir. 2012) (quoting United States v. Lopez, 649 F.3d 1222, 1245 (11th Cir. 2011)). The Fourth

3

Amendment also requires "a nexus between the item to be seized . . . and criminal behavior." Warden v. Hayden, 387 U .S. 294, 307 (1967); see also United States v. Payne, 341 F.3d 393, 400 (5th Cir. 2003) ("Facts in the affidavit must establish a nexus between the house [or item] to be searched and the evidence sought."). To establish a nexus in cases where the evidence sought is not contraband or a fruit or instrumentality of a crime, an affidavit or application must demonstrate that "the evidence sought will aid in a particular apprehension or conviction." Id.

The alleged child victim stated that Hodivksy showed her photos and videos on his phone and, based on the child's description, the officers believed that the photos were of children engaged in sexual activity. Accordingly, evidence of child pornography on the Hodivsky's phone would corroborate the child's statement of how the abuse occurred. Moreover, it is evidence of a defendant's effort to "groom" the child so that the abuse could occur with less resistance. Thus, the pornography was evidence of the crime of child abuse, as it is alleged to have occurred in this case.

Hodivsky relies heavily on two non-binding cases for support: United States v. Golden and United States v. Oglesby. Both are distinguishable. In Oglesby, the search warrant affidavit failed to contain any connection to the alleged crime of vehicle burglary and the cell phone for which a warrant was issued. Indeed, the Oglesby court observed that "[n]othing about vehicle burglary is 'sufficiently linked' to the various categories of data described in the warrant. Certainly, no connection is explicated in the affidavit or the warrant. The conduct described in the affidavit does not inherently implicate the use of a cell phone." 2019 WL 1877228, at *9 (S.D. Tex. Apr. 26, 2019). The statements the affiant made in support of the search warrant in Oglesby boiled down to the following: the affiant believed evidence of the vehicle burglary would be located on the phone because lots of people use cell phones and it is common for criminal suspects to

4

communicate regarding their criminal acts. The Oglesby court suppressed the contents discovered from the phone's search, holding that the "affidavit's generalizations about cell phone use [did not] even name the offense being investigated—much less provide any kind of connection between that specific offense and the use of a cell phone." Oglesby, 2019 WL 1877228, at *5. The same cannot be said for the search warrant application challenged in this case. Here, the search warrant affidavit linked Hodivsky's cell phone with the crimes alleged by explicitly relaying the alleged victim's interview statement that Hodivsky showed her pornographic material around the same time he sexually abused her. If pornographic material was uncovered during a search of the phone, the evidence would corroborate the minor's statements and thus crucial facts supporting the alleged abuse of the alleged victim.

Hodivsky relies on Golden for the proposition that the link or nexus must specifically relate to elements of the crimes listed in the warrant application. See (Doc. 37 at 6 (citing United States v. Golden, 2012 WL 4936515, at *3–4 (M.D. Ala. June 21, 2012), report and recommendation adopted, 2012 WL 4936512 (M.D. Ala. Oct. 17, 2012), aff'd, 545 Fed. App'x 920 (11th Cir. 2013))). That is, however, not the rule. Instead, the rule is that "valid warrants may be issued to search any property . . . at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found." Zurcher v. Stanford Daily, 436 U.S. 547, 554 (1978) (emphasis omitted). Although pornography on Hodivsky's phone could not necessarily be categorized as a fruit or instrumentality of the two crimes listed (assuming it was not child pornography), it *would be* evidence of the crimes listed because its existence corroborates the alleged victim's statement that he showed her pornographic material prior to subjecting her to sexual activity.

5

b. **The warrant was not overbroad[1] and law enforcement did not exceed the search warrant's scope by searching the MEGA App.**

Hodivsky also argues that, even assuming probable cause supported the warrant, the warrant was overbroad because it did not limit the areas of the phone to be searched. However, as explained at the hearing, the images and videos that were allegedly shown the minor could possibly be found in all areas of the phone's stored memory, e.g. emails, apps, photos, and texts. Accordingly, the warrant was not deficient for failing to specify which areas of the phone could be searched.

In the alternative, Hodivsky argues that law enforcement exceeded its scope by searching the MEGA App. He argues the search warrant authorized a search of photographs and videos "actually stored" on the phone, (Doc. 37 at 13), but not third-party applications or cloud-based storage.

The search warrant allowed law enforcement to search for images and videos of pornography stored on the cell phone. Credible testimony at the hearing established that images and videos can be found at many locations in a cell phone, including in the MEGA App. In this case, once the phone was seized, airplane mode was activated. This activation prevented the transmission and receipt of live data. In other words, the data searched on the phone was only the data that was stored on the device, not data stored in the cloud or elsewhere. Accordingly, law

---

[1] During the motion hearing, Hodivsky also argued that the second warrant application failed to specify the time frame during which Hodivsky allegedly showed the alleged victim the pornography or when the videos and images were taken. Although Hodivsky argued that this shows a lack of particularity in the search warrant, the Court understands it as a staleness argument. That is, the affidavit failed to specify when Hodivsky allegedly showed the images to the alleged minor victim. Therefore, there was no basis (i.e., probable cause) to believe that images could still be located on the phone. As the Court noted at the hearing, a time frame in the second warrant application should have been included. However, considering the fact that people routinely store images on their phones for long periods of time, and that the alleged victim was only six years old, it could easily be inferred that the images would continue to be on the phone. And while not repeated in the second warrant application, Judge Scully was informed in the first warrant application that the contact the child had with Hodivsky had occurred during the previous school year. (Def.'s Ex. 1 at 2).

6

enforcement did not exceed the search warrant's scope when they searched the MEGA App for images and videos stored therein. Moreover, prior to searching the MEGA App, officers had found child pornography in other parts of the phone with a file path description of MEGA. This reasonably led the officers to believe that images and videos could be also be found in the MEGA App.

The fact that law enforcement found additional evidence, i.e., chats and links, when searching for the images does not provide a basis for suppressing the chats and link evidence. It is akin to being lawfully in a room searching a drawer for the gun used in a murder and finding bloody clothes. Law enforcement could seize the bloody clothes just as they seized the chats and links in this case. This is because "[e]vidence not described in a valid search warrant but having a nexus with the crime under investigation may be seized at the same time the described evidence is seized." United States v. Kane, 450 F.2d 77, 85 (5th Cir. 1971)[2]; see also Garland v. Maggio, 717 F.2d 199, 206 (5th Cir. 1983) ("[P]roperty which has a sufficient nexus to the crime being investigated may be seized at the time officers are properly executing a warrant authorizing a search for other items.").

The stored electronic data in the MEGA App consisted of links and passwords. The passwords and links connected to images, videos, and locations where images and videos were located. But the links and passwords still constituted electronic data. And therefore, the search did not exceed the search warrant's scope.

> **c. Even if the warrant lacked probable cause or was overbroad, Leon's good faith exception applies.**

The Eleventh Circuit has observed that:

---

[2] Decisions the former Fifth Circuit handed down before October 1, 1981 are binding on the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

> United States v. Leon, 468 U.S. 897, 922, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984),
> stands for the principle that courts generally should not render inadmissible
> evidence obtained by police officers acting in reasonable reliance upon a search
> warrant that is ultimately found to be unsupported by probable cause. The Leon
> good faith exception applies in all but four limited sets of circumstances. Id. at 923,
> 104 S. Ct. 3405. The four sets of circumstances are as follows: (1) where "the
> magistrate or judge in issuing a warrant was misled by information in an affidavit
> that the affiant knew was false or would have known was false except for his
> reckless disregard of the truth"; (2) "where the issuing magistrate wholly
> abandoned his judicial role in the manner condemned in" Lo–Ji Sales, Inc. v. New
> York, 442 U.S. 319, 99 S. Ct. 2319, 60 L. Ed. 2d 920 (1979); (3) where the affidavit
> supporting the warrant is "so lacking in indicia of probable cause as to render
> official belief in its existence entirely unreasonable"; and (4) where, depending
> upon the circumstances of the particular case, a warrant is "so facially deficient—
> i.e., in failing to particularize the place to be searched or the things to be seized—
> that the executing officers cannot reasonably presume it to be valid." Id. (internal
> quotation marks omitted).

United States v. Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). The good faith exception also

applies "to a search conducted pursuant to an overly broad warrant." United States v. Travers, 233

F.3d 1327, 1330 (11th Cir. 2000).

Based on the facts and circumstances of this case, the Court cannot conclude that any of

the four recognized exceptions to Leon apply in this case. Specifically addressing Hodivsky's

arguments to the contrary, it cannot be said that the affidavit supporting the search warrant so

lacked in indicia of probable cause that it rendered official belief in its existence unreasonable.

Neither was the warrant itself so unparticularized that the executing officers could not reasonably

presume that it was valid. Accordingly, even if probable cause did not support the warrant and

even if the warrant was overbroad, the good faith exception applies.

## IV.    CONCLUSION

For all of the foregoing reasons, Hodivsky's motion to suppress is **DENIED**.

8

**DONE** and the 21st day of June 2019.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**

9

DOC 59

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   **CRIMINAL NO. 19-00080-KD** |
| | ) |
| TARAS HODIVSKY JR. | ) |

### FED. RULE 11(c)(1)(C) PLEA AGREEMENT

The defendant, **TARAS HODIVSKY JR.** represented by his counsel, and the United

States of America have reached a plea agreement in this case, pursuant to **Rule 11(c)(1)(C)** of

the Federal Rules of Criminal Procedure, the terms and conditions of which are as follows:

### RIGHTS OF THE DEFENDANT

1.    The defendant understands his rights as follows:

    a.    To be represented by an attorney;

    b.    To plead not guilty;

    c.    To have a trial by an impartial jury;

    d.    To confront and cross-examine witnesses and to call witnesses and

        produce other evidence in his defense; and

    e.    To not be compelled to incriminate himself.

### WAIVER OF RIGHTS AND PLEA OF GUILTY

2.    The defendant waives rights b through e, listed above, and pleads guilty to Count

One of the Indictment, charging a violation of Title 18, United States Code,

Section 2251 (d), Advertising of Child Pornography, and Count Three of the

1

Indictment, charging a violation of Title 18, United States Code, Section 2252A(a)(5)(B), Possession of Child Pornography.

3.  The defendant understands that the statements he makes under oath in the plea of guilty must be completely truthful and that he can be prosecuted for making false statements or perjury, or receive a perjury enhancement at sentencing, for any false statements he makes intentionally in this plea of guilty.

4.  The defendant expects the Court to rely upon his statements here and his response to any questions that he may be asked during the guilty plea hearing.

5.  The defendant is not under the influence of alcohol, drugs, or narcotics. He is certain that he is in full possession of his senses and is mentally competent to understand this Plea Agreement and the guilty plea hearing which will follow.

6.  The defendant has had the benefit of legal counsel in negotiating this Plea Agreement. He has discussed the facts of the case with his attorney, and his attorney has explained to the defendant the essential legal elements of the criminal charge which has been brought against him. The defendant's attorney has also explained to the defendant him understanding of the United States' evidence and the law as it relates to the facts of his offense.

7.  The defendant understands that the United States has the burden of proving each of the legal elements of the criminal charge beyond a reasonable doubt. The defendant and his counsel have discussed possible defenses to the charge. The defendant believes that his attorney has represented him faithfully, skillfully, and diligently, and he is completely satisfied with the legal advice of his attorney.

2

8.  Defendant recognizes that pleading guilty may have consequences with respect to immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including the offense(s) to which he is pleading guilty. Removal and other immigration consequences are the subject of a separate proceeding, however, and the defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

9.  A separate document, entitled Factual Resume, will be submitted to the Court as evidence at the guilty plea hearing. The Factual Resume is incorporated by reference into this Plea Agreement. The defendant and the United States agree that the Factual Resume is true and correct. Alterations to the Plea Agreement or Factual Resume initialed only by the defendant and his counsel are not part of this agreement and are not agreed to by the United States.

10.  This plea of guilty is freely and voluntarily made and is not the result of force, threats, promises, or representations, apart from those representations set forth in this Plea Agreement. The defendant is pleading guilty because he is guilty.

11.  The defendant also knowingly and voluntarily waives all rights, whether asserted directly or through a representative, to receive from the United States after sentencing any further records, reports, or documents pertaining to the investigation or prosecution of this matter. This waiver includes, but is not

3

limited to, rights under the Freedom of Information Act and the Privacy Act of 1974.

12.     The defendant knowingly and voluntarily waives any rights and defenses defendant may have under the Excessive Fines Clause of the Eighth Amendment to the United States Constitution to the forfeiture of property in this proceeding or any related civil proceeding, special or other assessment, and any order of restitution.

## PENALTY

12.     The maximum penalty the Court could impose as to Count One of the Indictment is:

    a.      up to 30 years imprisonment WITH A 15 YEAR MINIMUM MANDATORY SENTENCCE;

    b.      A fine not to exceed $250,000;

    c.      A term of supervised release of five (5) years to LIFE, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

    d.      A mandatory special assessment of $100.00

    e.      An assessment of $5,000.00 per count under 18 U.S.C. § 3014;

    f.      An assessment, pursuant to 18 U.S.C. §2259A, per count of no more than:

        1.      $17,000.00 if convicted of 18 U.S.C. §2252(a)(4) or §2252A(a)(5);

4

2.  $35,000.00 if convicted of any other trafficking in child pornography offense as defined by §2259(c)(3), which includes offenses under 18 U.S.C. §§2251(d), 2252(a)(1) through (3), 2252A(a)(1) through (4), 2252A(g) (in cases in which the series of felony violations exclusively involves violations of sections 2251(d), 2252, 2252A(a)(1) through (5), or 2260(b)), or 2260(b);

3.  $50,000.00 if convicted of child pornography production as defined by 18 U.S.C. §2259(c)(1), which includes offenses under 18 U.S.C. §2251(a) through (c), 2251A, 2252A(g) (in cases in which the series of felony violations involves at least 1 of the violations listed in this subsection), 2260(a) or any offense under chapter 109A or chapter 117 that involved the production of child pornography (as such term is defined in section 2256);

g.  Mandatory restitution under 18 U.S.C. §2259 that, for any conviction of an offense described in paragraphs (e)(1) or (2), is not less than $3,000.00 per victim;

h.  Such restitution as may be ordered by the Court.

13. The maximum penalty the Court could impose as to Count Three of the Indictment is:

a.  up to 20 years imprisonment;

b.  A fine not to exceed $250,000;

c.  A term of supervised release of five (5) years to LIFE, which would follow any term of imprisonment. If the defendant violates the conditions of supervised release, he could be imprisoned for the entire term of supervised release;

5

d.    A mandatory special assessment of $100.00

e.    An assessment of $5,000.00 per count under 18 U.S.C. § 3014;

f.    An assessment, pursuant to 18 U.S.C. §2259A, per count of no more than:

    1.    $17,000.00 if convicted of 18 U.S.C. §2252(a)(4) or §2252A(a)(5);

    2.    $35,000.00 if convicted of any other trafficking in child

pornography offense as defined by §2259(c)(3), which includes offenses under 18

U.S.C. §§2251(d), 2252(a)(1) through (3), 2252A(a)(1) through (4), 2252A(g) (in

cases in which the series of felony violations exclusively involves violations of

sections 2251(d), 2252, 2252A(a)(1) through (5), or 2260(b)), or 2260(b);

    3.    $50,000.00 if convicted of child pornography production as

defined by 18 U.S.C. §2259(c)(1), which includes offenses under 18 U.S.C.

§2251(a) through (c), 2251A, 2252A(g) (in cases in which the series of felony

violations involves at least 1 of the violations listed in this subsection), 2260(a) or

any offense under chapter 109A or chapter 117 that involved the production of

child pornography (as such term is defined in section 2256);

g.    Mandatory restitution under 18 U.S.C. §2259 that, for any conviction of

an offense described in paragraphs (e)(1) or (2), is not less than $3,000.00 per

victim;

h.    Such restitution as may be ordered by the Court.

## SENTENCING AND APPLICATION OF FED.R.CRIM.P. 11(c)(1)(C)

14.    The defendant acknowledges that the Court will impose sentence in this case, and

that the parties have reached a binding agreement as to the appropriate sentence.

6

Specifically, the defendant acknowledges that Federal Rule of Criminal Procedure

11(c)(1)(C) provides in relevant part:

> If the defendant pleads guilty . . . to . . . a charged offense . . ., the plea agreement may specify that an attorney for the government will: . . . (C) agree that a specific sentence or sentencing range is the appropriate disposition of the case. . . (such a recommendation or request binds the court once the court accepts the plea agreement).

15. The defendant has reviewed Rule 11(c)(1)(C) with his attorney and understands

that it will govern the sentence imposed by the Court in this case.

16. The parties agree that a sentence of **THIRTY (30)** years imprisonment to be

followed by a lifetime term of supervised release as to Counts One and Three is

the appropriate resolution in this case. The defendant further understands that if

the Court accepts his plea, this plea agreement binds the Court, and the defendant

will be sentenced to **THIRTY (30)** years imprisonment to be followed by a

lifetime term of supervised release as to Counts One and Three.

17. The United States will provide all relevant sentencing information to the

Probation Office for purposes of the pre-sentence investigation. Relevant

sentencing information includes, but is not limited to, all facts and circumstances

of this case and information concerning the defendant's conduct and background.

18. Both the defendant and the United States are free to allocute fully at the time of

sentencing.

19. The defendant agrees to tender $200.00 to the U.S. District Court Clerk in

satisfaction of the mandatory special assessment in this case. The United States

reserves the right to withdraw any favorable recommendations it may agree to

within this document if the defendant fails to pay the special assessment prior to or at the time of his sentencing.

## SEX OFFENDER REGISTRATION

20.  The defendant stipulates and agrees that based on the Sex Offender Registration and Notification Act ("the Act"), Title 42, United States Code, Section 16911 et seq., he is a sex offender as that term is defined in the Act. The defendant further understands, acknowledges, and agrees to the following concerning his sex offender registration: I am required to register and keep my registration current in each of the following jurisdictions: where I reside; where I am an employee; and where I am a student. I understand that the requirements for registration include providing my name, my residence address, and the names and addresses of any places where I am or will be an employee or a student, among other information. I further understand that the requirement to keep the registration current including informing at least one jurisdiction in which I reside, am an employee, or am a student not later than three business days after any change of my name, residence, employment, or student status. I also understand that if I possess a passport, it will be marked with a unique identifier identifying me as a convicted sex offender. I understand that if I seek to travel outside the United States, I must notify my residence jurisdiction of my travel at least 21 days prior to that travel. I have been advised, and understand, that failure to comply with these obligations subjects me to prosecution for failure to register under federal law, 18 U.S.C. §2250, which is punishable by fine or imprisonment, or both. The defendant further agrees that for initial registration purposes only, the defendant is required

8

to also register in the jurisdiction in which the defendant is convicted if such
jurisdiction is different from the jurisdiction of residence.

## RESTITUTION

21.  Pursuant to 18 U.S.C. §§ 3556 and 3663(A), restitution is mandatory. The
defendant agrees to make full restitution in an amount to be determined by the
Court at sentencing.

22.  The parties agree that the United States will request the Court to order the
defendant to pay an assessment of $35,000.00 per relevant count of conviction
pursuant to 18 U.S.C. § 2259A and $5,000.00 pursuant to 18 U.S.C. §3014 as
determined by the Court at the time of sentencing

23.  Defendant agrees that if any restitution is ordered by the Court under 18 U.S.C.
§2259, the amount of restitution ordered by the Court shall include defendant's
total offense conduct. Defendant agrees and understands that any payment
schedule imposed by the Court is without prejudice to the United States to take all
actions and take all remedies available to it to collect the full amount of the
restitution. Defendant agrees that the restitution, restitution judgment, payment
provisions, and collection actions of this plea agreement are intended to, and will,
survive defendant, notwithstanding the abatement of any underlying criminal
conviction after the execution of this agreement. Defendant further agrees that
any restitution collected and/or distributed will survive him, notwithstanding the
abatement of any underlying criminal conviction after execution of this
agreement. The parties will jointly recommend that as a condition of probation or

9

supervised release, defendant will notify the Collections Unit, United States

Attorney's Office, of any interest in property obtained, directly or indirectly,

including any interest obtained under any other name or entity, including a trust,

partnership or corporation after the execution of this plea agreement until the fine

or restitution is paid in full. The parties will also jointly recommend that as a

condition of probation or supervised release, defendant will notify the Collections

Unit, United States Attorney's Office, before defendant transfers any interest in

property owned directly or indirectly by defendant, including any interest held or

owned under any other name or entity, including trusts, partnerships and/or

corporations. Pursuant to 18 U.S.C. §§ 3556 and 3663(A), restitution is

mandatory.

## FORFEITURE

24.    The defendant agrees to confess the forfeiture to the United States of all

properties which represent proceeds of his criminal activities or which facilitated

any aspect of these illegal activities as determined by the Court at sentencing

including a cell phone.

## FINANCIAL OBLIGATIONS

25.    The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit

report in order to evaluate the Defendant's ability to satisfy any financial

obligation imposed by the Court. In order to facilitate the collection of financial

obligations to be imposed in connection with this prosecution, the Defendant

agrees to disclose fully all assets in which the Defendant has any interest or over

10

which the Defendant exercises control, directly or indirectly, including those held

by a spouse, nominee or other third party.

## UNITED STATES' OBLIGATIONS

26.    The United States will not bring any additional charges against the defendant

related to the facts underlying the Indictment and will not pursue additional

charges against the defendant in connection with this matter.  This agreement is

limited to the United States Attorney's Office for the Southern District of

Alabama and does not bind any other federal, state, or local prosecuting

authorities.

## LIMITED WAIVER OF RIGHT TO APPEAL AND
## WAIVER OF COLLATERAL ATTACK

27.    As part of the bargained-for exchange represented in this plea agreement, and

subject to the limited exceptions below, the defendant knowingly and voluntarily

waives the right to file any direct appeal or any collateral attack, including a

motion to vacate, set aside, or correct sentence under 28 U.S.C. § 2255.

Accordingly, the defendant will not challenge his guilty plea, conviction, or

sentence in any district court or appellate court proceedings.

      a.    **EXCEPTIONS.** The defendant reserves the right to timely

file a direct appeal challenging:

        (1)    any sentence imposed in excess of the statutory

maximum;

11

> (2)     any sentence which constitutes an upward departure
>
>         or variance from the advisory guideline range.
>
> The defendant also reserves the right to claim ineffective assistance of
>
> counsel in a direct appeal or § 2255 motion.

28.   If the United States files a notice of appeal and such appeal is authorized by the
      Solicitor General, the defendant is released from the appellate waiver.

29.   The defendant further reserves the right to timely move the district court for an
      amended sentence under 18 U.S.C. § 3582 in the event of a future retroactive
      amendment to the Sentencing Guidelines which would affect the sentence.

30.   If the defendant receives a sentence within or below the advisory guideline range,
      this plea agreement shall serve as the defendant's express directive to defense
      counsel to timely file a "Notice of Non-Appeal" following sentencing, signed by
      the defendant.

## VIOLATION OF AGREEMENT

31.   The defendant understands that if he breaches any provision of this Plea
      Agreement, the United States will be free from any obligations imposed by this
      agreement, but all provisions of the agreement remain enforceable against the
      defendant. In the exercise of its discretion, the United States will be free to
      prosecute the defendant on any charges of which it has knowledge. In such event,
      the defendant agrees not to assert any objections to prosecution that he might have
      under the Sixth Amendment and/or Speedy Trial Act.

12

32.     In addition, if the defendant is released from detention prior to sentencing, he understands that the United States will no longer be bound by this agreement if he violates any condition of his release prior to sentencing or prior to serving his sentence after it is imposed.

## ENTIRETY OF AGREEMENT

33.     This document is the complete statement of the agreement between the defendant and the United States and may not be altered unless done so in writing and signed by all the parties.

Respectfully submitted,
RICHARD W. MOORE
UNITED STATES ATTORNEY

Date: June 24, 2019

Kacey Chappelear
Assistant United States Attorney

Date: 6/24/2019

Sean P. Costello
Assistant United States Attorney
Chief, Criminal Division

I have consulted with my counsel and fully understand all my rights with respect to the offense charged in the Indictment pending against me. I have read this Plea Agreement and carefully reviewed every part of it with my attorney. I understand this agreement, and I voluntarily agree to it. I hereby stipulate that the Factual Resume, incorporated herein, is true and accurate in every respect, and that had the matter proceeded to trial, the United States could have proved the same beyond a reasonable doubt.

13

Date: 6/25/19

<u>TARAS HODIVSKY JR.</u>
Defendant

    I am the attorney for the defendant. I have fully explained his rights to him with respect

to the offense(s) charged in the Indictment in this matter. I have carefully reviewed every part of

this Plea Agreement with him. To my knowledge, his decision to enter into this agreement is an

informed and voluntary one. I have carefully reviewed the Factual Resume, incorporated herein,

with the defendant and to my knowledge, his decision to stipulate to the facts is an informed,

intelligent and voluntary one.

Date: 6/25/2019

<u>D. ROBERT STANKOSKI JR.</u>
Attorney for Defendant

14

# DOC 60

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

UNITED STATES OF AMERICA    )
                                            )

v.                                )    **CRIMINAL NO.  19-00080-KD**
                                            )

**TARAS HODIVSKY JR.**         )

## FACTUAL RESUME

The defendant, **TARAS HODIVSKY JR.** admits the allegations of Counts One and

Three of the Indictment.

## ELEMENTS OF THE OFFENSE

**TARAS HODIVSKY JR.** understands that in order to prove a violation of Title 18,

United States Code, Section 2251(d) as charged in Count One of the Indictment, the United

States must prove:

| | |
|---|---|
| First: | That the defendant knowingly made, printed, published, or caused to be made, printed, or published, a notice or advertisement, and |
| Second: | The notice or advertisement sought or offered: |
| | (A) to receive, exchange, buy, produce, display, distribute, or reproduce any visual depiction, the production of which utilized a minor engaging in sexually explicit conduct and such visual depiction is of such conduct; or |
| | (B) participation in any act of sexually explicit conduct by or with any minor for the purpose of producing a visual depiction of such conduct; and |
| Third: | Either that: |
| | (A) The Defendant knew or had reason to know that such notice or advertisement would be transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce by any means including by computer, or would be mailed; or |

1

(B) Such notice or advertisement was transported using any means or
facility of interstate or foreign commerce or in or affecting interstate
commerce by any means including by computer, or was mailed.

In order to prove a violation of Title 18, United States Code, Section 2252A(a)(5)(B) as

charged in Count Three of the Indictment, the United States must prove:

First:      That the defendant knowingly possessed any matter that contained an
            image of child pornography, as defined in Title 18 United States Code
            Section 2256(8)(A); and

Second:     Which involved a prepubescent minor; and

Third:      That such child pornography had been transported in interstate or foreign
            commerce by any means, including by computer, or that such child
            pornography had been produced using materials that had been mailed or
            shipped or transported in interstate or foreign commerce by any means,
            including by computer; and

Fourth:     The defendant knew that such items constituted child pornography.

**OFFENSE CONDUCT**

On January 17, 2019, Summerdale Police Department (SPD) Detective John Gleaton

attended a forensic interview at the Baldwin County Child Advocacy Center. The interview was

conducted following a report received by Alabama Department of Human Resources (DHR)

involving a seven year old female victim, hereafter referred to as M.G. The allegation received

by DHR concerned a family friend, TARAS HODIVSKY, hereafter referred to as HODIVSKY,

who had possibly digitally penetrated the child's vagina. The child was forensically interviewed

and made credible allegations of sexual abuse against HODIVSKY.

Shortly after the forensic interview, SPD arrested HODIVSKY and he was charged in the

State of Alabama with Rape 1st Degree (AL 13a-6-61) and/or Sexual Abuse of a Child Less than

2

12 Years Old (AL 13-6-69.1). HODIVSKY had a cellular telephone on his person at the time of arrest, which was seized by SPD officers.

The cellular telephone on HODIVSKY'S person at the time of arrest is further described as a Samsung GSM, SM-G960U Galaxy S9, IMEI: 352410092195572. SPD obtained a warrant to search the phone and submitted the device to personnel of the Foley Police Department (FPD), located in Foley, Alabama to perform a digital extraction of the data contained on the phone.

The aforementioned digital forensic examination of the cellular telephone on HODIVSKY'S person at the time of arrest yielded over 14,000 still images and approximately 59 video clips saved in some capacity within the phone. Among the still images were approximately 2,430 still images depicting the sexual exploitation of children. At least half of the images depicted children of pre-pubescent age engaged in sex acts or exposing their genitalia. Also found on the phone were approximately 13 downloaded video files which depicted the sexual exploitation of children. The images were submitted to the National Center for Missing & Exploited Children (NCMEC), and they verified that 454 of the submitted images were verified child victims who have been identified by law enforcement. Those 454 images came from 125 different known child pornography series.

Upon further examination of the device, SA Middleton discovered the MEGA app, which HODIVSKY was utilizing to communicate with other consumers of child pornography and to trade images of child pornography. SA Middleton did gain access to the MEGA app, which documented HODIVSKY's repeated and consistent communication with other app users to share child pornography. Through the messaging feature in the app, SA Middleton was able to observe messages to multiple other users beginning in October 16, 2016 and continuing until January 20, 2019. In those messages HODIVSKY would exchange images of child pornography

3

with other users. HODIVSKY would both request specific series of child pornography images as well as provide links to child pornography images. The users also exchange addresses for particular email accounts and passwords, where it is believed that child pornography images were stored.

On March 8, 2019, federal agents executed a search warrant at HODIVISKY's home. At that time a Samsung S5 cellular phone was located and seized. On March 27, 2019, SA Middleton conducted a data extraction of the Samsung Galaxy S5 phone. On April 8, 2019, SA Middleton reviewed the images recovered from the data extraction of the S5 phone. SA Middleton identified approximately 802 images that appeared to depict the sexual exploitation of children on the S5 phone. These images included images of prepubescent children engaged in sex acts and children engaged in sadistic or masochistic conduct. The images were submitted to the National Center for Missing & Exploited Children (NCMEC), and they verified that 104 of the submitted images were verified child victims who have been identified by law enforcement. Those 104 images came from 27 different known child pornography series.

The MEGA application on HODIVKSY's phone requires users to communicate using the internet. Therefore, the advertisement was transported using any means or facility of interstate or foreign commerce or in or affecting interstate commerce. The file paths for the images found on HODIVKSY's phone indicate that the child pornography images were downloaded to the phone via the internet, meaning that the child pornography had been transported in interstate or foreign commerce by any means.

AGREED TO AND SIGNED.

Respectfully submitted,

4

RICHARD W. MOORE
UNITED STATES ATTORNEY

Date: June 24, 2019

Kacey Chappelear
Assistant United States Attorney

Date: 6/24/2019

Sean P. Costello
Assistant United States Attorney
Chief, Criminal Division

Date: 6/25/19

TARAS HODIVSKY JR.
Defendant

Date: 6/25/2019

D. ROBERT STANKOSKI
Attorney for Defendant

5

DOC 63

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                    SOUTHERN DISTRICT OF ALABAMA

 3                         SOUTHERN DIVISION


 4   ------------------------------------
                                         ) CRIMINAL NO. CR19-00080
 5   UNITED STATES OF AMERICA,           ) COURTROOM 4B
                                         ) U.S. FEDERAL COURTHOUSE
 6                                       ) MOBILE, ALABAMA
     VS.                                 ) JUNE 26, 2019
 7                                       )
     TARAS HODIVSKY, JR.,                )
 8                                       )
                     DEFENDANT.          )
 9   ------------------------------------)

10

11                     CHANGE OF PLEA HEARING
             BEFORE THE HONORABLE KRISTI K. DuBOSE
12          CHIEF UNITED STATES DISTRICT COURT JUDGE

13   APPEARANCES:

14   FOR THE             U.S. Attorney's Office
     GOVERNMENT:         By:  Maria E. Murphy, Esq.
15                       By:  Gina S. Vann, Esq.
                         Assistants U.S. Attorney
16                       63 South Royal Street, Suite 600
                         Mobile, Alabama  36602

17   FOR DEFENDANT TARAS HODIVSKY, JR.:

18                       Michael A. Pylant, P.C.
                         By:  Michael A. Pylant, Esq.
19                       P.O. Box 1322
                         Fairhope, Alabama  36533
20

21   COURT REPORTER:     Melanie Wilkins, RMR, CRR
                         Federal Official Court Reporter
22

23

24

25
```

```
1              Proceedings reported by machine stenography.

2              Transcript produced by computer.

3       [June 26, 2019, 11:22 a.m.  The defendant is present with

4       counsel in open court.]

5              THE CLERK:  The case before the court for a change of

6    plea in Criminal No. 19-80, United States of America versus

7    Taras Hodivsky.

8              What says the Government?

9              MS. MURPHY:  Ready, Your Honor.

10             THE CLERK:  And the defendant?

11             MR. PYLANT:  Ready, Your Honor.

12             THE COURT:  All right.  Mr. Hodivsky, if you'll raise

13   your right hand, please.

14      [Defendant duly sworn.]

15             THE COURT:  All right.  Mr. Hodivsky, I understand

16   you wish to enter a plea of guilty; is that correct?

17             MS. MURPHY:  I'm sorry, Your Honor.  Before the Court

18   begins its plea colloquy, the parties wanted to place a matter

19   on the record.

20             THE COURT:  Okay.  On sidebar?

21             MS. MURPHY:  No, ma'am.

22             THE COURT:  Okay.  Go ahead.

23             MR. PYLANT:  And, Your Honor, I can do that at this

24   time if I may.  Pursuant to an agreement between the parties,

25   my cocounsel in this case, Rob Stankoski, is a judge in the
```

```
1   town of Summerdale, in that municipality.  And when this
2   investigation initiated, Summerdale Police Department was the
3   investigating agency.
4           And in my conversations with the prosecution, we are
5   agreeing to waive any perceived conflict that might create and
6   waive any appellate remedy that Mr. Hodivsky might seek
7   specific to that issue.  And we do so at this time.
8           MS. MURPHY:  No, Your Honor.  Kind of.  But we
9   learned of that situation.  I spoke in detail to Mr. Stankoski,
10  and he indicated that he had researched the matter.  There was
11  no actual or apparent conflict and that he had discussed the
12  matter with Mr. Hodivsky and that Mr. Hodivsky waived any
13  possible conflict.  And we just wanted Mr. Hodivsky to
14  acknowledge that and place it on the record.
15          MR. PYLANT:  And, Judge DuBose, in response to that,
16  I can tell you I wholeheartedly agree that there is no conflict
17  that exists after my research.  But, again, in terms of should
18  that ever arise, Mr. Hodivsky is here to waive that today.
19          THE COURT:  Okay.  All right.  Well, that's put on
20  the record then.
21          Mr. Hodivsky, do you affirm that's correct?
22          THE DEFENDANT:  Yes, ma'am.
23          THE COURT:  Okay.  All right.  Did you swear him in?
24          THE CLERK:  Yes, ma'am.
25          THE COURT:  Okay.  I understand you wish to change
```

```
1    your plea of not guilty to guilty as to Counts 1 and 3; is that

2    correct?

3               THE DEFENDANT:  Correct.

4               THE COURT:  All right.  And, as I said, I need to ask

5    you some questions to determine whether you are competent to

6    plea and whether this is a voluntary plea.  If you'll state

7    your full name.

8               THE DEFENDANT:  Taras Hodivsky, Jr.

9               THE COURT:  How old are you?

10              THE DEFENDANT:  Forty.

11              THE COURT:  How far did you go in school?

12              THE WITNESS:  Graduation and associate's degree in

13   college.

14              THE COURT:  So you can read, write, and understand

15   the English language?

16              THE DEFENDANT:  Yes, Your Honor.

17              THE COURT:  Have you ever been treated for any type

18   of mental illness?

19              THE DEFENDANT:  No.

20              THE COURT:  How about addiction to drugs?

21              THE DEFENDANT:  No.

22              THE COURT:  Are you currently under the influence of

23   any drug, alcohol, or medication?

24              THE DEFENDANT:  No.

25              THE COURT:  Did you and your attorney discuss the
```

```
 1   charge against you?

 2            THE DEFENDANT:  Correct.  Yes.

 3            THE COURT:  And you've discussed the facts?

 4            THE DEFENDANT:  Yes.

 5            THE COURT:  And, obviously, you've discussed

 6   defenses; is that correct?

 7            THE DEFENDANT:  Yes.

 8            THE COURT:  And, after doing so, are you satisfied

 9   with their advice to enter a plea of guilty?

10            THE DEFENDANT:  Yes, I am.

11            THE COURT:  Now, you are pleading pursuant to a plea

12   agreement.  That is an 11D -- what we call an 11C agreement.

13   This agreement is where it binds the Government and you to a

14   certain -- and the Court to a certain sentence, and in this

15   case it's an agreed sentence of 30 years imprisonment to be

16   followed by a lifetime term of supervised release as to

17   Counts 1 and 3.

18            Is that the way you understand the agreement?

19            THE DEFENDANT:  Yes.

20            THE COURT:  Okay.  And I will tell you now that after

21   we finish with this plea colloquy that I will not be accepting

22   your plea today because I am going to defer that until I have

23   read the presentence investigation, and if at the time, after I

24   read the presentence investigation, I do not accept the

25   agreement, then I will allow you to withdraw your plea.
```

```
 1                Do you understand that?  I'll go over it again.

 2                THE DEFENDANT:  Okay.

 3                THE COURT:  You are going to -- we are going to go

 4     through the plea colloquy.  And when I get to the end, I

 5     normally would say I accept your plea, but I'm not going to

 6     accept your plea today because it is based on this plea

 7     agreement.

 8                What I'm going to do is, after they do the

 9     presentence investigation, I want to know the background.  I

10     want to know more about this case.

11                Then if I -- then I'll have a better basis of

12     deciding whether to accept this agreement, and at that time I

13     will either accept the agreement.  If I do not accept the

14     agreement, then I will say you do not have to plead guilty.

15     I'm not accepting your plea on this basis.  And you can choose

16     at that point to withdraw your plea.

17                Why don't you talk with your attorney to make sure

18     that you understand.

19           [The defendant and counsel confer off the record.]

20                THE COURT:  Okay.  May we go forward?

21                MR. PYLANT:  Yes, Your Honor.

22                THE COURT:  Mr. Hodivsky, do you understand what I'm

23     saying?

24                THE DEFENDANT:  Yes, ma'am.

25                THE COURT:  Okay.  All right.  Now, the plea
```

```
 1   agreement also provides that you are waiving your right to

 2   appeal this conviction and the sentence.  Do you understand

 3   that?

 4           THE DEFENDANT:  Yes, ma'am.

 5           THE COURT:  The only reason you could appeal is if I

 6   go above the guidelines, you received ineffective assistance of

 7   counsel, or I went above the statutory maximum.  Do you

 8   understand?

 9           THE DEFENDANT:  Yes, ma'am.

10           THE COURT:  Okay.  Now, you do have a right to

11   continue in your plea of -- one other thing.  You understand

12   you are pleading to a felony offense.  And you lose the right

13   to vote, the right to hold public office, and the right to a

14   firearm?  Do you understand that?

15           THE DEFENDANT:  Yes, ma'am.

16           THE COURT:  Now, you read that plea agreement and

17   discussed it with your attorney before you signed it?

18           THE DEFENDANT:  Yes.

19           THE COURT:  Now, you do have a right to continue in

20   your plea of not guilty.  We would have a trial.  At trial, you

21   would be presumed innocent.  The Government would have to prove

22   your guilt beyond a reasonable doubt.

23           At trial, you would have the right to the assistance

24   of counsel.  You'd have the right to cross-examine the

25   Government's witnesses.  You'd have the right to compel
```

Case 1:19-cr-00080-KD-N   Document 162-2   Filed 07/26/23   Page 87 of 257   PageID #: 870
Case: 19-14844   Date Filed: 08/10/2020   Page: 88 of 257

8

```
 1    witnesses to attend the trial on your behalf.  You'd also have

 2    the right to choose to testify -- you'd also have the right to

 3    choose to testify or not testify, and if you chose not to

 4    testify, that fact could not be used against you.

 5              But do you understand by pleading guilty today, you

 6    are giving up those rights and there will not be a trial?

 7              THE DEFENDANT:  Yes, ma'am.

 8              THE COURT:  Is that what you want?

 9              THE DEFENDANT:  Yes.

10              THE COURT:  All right.  If the Government would give

11    me the elements and the facts, please.

12              MS. MURPHY:  Yes, Your Honor.  The defendant is

13    pleading guilty to Count 1, which is a violation of Title 18,

14    United States of America Code Section 2251(D).

15              It requires that the United States prove that the

16    defendant knowingly made, printed, published, or caused to be

17    made, printed, or published a notice or advertisement;

18              And that the notice or advertisement sought or

19    offered, A, to receive, exchange, buy, produce, display,

20    distribute, or reproduce, any visual depiction, the production

21    of which utilized a minor engaging in sexually explicit conduct

22    and such visual depiction is of such conduct; or, B,

23    participation in any act of sexually explicit conduct by or

24    with any minor for purposes of producing a visual depiction of

25    such conduct;
```

```
 1                And,  third,  either  that,  A,  the  defendant  knew  or  had

 2    reason  to  know  that  such  notice  or  advertisement  would  be

 3    transported  using  any  means  or  facility  of  interstate  or

 4    foreign  commerce  or  in  or  affecting  interstate  commerce  by  any

 5    means,  including  by  a  computer,  or,  B,  that  such  notice  or

 6    advertisement  was  transported  using  any  means  or  facility  of

 7    interstate  or  foreign  commerce  or  in  or  affecting  interstate

 8    commerce  by  any  means,  including  by  computer.

 9                And  then  Count  3  of  the  indictment  charges  a

10    violation  of  18  United  States  Code  Section  2252(a)(5)(B).   And

11    that  requires  the  United  States  to  prove,  first,  that  the

12    defendant  knowingly  possessed  any  matter  that  contained  an

13    image  of  child  pornography,  as  defined  by  the  United  States

14    Code;

15                Second,  which  involved  a  prepubescent  minor;

16                And,  third,  that  such  child  pornography  had  been

17    transported  in  interstate  or  foreign  commerce  by  any  means,

18    including  by  computer,  or  that  the  child  pornography  had  been

19    produced  using  materials  that  have  been  shipped  or  transported

20    in  interstate  commerce;

21                And,  fourth,  that  the  defendant  knew  that  such  items

22    constituted  child  pornography.

23                The  United  States  is  prepared  to  prove  that  on

24    January  17th  of  2019,  Summerdale  Police  Department  Detective

25    John  Gleaton  attended  a  forensic  interview  at  the  Baldwin
```

```
 1    County Child Advocacy Center.

 2            The interview was conducted following a report

 3    received by DHR involving a seven-year-old female victim

 4    hereinafter referred to as M.G.

 5            The allegation received by DHR concerned a family

 6    friend, Mr. Hodivsky, who had possibly or was alleged to have

 7    digitally penetrated the child's vagina.  The child was

 8    forensically interviewed and made credible allegations of

 9    sexual abuse against the defendant.

10            Shortly thereafter, the Summerdale Police Department

11    arrested the defendant, and he was charged in the State of

12    Alabama with rape first degree and sexual abuse of a child less

13    than 12 years old.

14            At that time the defendant had a cellular telephone

15    on his person which was seized at the time of his arrest.  The

16    cellular telephone is described as a Samsung Galaxy S9 model.

17            The Summerdale Police Department obtained a warrant

18    to search that phone and submitted the device to the Foley

19    Police Department to perform a digital extraction of the data.

20            The forensic examination of the telephone on his

21    possession at the time of his arrest yielded 14,000 still

22    images and approximately 59 video clips saved in some capacity

23    within the phone.

24            Among the still images were approximately 2,430

25    images depicting the sexual exploitation of children.  At least
```

```
 1    half of them depicted children of prepubescent age engaged in

 2    sexual acts or exposing their genitalia.

 3             Also found on the phone were 13 downloaded video

 4    files which depicted the sexual exploitation of children.  The

 5    images were submitted to the National Center for Missing and

 6    Exploited Children, and they verified 454 of the submitted

 7    images were of verified child victims identified by law

 8    enforcement.  Of those images, they came from 125 different

 9    known child pornography series.

10             Upon further examination of the device, Special Agent

11    Middleton discovered the MEGA app which the defendant was using

12    to communicate with other consumers of child pornography and to

13    trade images of child pornography.

14             The agent gained access to the MEGA app which

15    documented the defendant's repeated and consistent

16    communications with other app users to share child pornography.

17    Through the messaging feature in the app, the agent was able to

18    observe multiple other users beginning in October 16th of

19    2016 and continuing through January 20th of 2019.

20             In those messages, the defendant would exchange

21    images of child pornography with other users.  He would also

22    request specific series of child pornography images as well as

23    provide links to child pornography images.  The users exchanged

24    addresses for particular e-mail accounts and password where it

25    was believed the child pornography images were stored.
```

Case 1:19-cr-00080-KD-N   Document 132-2   Filed 07/26/23   Page 92 of 257   PageID 266
Case: 19-14844   Date Filed: 08/10/2020   Page: 92 of 257

12

```
 1              On March 8th of 2019, federal agents executed a
 2   search warrant of the defendant's home.  At that time they
 3   found a Samsung S5 cellular phone.  On March 27th, 2019, the
 4   agent conducted a data extraction of the S5 and on April 8th
 5   of 2019 reviewed the images from that extraction.
 6              The agent identified approximately 802 images that
 7   appeared to depict the sexual exploitation of children on the
 8   S5 phone.  These images included prepubescent children engaged
 9   in sex acts and children engaged in sadistic or masochistic
10   conduct.
11              The National Center for Missing and Exploited
12   Children verified that 104 of the submitted images were
13   verified child victims who have been identified by law
14   enforcement.
15              The MEGA app on the defendant's phone requires users
16   to communicate using the Internet; therefore, the advertisement
17   was transported using any means or facility of interstate or
18   foreign commerce or in and affecting interstate commerce.  The
19   file paths for the images found on the phone indicate that the
20   child pornography images were downloaded to the phone via the
21   Internet.
22              THE COURT:  Do you agree the Government could prove
23   those facts against you?
24              THE DEFENDANT:  Yes.
25              THE COURT:  How do you plead?
```

```
 1                THE DEFENDANT:  Ma'am?

 2                THE COURT:  What plea will you enter?

 3                THE DEFENDANT:  Guilty.

 4                THE COURT:  Okay.  And, as I said, I'm going to wait

 5   to accept your plea until I've had a chance to read the PSI.

 6                Your sentence will be set for September the 27th at

 7   10:00 o'clock.  At that time you may speak on your own behalf,

 8   and you may present witnesses.

 9                What's the Government's position on his detention or

10   release?

11                MS. MURPHY:  This is a mandatory detention case, and

12   the defendant has been advised of that, Your Honor.

13                THE COURT:  Okay.  Then he's remanded to the custody

14   of the Marshals.

15                MR. PYLANT:  And, Your Honor, if we can be heard

16   about the possibility of him not being likely to flee or pose a

17   danger to the safety of any other person in the community?

18   We'd ask to be heard at this time pending sentencing.

19                THE COURT:  Okay.  There has to be extraordinary

20   circumstances.

21                MR. PYLANT:  And, Your Honor, may I give you some

22   background as to --

23                THE COURT:  I mean, just because he won't flee and

24   just because he won't hurt somebody in the community, which is

25   debatable, you have to have extraordinary circumstances when
```

```
1    it's a mandatory case.  What are your extraordinary

2    circumstances?

3              MR. PYLANT:  Well, Your Honor, at this time his

4    parents, who are present in court today, along with his sister,

5    are both in poor health.  He is attempting to sell his home

6    pending his incarceration.  He's trying to wrap that up while

7    also complying with the terms of his release, which he's done

8    since his arrest in January of 2019.

9              He works for his father's fence company, and, again,

10   they are trying to keep it afloat knowing that in 90 day's

11   time, he'll be incarcerated, and he only asks for the

12   opportunity to keep supporting them for the intervening

13   3 months between now and sentencing.

14             THE COURT:  Your motion is denied.  Thank you.

15             He's remanded to the custody of the Marshals.

16        [Recess.]

17             THE COURT:  All right.  I'm so sorry.  I made a

18   pretty major mistake of not advising your client of the

19   sentencing guidelines and, more importantly, of the statutory

20   mandatory minimums and maximums which I'm required to do under

21   law.

22             MR. PYLANT:  Yes, Your Honor.

23             THE COURT:  Otherwise, it's not a valid plea.  So,

24   Ms. Vann, I'm going to need you to stand in for Ms. Murphy.

25   Okay?
```

```
 1                MS. VANN:  I will.

 2                THE COURT:  And let her know what I did wrong and how

 3    I corrected it.

 4                MS. MURPHY:  Yes, ma'am.

 5         [Recess.]

 6                THE COURT:  He's going to be in custody now, so you

 7    might want to sit at the table with him.

 8                MR. PYLANT:  I'll get it right one of these times.

 9                THE COURT:  Mr. Hodivsky, come back in.  I forgot to

10    advise you of a very important fact which I need to do on the

11    record.  I got offtrack when I was reading your plea agreement.

12                But Count 1, Mr. Hodivsky -- and this is important

13    and I'm sorry I forgot to tell you.  I'm sure your attorney has

14    told you, but, by law, I'm required to tell you this too.

15                Count 1 carries a mandatory minimum of 15 years to

16    30 years, $250,000 fine, lifetime SRT, and $100 special

17    assessment.  And I'm not sure what's the $5000 special

18    assessment.

19                In addition to that, Count 3 carries up to 20 years,

20    $250,000 fine, 5 years to life SRT, $100 special assessment,

21    $5000 special assessment up to $17,000 special assessment.

22                Do you understand those to be the penalties in your

23    case?

24                THE DEFENDANT:  Yes, ma'am.

25                THE COURT:  And you understand that the 15-year
```

Case 1:19-cr-00080-KD-B   Document 632-1   Filed 07/26/23   Page 96 of 257   PageID #: 8768
Case: 19-14844    Date Filed: 08/10/2020    Page: 96 of 257

16

```
1   mandatory minimum is required no matter what happens in this

2   case, that I would be required to give you at least those

3   15 years?  Do you understand that?

4              THE DEFENDANT:  Yes, ma'am.

5              THE COURT:  But you do understand, here again, that

6   if I accept the plea agreement, it will be 30 years?

7              THE DEFENDANT:  [Nods head up and down.]

8              THE COURT:  Do you understand that?

9              THE DEFENDANT:  [Nods head up and down.]

10             THE COURT:  There are sentencing guidelines that

11  apply to your case.  Did you go over those with your attorney?

12             THE DEFENDANT:  Yes.

13             THE COURT:  I think 360 to life were your guidelines.

14  You understand those are advisory, and I'm not required to

15  follow those?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Now, having told you what the penalties

18  are in this case, do you still wish to affirm your plea of

19  guilty?

20             THE DEFENDANT:  Yes.

21             THE COURT:  Okay.  Thank you.  Sorry.

22        [Recess.]

23

24

25
```

17

```
1    STATE OF ALABAMA)
                     :
2    COUNTY OF MOBILE)

3                      UNITED STATES OF AMERICA
                                VS.
4                      TARAS HODIVSKY, JR.
                       CASE NO. CR19-00080
5

6            I, Melanie Wilkins, do hereby certify that the above

7    and foregoing transcript of proceedings in the matter

8    aforementioned was taken by me in machine shorthand, and the

9    questions and answers thereto were reduced to writing under my

10   personal supervision using computer-aided transcription, and

11   that the foregoing represents a true and correct transcript of

12   the proceedings upon said hearing.

13

14           I further certify that I am neither counsel nor

15   related to the parties to the action, nor am I in anywise

16   interested in the result of said cause.

17   Pages 1 to 17, inclusive.
     Dated:  July 26, 2019
18

19                            _____
                              Melanie Wilkins
20                            Registered Merit Reporter
                              Certified Realtime Reporter
21                            Official Court Reporter
                              United States District Court
22                            Southern District of Alabama
                              155 St. Joseph Street
23                            Mobile, Alabama  36602
                              (251) 690-3371
24

25
```

DOC 72

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | **JUDGMENT IN A CRIMINAL CASE** |
| | § | |
| v. | § | |
| | § | Case Number: **1:19-CR-00080-KD-B(1)** |
| **TARAS HODIVSKY, JR.** | § | USM Number: **08493-003** |
| | § | <u>**Michael Alan Pylant**</u> |
| | § | Defendant's Attorney |

## THE DEFENDANT:

☒ pleaded guilty to count(s)  **1s and 3s on 6/26/2019**

☐ pleaded nolo contendere to count(s)     which was accepted by the court

☐ was found guilty on count(s)     after a plea of not guilty

ACCORDINGLY, the court has adjudicated that the defendant is guilty of the following offenses:

| Title & Section / Nature of Offense | Offense Ended | Count |
|---|---|---|
| 18:2251.F Advertising Of Child Pornography | 01/24/2019 | 1s |
| 18:2252A.F Possession Of Child Pornography | 01/24/2019 | 3s |

The defendant is sentenced as provided in pages 2 through 8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☒ Count 2s ☒ is ☐ are dismissed on the motion of the United States

    IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States Attorney of material changes in economic circumstances.

<u>**September 27, 2019**</u>

Date of Imposition of Judgment

<u>**s/Kristi K. DuBose**</u>

**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**
Name and Title of Judge

<u>**October 9, 2019**</u>

Date

AO 245B (ALSD 01/16) Judgment in a Criminal Case                                        Judgment -- Page 2 of 8

DEFENDANT:          TARAS HODIVSKY, JR.
CASE NUMBER:        1:19-CR-00080-KD-B(1)

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

**360 months as to each of Counts 1s and Count 3s; said terms to run concurrently**.

☒   The court makes the following recommendations to the Bureau of Prisons:
**The Court recommends to the Bureau of Prisons that the defendant be imprisoned at an institution where he may be evaluated and receive in-depth psychological counseling, or, in the alternative, if the defendant volunteers, at a Federal Correctional Institution where he may participate in the Sex Offender Treatment Program; and that he be incarcerated as close as possible to his family in Foley, Alabama.**

☒   **The defendant is remanded to the custody of the United States Marshal.**

☐   The defendant shall surrender to the United States Marshal for this district:

        ☐   at                        ☐   a.m.   ☐   p.m.   on

        ☐   as notified by the United States Marshal.

☐   The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

        ☐   before 2 p.m. on
        ☐   as notified by the United States Marshal.
        ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

                                                    UNITED STATES MARSHAL

                                    By   _____
                                                    DEPUTY UNITED STATES MARSHAL

Case: 19-cr-00080-KD-B Document 122 Filed 10/23/23 Page 101 of 257 PageID #: 883
Case: 19-14844     Date Filed: 03/10/2020     Page: 101 of 257
AO 245B (ALSD 01/16) Judgment in a Criminal Case                                                      Judgment -- Page 3 of 8

DEFENDANT:          TARAS HODIVSKY, JR.
CASE NUMBER:        1:19-CR-00080-KD-B(1)

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of : **fifteen (15) years, as to each of Counts One and Three; said terms to run concurrently.**

☒   Special Conditions:

**1)  the defendant shall participate in a mental health evaluation and comply with any treatment consistent with the findings of said evaluation, as directed by the Probation Office.  The defendant may incur costs associated with such program, based on ability to pay as determined by the probation officer.**

**2)  the defendant shall make restitution to the victims as further set out on the Restitution Page of this Judgment. Restitution is due immediately and payable in full, and is to be paid through the Clerk, U.S. District Court. Payment to the victims shall be on a pro rata basis. If full restitution is not immediately paid, any amount owing during a period of incarceration shall be subject to payment through the Bureau of Prison's Inmate Financial Responsibility Program. In the event that the defendant is not eligible for the Bureau of Prison's Inmate Financial Responsibility Program, the defendant is ordered to make minimum monthly payments of $50 while incarcerated.  The Probation Office shall pursue collection of any balance remaining at the time of release, in installments to commence no later than 30 days after the date of release. If restitution is to be paid in installments, the Court orders that the defendant make at least minimum monthly payments in the amount of $100. The defendant is ordered to notify the Court of any material change in the defendant's ability to pay restitution; the Probation Office shall request the Court to amend any payment schedule, if appropriate.**

**3)  the defendant is prohibited from making major purchases, incurring new credit charges or opening additional lines of credit without approval of the Probation Office, until such time as the financial obligations imposed by this order have been satisfied in full.  The defendant is ordered to notify the Court of any material change in the defendant's ability to pay restitution.**

**4)  the defendant shall provide the Probation Office access to any requested financial information.**

**5)  if deemed appropriate by the Probation Office, the participant shall be monitored by the form of location monitoring indicated below for a period to be determined by the Probation Office and shall abide by all technology requirements. The participant shall pay all or part of the costs of participation in the location monitoring program as directed by the court and the supervising officer:**
          **• location monitoring technology at the discretion of the officer;**
**This form of location monitoring technology shall be used to monitor the following restriction on the movement of participants in the community as well as other court-imposed conditions of release (the court must impose one of these components):**
**• You are restricted to your residence every day from _____ to _____ or as directed by the supervising officer (curfew).**
**• You are restricted to your residence at all times, except for employment; education; religious services; medical, substance abuse, or mental health treatment; attorney visits; court appearances; court-ordered obligations; or other activities as preapproved by the officer (home detention).**
**• You are restricted to your residence at all times, except for medical necessities and court appearances or other activities specifically approved by the court (home incarceration)**

**6)  SEX OFFENDER:**

**a.  the defendant shall participate in a program of mental health treatment/sex offender treatment, evaluation, testing, clinical polygraphs and other assessment instruments, as directed by the Probation Office.**
**b.  the defendant shall not possess or use a computer with access to any "on-line computer service" at any location (including employment) without the permission of the Probation Office.**
**c.  the defendant shall consent to periodic, unannounced examinations of any internet capable device, which may include retrieval and copying of all data to ensure compliance with this condition, and/or removal of such equipment for the purpose of conducting a more thorough inspection.**
**d.  the defendant shall register with the state sex offender registration agency in any state where he resides, is employed, carries on a vocation, or is a student, pursuant to the provisions of Tier III as outlined in the Sex Offender Registration and Notification Act (SORNA).**

Case: 1:19-cr-00080-KD-B Document 1272 Filed 10/23/23 Page 4 of 8 PageID #: 802
Case: 19-14844    Date Filed: 08/10/2020    Page: 102 of 257
AO 245B (ALSD 01/16) Judgment in a Criminal Case                                    Judgment -- Page 4 of 8

DEFENDANT:          TARAS HODIVSKY, JR.
CASE NUMBER:        1:19-CR-00080-KD-B(1)


**7)  the defendant shall submit his person, house, residence, vehicle(s), papers, [computers (as defined by 18 U.S.C. Section 1030(e)(1)) or other electronic communications or data storage devices of media], business or place of employment, and any other property under the defendant's control to a search, conducted by a United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to a search in accordance with this condition may be grounds for revocation. The defendant shall warn any other occupants that the premises may be subject to searches pursuant to this condition.**


**For offenses committed on or after September 13, 1994**:  The defendant shall refrain from any unlawful use of a controlled substance.  The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

☐  The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.  *(Check, if applicable.)*

☐  The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer.  *(Check, if applicable.)*

☐  The defendant shall participate in an approved program for domestic violence.  *(Check, if applicable.)*

☒  **The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.**  *(Check, if applicable.)*

If this judgment imposes a fine or restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.  The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

**The defendant shall not commit another federal, state or local crime.**
**The defendant shall not illegally possess a controlled substance.**
**The defendant shall comply with the standard conditions that have been adopted by this court.**
**The defendant shall also comply with the additional conditions on the attached page.**

**See Page 5 for the
"STANDARD CONDITIONS OF SUPERVISION"**

AO 245B (ALSD 01/16) Judgment in a Criminal Case

Judgment -- Page 5 of 8

DEFENDANT:        TARAS HODIVSKY, JR.
CASE NUMBER:      1:19-CR-00080-KD-B(1)

## STANDARD CONDITIONS OF SUPERVISION

1. the defendant shall not leave the judicial district without the permission of the court or probation officer;
2. the defendant shall report to the probation officer in a manner and frequency directed by the court or probation officer;
3. the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4. the defendant shall support his or her dependents and meet other family responsibilities;
5. the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;
6. the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7. the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8. the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9. the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10. the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11. the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12. the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13. as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.
14. the defendant shall cooperate, as directed by the probation officer, in the collection of DNA, if applicable, under the provisions of 18 U.S.C. §§ 3563(a)(9) and 3583(d) for those defendants convicted of qualifying offenses.

Case: 1:19-cr-00080-KD-B Document 222 Filed 10/23/23 Page 104 of 257 PageID #: 886
Case: 19-14844    Date Filed: 08/10/2020    Page: 104 of 257
AO 245B (ALSD 01/16) Judgment in a Criminal Case                                                          Judgment -- Page 6 of 8

DEFENDANT:          TARAS HODIVSKY, JR.
CASE NUMBER:        1:19-CR-00080-KD-B(1)

# CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Page 6.

| | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $10,200.00 | $.00 | $164,415.00 |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO245C)* will be entered after such determination.

☒ The defendant shall make restitution (including community restitution) to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. (or see attached).  However, pursuant to 18 U.S.C. § 3644(i), all non-federal victims must be paid in full prior to the United States receiving payment.

Restitution of $164,415.00 to:

1) Marsh Law Firm PLLC
Attn: "Jane" Restitution
Box 4669 #65135
New York, NY
Amount Owed:  $3,000

2)  Marsh Law Firm PLLC
Attn: "Jenny" Restitution
Box 4669 #65135
New York, NY
Amount Owed: $3,000

3)  Marsh Law Firm PLLC
Attn: "Raven" Restitution
Box 4669 #65135
New York, NY
Amount Owed:  $3,000

4) Carol L. Hepburn
Attn: Carol L. Hepburn in trust for Sarah
200 First Avenue West, Suite 550
Seattle, WA  98119
Amount Owed:  $15,000

5) Carol L. Hepburn
Attn: Carol L. Hepburn in trust for Sierra
200 First Avenue West, Suite 550
Seattle, WA  98119
Amount Owed:  $10,000

6) Carol L. Hepburn
Attn: Carol L. Hepburn in trust for Savannah
200 First Avenue West, Suite 550
Seattle, WA  98119
Amount Owed:  $7,500

AO 245B (ALSD 01/16) Judgment in a Criminal Case

Judgment -- Page 7 of 8

DEFENDANT:        TARAS HODIVSKY, JR.
CASE NUMBER:      1:19-CR-00080-KD-B(1)

7) Carol L. Hepburn
Attn: Carol L. Hepburn in trust for Skylar
200 First Avenue West, Suite 550
Seattle, WA  98119
Amount Owed:  $7,500

8) Carol L. Hepburn
Attn: Carol L. Hepburn in trust for Lily
200 First Avenue West, Suite 550
Seattle, WA  98119
Amount Owed:  $10,000

9) Utah Crime Victims Legal Clinic
Attn: "Andy" Restitution
404 East 4500 South, Suite B24
Salt Lake City, UT 84107
Amount Owed: $58,415

10) Carol L. Hepburn
Attn: Carol L. Hepburn in trust for Violet
200 First Avenue West, Suite 550
Seattle, WA  98119
Amount Owed:  $10,000

11) "Maureen"
C/O Deborah A. Bianco
14535 Bellevue-Redmond Road, Suite 201
Bellevue, WA 98007
Amount Owed:  $10,000

12) Lenahan Law, P.L.L.C., F/B/O - "Angela"
2655 Villa Creek, Suite 222
Dallas, TX 75234
Amount Owed:  $12,000

13) Lenahan Law, P.L.L.C., F/B/O - "2Crazygurls"
2655 Villa Creek, Suite 222
Dallas, TX 75234
Amount Owed:  $10,000

14) "Pia"
C/O Deborah A. Bianco
14535 Bellevue-Redmond Road, Suite 201
Bellevue, WA 98007
Amount Owed:  $5,000

☐  If applicable, restitution amount ordered pursuant to plea agreement $ _____
☐  The defendant must pay interest on any fine or restitution of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Page 6 may be subject to penalties for default, pursuant to 18 U.S.C. § 3612(g).
☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:
   ☐  the interest requirement is waived for the    ☐ fine    ☐ restitution
   ☐  the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B (ALSD 01/16) Judgment in a Criminal Case                                                                Judgment -- Page 8 of 8

DEFENDANT:          TARAS HODIVSKY, JR.
CASE NUMBER:        1:19-CR-00080-KD-B(1)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A** ☒   Lump sum payments of $200.00 (Special Assessment) , $164,415.00 (Restitution), due immediately, and additional Special Assessment of $5,000, pursuant to 18 U.S.C. Section 3014; and a $5,000 special assessment pursuant to the Amy, Vicky and Andy Act, on each of Counts One and Three, **for a total of $10,200**

    ☒ in accordance with   ☐ C,   ☐ D,   ☐ E, or   ☒ F below; or

**B** ☐   Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C** ☐   Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
      _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐   Payment in equal   *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of
      _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment
      to a term of supervision; or

**E** ☐   Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release
      from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that
      time; or

**F** ☒   Special instructions regarding the payment of criminal monetary penalties:
      **It is ordered that the Defendant shall pay to the United States a special assessment of $200.00 for Counts 1s and 3s ,**
      **which shall be due immediately.  Said special assessment shall be paid to the Clerk, U.S. District Court.**

Unless the court has expressly ordered otherwise in the special instructions above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment.  All criminal monetary penalty payments, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States Attorney.

The defendant will receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐   Joint and Several

     ☐ Defendant shall receive credit on his restitution obligation for recovery from other defendants who contributed to the same
     loss that gave rise to defendant's restitution obligation.
☐   The defendant shall pay the cost of prosecution.
☐   The defendant shall pay the following court cost(s):
☐   The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

DOC 99

Case 1:19-cr-00080-KD-B   Document 192-2   Filed 04/04/2023   Page 108 of 257   PageID #:
Case: 19-14844   Date Filed: 09/10/2020   Page: 108 of 257

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 SOUTHERN DISTRICT OF ALABAMA

 3                      SOUTHERN DIVISION


 4   ------------------------------------
                                        )  CRIMINAL NO. CR19-00080
 5   UNITED STATES OF AMERICA,          )  COURTROOM 4B
                                        )  U.S. FEDERAL COURTHOUSE
 6                                      )  MOBILE, ALABAMA
     VS.                                )  JUNE 19, 2019
 7                                      )  PAGES 1 TO 137, INCLUSIVE
     TARAS HODIVSKY, JR.,               )
 8                                      )
                    DEFENDANT.          )
 9   ------------------------------------)


10

                         SUPPRESSION MOTION
11          BEFORE THE HONORABLE KRISTI K. DuBOSE
              CHIEF UNITED STATES DISTRICT COURT JUDGE
12

     APPEARANCES:
13

     FOR THE            U.S. Attorney's Office
14   GOVERNMENT:        By:  Katherine Chappelear, Esq.
                        By:  Maria Murphy, Esq.
15                      Assistants U.S. Attorney
                        63 South Royal Street, Suite 600
16                      Mobile, Alabama  36602

17   FOR DEFENDANT TARAS HODIVSKY, JR.:

18                      Stankoski Myrick, LLC
                        By:  Daniel Robert Stankoski, Jr., Esq.
19                      8335 Gayfer Road Ext.
                        Fairhope, Alabama  36532
20
                        Michael A. Pylant, P.C.
21                      By:  Michael A. Pylant, Esq.
                        P.O. Box 1322
22                      Fairhope, Alabama  36533

23   COURT REPORTER:    Melanie Wilkins, RMR, CRR
                        Federal Official Court Reporter
24

25
```

Case: 1:19-cr-00080-KD-N   Document 192-1   Filed 04/02/2021   Page 109 of 257   PageID #:
Case: 19-14844   Date Filed: 08/10/2020   Page: 109 of 257

DIRECT - JOHN GLEATON                                          2

 1                Proceedings reported by machine stenography.

 2                Transcript produced by computer.

 3        [June 19, 2019, 1:00 p.m.  The defendant is present with

 4        counsel in open court.]

 5            THE CLERK:  We're on the record for a suppression

 6   hearing in Criminal No. 19-80, United States of America versus

 7   Taras Hodivsky.

 8            What says the Government?

 9            MS. CHAPPELEAR:  Ready, Your Honor.

10            THE COURT:  And the defendant?

11            MR. STANKOSKI:  Ready.

12            THE COURT:  Okay.  All right.  We are here on your

13   motion.  I'll hear what you have to say.

14            MR. STANKOSKI:  Okay.  If I could call a witness?

15            THE COURT:  You may.

16            MR. STANKOSKI:  We call Detective Gleaton.

17                        **JOHN GLEATON,**

18       **having been first duly sworn, testified as follows:**

19                      <u>**DIRECT EXAMINATION**</u>

20   BY MR. STANKOSKI:

21   Q.   State your name for the record, please.

22   A.   My name is John Gleaton.

23   Q.   How are you employed, Detective Gleaton?

24   A.   I am employed at the Summerdale Police Department as an

25   investigator.

DIRECT - JOHN GLEATON

1   Q.   How long have you been working in that capacity?

2   A.   At Summerdale, I've been there since last June.  About a

3   year.

4   Q.   And are you assigned to any particular areas of

5   investigation at Summerdale P.D.?

6   A.   I handle most all investigations at Summerdale.  I'm

7   retired from law enforcement, and I work part-time to assist

8   Chief Brock.

9   Q.   You say in your affidavit in support of one of your search

10  warrants here that you've had experience of over 30 years of

11  law enforcement investigation; is that correct?

12  A.   I've had around that amount, yes.

13  Q.   Where else would you have gained that experience, your law

14  enforcement experience?

15  A.   I started out at U.S. Customs Service in the late '80s.  I

16  worked at Mobile County Sheriff's Office starting in 1989.  I

17  worked there until 2007 where I was the supervisor for the

18  child abuse unit on two different tours that I worked there in

19  the child abuse unit.

20         And I worked for the Escambia County Sheriff's Office

21  Brewton and was the chief investigator there.  And I worked at

22  Foley Police Department as an investigator and a patrol

23  officer.

24  Q.   So how many cases have you had involving sexual abuse of a

25  child or other crimes against children?

1    A.    Quite a few.  I don't have an exact number for you.

2    Q.    Okay.  And, in this particular occasion, when is it that

3    you first had some type of involvement with my client,

4    Mr. Taras Hodivsky?

5    A.    I was contacted by DHR about a forensic interview on

6    January 17th of this year.

7    Q.    Were you present during that forensic interview?

8    A.    I was.

9    Q.    And who was being interviewed and who was doing the

10   interviewing?

11   A.    I was --

12              MS. CHAPPELEAR:  Your Honor, if we could just use

13   initials, perhaps, when discussing the alleged child victim.

14              MR. STANKOSKI:  No problem with that.

15   BY MR. STANKOSKI:

16   Q.    Detective Gleaton, if you could identify the minor child

17   by her initials, that would be sufficient for today's record.

18   A.    The minor child's initials were M.G.

19   Q.    Who was doing the interviewing?

20   A.    I believe Robin Taylor with the Child Advocacy Center in

21   Baldwin County.

22   Q.    This was January 17th of 2019?

23   A.    I believe so.

24   Q.    And were you outside the presence of the interview

25   watching through a window?

Case 1:19-cr-00080-KD-N Document 199-2 Filed 04/24/2023 Page 113 of 258 PageID #: 994
Case: 19-14844    Date Filed: 09/10/2020    Page: 112 of 257

DIRECT - JOHN GLEATON                                              5

1  A.   Yes, I was, through both a window and a television

2  closed-circuit monitor.

3  Q.   And were you present watching the entire interview?

4  A.   I was.

5  Q.   And the minor child in question, did she make any

6  disclosures to you about my client showing her particular

7  images?

8  A.   Yes, she did.

9  Q.   What do you recall the minor child saying specifically

10 about that?

11 A.   That she saw -- she called Taras, the defendant, "Junior,"

12 and she said that he showed her pictures of boys and girls and

13 inferred that they were involved in sexual activity.

14 Q.   Showed her pictures of boys and girls?

15 A.   Yes.

16 Q.   Is that all she said?

17 A.   That's not all she said, but I'm not --

18 Q.   I mean, all she said in relation to images?

19 A.   That was some of the things that she said in relation to

20 images, yes, that I can remember.

21 Q.   Yeah.  I want to know exactly what was said from the minor

22 child in relation to images as it relates to Mr. Hodivsky.

23 A.   I don't recall what the details -- I mean, it was --

24 Q.   What you recall for today's hearing is that she said she

25 was shown images of boys and girls?

1    A.    Yes.

2              THE COURT:  Well, you also said that she inferred

3    that they were involved in sexual activity.

4              THE WITNESS:  Yes.

5              THE COURT:  Do you recall what she said that inferred

6    that?

7              THE WITNESS:  I'm not sure -- the way she was using

8    mannerisms and explaining herself was very difficult and open

9    to a lot of interpretation.  She's a six-year-old child.  And

10   it was assumed that she was -- by me, that she was talking

11   about sexual activity between the boys and girls.

12   BY MR. STANKOSKI:

13   Q.    And based upon that interview that took place on

14   January 17th, what was your next investigative step as it

15   relates toward Mr. Hodivsky?

16   A.    As it relates to Mr. Hodivsky, I filed for -- I actually

17   obtained two warrants for his arrest on the morning of the

18   22nd at the Foley satellite courthouse, and I also applied

19   for two search warrants before Judge Scully with Baldwin County

20   District Court.

21   Q.    Okay.

22   A.    One for Mr. Hodivsky's DNA and one for search of the crime

23   scene, the property that belonged to his family, and for any

24   digital devices that I could find, such as the phone that was

25   used -- that was used to show her these images.

DIRECT - JOHN GLEATON

1  Q.   Did you get the arrest warrants first, or did you get the

2  search warrants first?

3  A.   I got the search warrants first because I found that

4  Judge Scully was at the courthouse in Foley which would have --

5  I would have had to drive to Bay Minette if I didn't have a

6  judge in Foley.

7  Q.   I'm going to show you a couple of documents and ask you if

8  these are the search warrants and ask you some questions about

9  this.  Can you see this image, Detective Gleaton?

10 A.   Yes.

11 Q.   Okay.  This is a package that I'm going to refer as

12 Defendant's Exhibit 1, and I'm going to refer to this package,

13 if it's okay with you, as the cell phone warrant.  Is that okay

14 with you?

15 A.   That's okay.  That's one of the cell phone warrants.

16 Q.   Right.  I understand that.  I'll refer to the other one as

17 the cell phone data warrant, but, for purposes of today, is it

18 okay if I refer to this as the cell phone search warrant?

19 A.   Yes.

20 Q.   All right.  Taking a look at this document here, is this

21 document your application to obtain a search warrant with

22 Judge Scully?

23 A.   Yes, it is.

24 Q.   Is that your signature affixed to the bottom of that page?

25 A.   It appears to be my signature, yes.

Case 1:19-cr-00080-KD-MB   Document 192-7   Filed 04/04/2023   Page 157 of 287   PageID #:
Case: 19-14844   Date Filed: 08/10/2020   Page: 115 of 257

8

DIRECT - JOHN GLEATON

1   Q.   That's dated January 22nd of 2019?

2   A.   Yes.

3   Q.   Which would have been about 5 days after your interview

4   with the minor child, M.G.?

5   A.   Yes.

6   Q.   Okay.  Now, if I understand the purposes of this warrant,

7   this warrant is a two-fold warrant, is it not?

8   A.   Yes, it is.

9   Q.   The first thing that you were searching for on this was

10  bodily fluids and genetic material which would be located at

11  the shop, Mr. Hodivsky's shop; is that correct?

12  A.   That's correct.

13  Q.   And that's not his residence, is it?

14  A.   That's not his residence, no, sir.

15  Q.   Where does Mr. Hodivsky reside?

16  A.   He lives at an address in Foley.  I'm not sure of the

17  exact address.

18  Q.   Okay.  And the second part of this -- I'm just going to

19  kind of mark it along here so you can see where I'm reading

20  from.  You see the sentence here where you talk about your

21  genetic period -- genetic material, period, and then you start

22  this next sentence here, is items used to view pornography.

23  That's the start of that sentence?

24  A.   Uh-huh.

25  Q.   Okay.  You testified earlier that M.G. told you that he

DIRECT - JOHN GLEATON

1    was showing you -- her -- that M.G. was being shown by

2    Mr. Hodivsky images?

3    A.    Uh-huh.

4    Q.    Why did you refer to them as "pornography" in your

5    application for the search warrant?

6    A.    Because it was -- I referred to images used -- items used

7    to view pornography.

8    Q.    Right.  But your testimony is that she said he showed her

9    images of boys and girls?

10   A.    Yes.

11   Q.    Why do you refer to it as pornography?

12   A.    Because she said that they -- that she inferred that they

13   were involved in sexual activity.

14   Q.    Well, sexual activity is not pornography, is it?

15   A.    It can be.

16   Q.    Did she tell you during the meeting that she was involved

17   in pornography with Mr. Hodivsky?

18   A.    No, she did not.

19   Q.    As a matter of fact, when she was asked during that

20   meeting, didn't M.G. say that he's never filmed her at all?

21   A.    Yeah.  I believe he said -- she said that.

22   Q.    But you refer to it as "pornography" based upon the

23   inferences that you drew from that meeting?

24   A.    Yes.  I used language that I commonly use to do search

25   warrants with, and the fact that they used the word

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/21   Page 117 of 257   PageID #:
Case: 19-14844   Date Filed: 09/10/2020   Page: 117 of 257

DIRECT - JOHN GLEATON                                              10

1    "pornography" did not mean particularly that I could find

2    pornography of a child pornography nature on the phone.

3    Q.   Oh, I completely understand that.  But these are your

4    words, "pornography," that you used from the inference that the

5    child inferred?

6    A.   The fact is that many of these defendants have pornography

7    on their phones.

8    Q.   Right.

9    A.   And on their computers.  The fact that -- the fact that it

10   does not necessarily have to be child pornography that she was

11   shown.  As a six-year-old child, many times she may not be able

12   to understand the difference between an adult dressed as a

13   young person or an actual young person depicted in some type of

14   image.

15   Q.   Sure.  I understand what your inference is, but that's

16   your word, "pornography"; correct?

17   A.   That's correct.

18   Q.   And as we continue on, looking at what you were looking

19   for, you are looking for digital devices such as phones,

20   computers, and digital storage devices that may contain

21   SD cards or micro SD cards which would contain pornographic

22   images?

23   A.   Yes.

24   Q.   So this isn't really a search warrant you were applying

25   for.  This was a seizure warrant.  You wanted to seize these

Case 1:19-cr-00080-KD-B   Document 192-1 Filed 04/24/23   Page 118 of 257   Page ID #: 900
Case: 19-14844   Date Filed: 09/10/2020   Page: 118 of 257

DIRECT - JOHN GLEATON                                                    11

1    particular items; is that correct?

2    A.   Digital files and digital images are very perishable.

3    Q.   This doesn't have anything to do with digital images.  My

4    questions for you are what you are attempting to seize in this

5    document are phones, computers, and digital devices; correct?

6    A.   That could be used to contain the images that she was --

7    that she said that she saw.

8    Q.   That's right.  But what you are trying to do is you are

9    trying to seize these materials, right, the phones, the

10   devices?

11   A.   Yes.

12   Q.   Okay.  And then you continue on and you say, "The property

13   of Taras Hodivsky at" and then you describe an address in

14   there, 17807 County Road 28 in Summerdale.

15   A.   Uh-huh.

16   Q.   And that's what I have referred to as "the shop," not

17   Mr. Hodivsky's residence; correct?

18   A.   That is correct.

19   Q.   Who owns that residence on County Road 28?

20   A.   I believe it's his father.

21   Q.   But in your application, you identify this as Taras

22   Hodivsky, Jr., the nonowner of the property?

23   A.   He had equal access to the property and used it as if it

24   were his repair shop for his race cars.

25   Q.   How do you know that?

Case 1:19-cr-00080-KD-B   Document 192-1 Filed 04/23/20   Page 119 of 257   PageID #: 946
Case: 19-14844   Date Filed: 09/10/2020   Page: 119 of 257

12

DIRECT - JOHN GLEATON

1    A.    That's what I was told.

2    Q.    Well, tell me when you investigated this to determine who

3    owned it and who had access to it.

4    A.    During the course of my investigation --

5    Q.    Tell me when.  When --

6         MS. CHAPPELEAR:  Your Honor, I would ask that the

7    witness be allowed to answer.

8         THE WITNESS:  During the course of my investigation,

9    I interviewed the mother of the victim who lives in an

10   apartment attached to that property, and she said that this is

11   his -- this is his father's property, but he uses it to repair

12   his race cars.

13   BY MR. STANKOSKI:

14   Q.    When did you interview the mother?

15   A.    Right after the forensic interview on the 17th.

16   Q.    Okay.  And during your interview with the mother, she

17   disclosed to you that Taras Hodivsky, Jr., had used that shop,

18   had access to the shop?

19   A.    Yes.  She described her living arrangements as renting an

20   apartment that was attached to a large barn that he used to

21   store his race cars and do repair work on them.

22   Q.    Okay.  And then you go on to say in this is that this is

23   the location where multiple sexual assaults against the child

24   victim were said to have occurred; is that correct?

25   A.    That's correct.

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/20   Page 120 of 257   PageID #:
Case: 19-14844   Date Filed: 02/10/2020   Page: 120 of 257
902

13

DIRECT - JOHN GLEATON

1  Q.   Okay.  Now, if you take a look down at the bottom of this

2  particular warrant, the box that you checked in your

3  application is that you were looking for evidence that

4  constitutes the crime of rape in the first degree and sexual

5  abuse of a child less than 12 years old; is that correct?

6  A.   That's correct.

7  Q.   Now, tell me how obtaining images on a phone can support

8  the crime of rape in the first degree?

9  A.   It corroborates her statement.

10 Q.   Is that what warrants are used for?  To corroborate

11 someone's statement?

12 A.   The warrant was to obtain and seize any evidence that

13 could be either -- either corroborate the victim's statement or

14 possibly contain exculpatory evidence.

15 Q.   So if you found no pornographic materials on

16 Mr. Hodivsky's phone, were you going to dismiss the rape one

17 charge?

18          MS. MURPHY:  Objection, Your Honor.  That's not his

19 decision.

20          THE COURT:  Sustained.

21 BY MR. STANKOSKI:

22 Q.   Would you have asked the district attorney's office to

23 dismiss it if you had not found evidence of pornographic

24 material?

25 A.   I can't speculate on what I would have done, but that

Case 1:19-cr-00080-KD-B   Document 92   Filed 04/23/20   Page 121 of 257   PageID #:
Case: 19-14844   Date Filed: 03/10/2020   Page: 121 of 257
14

DIRECT - JOHN GLEATON

1  might be a possibility.

2  Q.   Okay.  All right.  So back to my question, which I don't

3  think you answered, and I'm going to switch gears here.  Are

4  you familiar with the crime of rape in the first degree?

5  A.   I am.

6  Q.   Okay.  Take a look, if you will, at what I've marked as

7  Defendant's Exhibit 4.  Where in the elements of rape in the

8  first degree is there anything related to images, possessing

9  images, or showing images to a minor?

10  A.   There's not, sir.

11  Q.   Okay.  Furthermore, you said in your -- in the cell phone

12  warrant dated January 22nd that you were also looking for

13  evidence of sexual abuse of a child less than 12 years old.

14  Are you familiar with the crime of sexual abuse of a child less

15  than 12 years old?

16  A.   Yes, I am.

17  Q.   What elements of sexual abuse of a child less than

18  12 years old contain anything related to possession of images?

19  A.   Nothing.

20  Q.   Yet your application for the search warrant, that's what

21  you are looking for, crimes to support rape in the first degree

22  and sexual abuse of a child less than 12?

23  A.   Yes.

24  Q.   Yet, you've admitted to this Court that those aren't

25  elements contained within those crimes; is that correct?

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/2   Page 122 of 257   PageID #
Case: 19-14844   Date Filed 06/10/2020   Page: 122 of 257

DIRECT - JOHN GLEATON

15

1    A.    That's correct.

2    Q.    Are there some other crimes in Alabama that could have

3    been applicable if someone were to show child images on their

4    phone which would be pornographic, in your words, in your

5    application?

6    A.    Yes, there are.

7    Q.    Okay.  One of those would be transmitting obscene material

8    to a child by computer; is that correct?

9    A.    That's correct.

10   Q.    Are you familiar with that crime?

11   A.    Yes, I am.

12   Q.    Okay.  Well, if you notice on the application for the

13   search warrant, there's a box that can be checked, which is

14   No. 2.  Why didn't you check the box saying you were looking

15   for evidence to support the specific crime that would be

16   showing a minor child possession of pornography on a phone?

17   A.    I can't answer that question.  It was an oversight, I

18   guess, on my part.

19   Q.    All right.  Let's take a look at the next page, which is

20   your affidavit on here.  Is this your affidavit that you used

21   in support of the application for your search warrant for what

22   I'll refer to as the cell phone warrant?

23   A.    Yes.

24   Q.    Okay.  Take a look at, if you will, the last couple of

25   sentences on there.  In your particular affidavit, you say that

Case 1:19-cr-00080-KD-B   Document 992-1 Filed 04/23/21   Page 123 of 257   PageID #:
Case: 19-14844   Date Filed: 05/10/2020   Page: 123 of 257
905

DIRECT - JOHN GLEATON                                                    16

1    digital devices are used to view such material that often

2    retain remnants of the images, evidence of the time and videos

3    viewed on the device.

4    A.    Yes, that's -- yes, that's correct.

5    Q.    Do I take that to mean that what you are looking for is

6    evidence of the time when Mr. Hodivsky supposedly showed these

7    pictures to the minor?

8    A.    There are -- there's evidence somewhere on a digital

9    device that shows the time stamp on the device when the -- when

10   the item was originally created, and there are some --

11   Q.    I'm sorry.  I may -- I may have confused you with my

12   question.  My question is on this -- not what you found later,

13   but on the affidavit that you submitted to the detached and

14   neutral magistrate in this matter, did you mean to say that

15   evidence of time and videos shown on the device would have

16   showed the time and date that Mr. Hodivsky supposedly showed

17   these videos to M.G.?

18   A.    No.

19   Q.    What did you mean by that then -- time and videos viewed

20   on the device?

21   A.    The time stamps of any videos or images found on the

22   device should have predated the time in which those videos were

23   viewed.

24   Q.    But any video or image that's on his device that predates

25   that doesn't support the crime of rape or sexual abuse in the

1    first degree, does it?

2    A.    It corroborates it if it exists.

3    Q.    But it doesn't support those crimes.  It corroborates or

4    does not corroborate someone's statement, but it doesn't

5    support those crimes, does it?

6    A.    Sure.

7    Q.    So you are just looking for dates and times and videos

8    that may have predated Mr. Hodivsky supposedly showing that to

9    the minor child?

10   A.    That's correct.

11   Q.    Okay.  And then you go on to say in here that you believe

12   the search would prove the allegations made by the victim in

13   this case, and I would take that to mean prove the allegations,

14   meaning the allegations that he showed her pornographic

15   material?

16   A.    Yes.

17   Q.    Okay.  That allegation that he showed her pornographic

18   material?

19   A.    Yes.  Well, he showed her the material on the phone.  I

20   had no idea at that moment that it would be pornographic or

21   not.

22   Q.    Right.  You had no idea whether it was pornographic or

23   not?

24   A.    No.

25   Q.    You just wanted to go looking for it, didn't you?

DIRECT - JOHN GLEATON                                        18

1    A.    I wanted to retain the digital devices so that they could

2    be further searched.

3    Q.    Right.  You wanted to go looking for evidence of a crime,

4    didn't you?

5    A.    No.  This warrant was not to look at the device.  This

6    warrant was to seize the device to safeguard it.

7    Q.    Thank you for that distinction.  Thank you.  I'm sorry.  I

8    didn't make that distinction there.

9               You wanted to seize a device so it could tend to

10   prove whether or not M.G. was being truthful when she said he

11   showed me pornographic material or images on the phone to me?

12   A.    That's correct.

13   Q.    So you are using this warrant to corroborate or not

14   corroborate a victim's statement?

15   A.    That's correct.  I'm trying to collect evidence that would

16   tend to either show that the person is being truthful or not

17   truthful.

18   Q.    In your 30-year law enforcement career, have you ever

19   retained a search warrant that you used solely for the purposes

20   of corroborating someone's statement?

21   A.    No.

22   Q.    This is the very first time?

23   A.    This warrant is not solely for corroborating someone's

24   statement.  This warrant also is for obtaining DNA evidence as

25   well.

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
MOBILE, ALABAMA  36602  (251) 690-3371

Case 1:19-cr-00080-KD-B   Document 192-1   Filed 04/23/2020   Page 126 of 257   PageID#
Case: 19-14844   Date Filed 08/10/2020   Page: 126 of 257
908

DIRECT - JOHN GLEATON

19

1    Q.    I'm not interested in DNA evidence.  I'm only talking

2    about the digital devices which is why we are here in federal

3    court.  But that's -- that's the purpose of this seizure is you

4    want to seize this to tend to prove or disprove somebody's

5    statement.  And my question for you is --

6    A.    Solely to prove or disprove her statement.  It's to see if

7    there's evidence that exists.

8    Q.    Right.  But, I mean, I'm --

9    A.    And potentially exculpatory evidence could be on this

10   digital device that we did not know at the time.

11   Q.    Right.  That's my question for you, and I'm sorry if I'm

12   not being clear.  How many times in your law enforcement career

13   have you used a search warrant to obtain evidence to

14   corroborate someone's story?

15   A.    I don't recall exactly time times.

16   Q.    That's not typically what you use a warrant for is to

17   corroborate someone's story.  Isn't it true that you normally

18   use a warrant to go find evidence of an alleged crime; isn't

19   that how it's normally used?

20   A.    That's correct.

21   Q.    And then you go on to say here it could also exonerate him

22   as a suspect in the crime?

23   A.    That's correct.

24   Q.    Okay.  All right.  So let's go over here and take a look

25   at the -- this is the actual search warrant itself that was

1   issued by Judge Scully.  I'm just going to zoom out to make

2   sure you recognize it.  Do you recognize a copy of this search

3   warrant?

4   A.   Yes.

5   Q.   Okay.  And this was issued to you at 9:00 o'clock in the

6   morning; is that correct, or 9:00 o'clock in the evening?

7   A.   9:00 o'clock in the morning.

8   Q.   Did you ask the judge to fill in the time stamp on the

9   warrant so it would be accurate?

10  A.   I guess that was an oversight on his part.

11  Q.   Did you fill in that information, or did he put in "John

12  Gleaton, 9:00 o'clock," and the date?

13  A.   He filled in that information, not me.

14  Q.   Okay.  And, again, on the actual search warrant itself, we

15  see the box that's checked constitutes the offenses we talked

16  about earlier, which is rape in the first degree and sexual

17  abuse of a child less than 12; correct?

18  A.   That's correct.

19  Q.   And I assume because that's not handwritten in that you

20  checked that box when you prepared this search warrant?

21  A.   I did.

22  Q.   And the information that's up top, which is very similar,

23  if not exactly the same as your application and affidavit, I

24  assume you filled in that information as well?

25  A.   Yes.

Case 1:19-cr-00080-KD-B   Document 192-1   Filed 04/23/21   Page 128 of 257   PageID #: 955
Case: 19-14844   Date Filed: 9/10/2020   Page: 128 of 257

21

DIRECT - JOHN GLEATON

1      MR. STANKOSKI:  Judge, I move Defendant's 1 into

2  evidence just for the suppression hearing.

3      MS. CHAPPELEAR:  No objection.

4      THE COURT:  It's admitted.

5  [Defendant's 1 was received in evidence.]

6  BY MR. STANKOSKI:

7  Q.   Now, Detective Gleaton, you've got the search warrant in

8  your hand obtained by Judge Scully at 9:00 o'clock in the

9  morning.  And then when do you go get the arrest warrants?

10  A.   I left his office in the Foley satellite courthouse and

11  went immediately to the magistrate's office, which is adjoining

12  that room, and secured the arrest warrants.

13  Q.   Okay.  And the arrest warrants --

14  A.   And turned in the -- and turned in a copy -- made a copy

15  of the search warrants for the Clerk of Court, I think.

16  Q.   You think you made a copy of the search warrants for the

17  Clerk at the time?

18  A.   I had to use their copy machine to make some copies of the

19  search warrant.

20  Q.   And the arrest warrants that you obtained were for rape in

21  the first degree and sexual abuse for a child less than 12?

22  Those were the two --

23  A.   That's correct.

24  Q.   Two arrest warrants obtained?

25  A.   Yes.

DIRECT - JOHN GLEATON

1    Q.   And, now, you are armed with the seizure warrant and the

2    arrest warrants.  What do you do?

3    A.   I went to locate Mr. Hodivsky, and I located him at his

4    house.

5    Q.   How did you locate him?

6    A.   We drove by his house and saw his truck was there.  And I

7    got some officers to go with me, and we knocked on his door.

8    And he -- we arrested him there.

9    Q.   Okay.  Now, when you went to Mr. Hodivsky's home and you

10   knocked on the door, Mr. Hodivsky, he was in bed at the time,

11   wasn't he?

12   A.   He was in a bathrobe when he came to the door, and he said

13   he had been sick.

14   Q.   Did he appear to be sick?

15   A.   He appeared to be sick, yes.

16   Q.   Did you inform him when you got to the door that, No. 1,

17   you had a search warrant or a seizure warrant for his phone and

18   other devices?

19   A.   No.  I informed him of the arrest warrants first.

20   Q.   You informed him -- well, you informed him of the arrest

21   warrant first.  Did you later inform him you had a search

22   warrant for his phones and --

23   A.   Later.

24   Q.   When later?

25   A.   When I was in the jail with him booking him in.

Case 1:19-cr-00080-KD-B   Document 192-1 Filed 04/23/21   Page 130 of 257   PageID #:
Case: 19-14844   Date Filed: 08/10/2020   Page: 130 of 257
9.12

23

DIRECT - JOHN GLEATON

1  Q.   So following Mr. Hodivsky's arrest, if I remember the

2  video correctly, he's in handcuffs.  And you and Chief Brock is

3  with you?

4  A.   Uh-huh.

5  Q.   How long did y'all interview Mr. Hodivsky or talk to him?

6  A.   I don't remember.

7  Q.   The residence that you located Mr. Hodivsky in, that's not

8  on County Road 28; is that correct?

9  A.   No.  It's in Foley.

10  Q.   Right.  That's his residence which, I think, is on

11  Hearthstone Drive?

12  A.   That's correct.

13  Q.   Which is not where the shop that was identified as the

14  location?

15  A.   That's correct.

16  Q.   At the end of the time when you -- when Mr. Hodivsky was

17  actually removed from his home and taken in custody by you,

18  didn't you take his cell phone and slip it in his back pocket?

19  A.   I told him if -- he had his cell phone on the kitchen

20  counter, and, attached to his cell phone, he had his driver's

21  license in a pocket on the phone.  And I said, "You are going

22  to need this when you get to jail."  So I was making sure he

23  took it to jail with him.

24  Q.   Why would he need his cell phone when he got to the jail?

25  A.   I don't know.  I assume he would need his driver's license

Case 1:19-cr-00080-KD-B Document 192 Filed 04/23/2Page 24 of 257 Page 1058
Case: 19-14844    Date Filed: 03/10/2020    Page: 131 of 257

24

DIRECT - JOHN GLEATON

1  for identity purposes.

2  Q.    Right.  But he could have just gotten his driver's license

3  and not the phone; correct?

4  A.    That's correct.

5  Q.    Why did he need the cell phone?

6  A.    He may not have needed his cell phone.

7  Q.    But you took it upon yourself to grab his cell phone and

8  put it in his back pocket while he was handcuffed; is that

9  correct?

10  A.    Correct.

11  Q.    And then Mr. Hodivsky was then transported by you to

12  the --

13  A.    No.  He was transported by another officer to the jail.

14  Q.    And he went to the Foley jail; correct?

15  A.    To the Foley jail.  We used Foley jail.

16  Q.    Okay.  And at the Foley jail, did Mr. Hodivsky surrender

17  to the jail the items that were on his person?

18  A.    Yes, he did.

19  Q.    Okay.  I'll show you a document that I have marked as

20  Defendant's Exhibit 2.  Ask you a couple of questions about

21  this document.  This is a Jail Property Inventory Receipt.  Are

22  you familiar with this document?

23  A.    Yes, I am.

24  Q.    Okay.  If I'm reading this correctly, at the time that he

25  went to the jail on January the 22nd, which would be the date

Case 1:19-cr-00080-KD-N   Document 192   Filed 04/23/21   Page 132 of 257   PageID #:
Case: 19-14844   Date Filed: 09/10/2020   Page: 132 of 257

25

DIRECT - JOHN GLEATON

1    that this report was created, he had a set of keys, his cell

2    phone, his jacket, and his belt?

3    A.    That's correct.

4    Q.    Okay.  We are going to get to this a little bit later on,

5    but at some point you came back and wrote in this word here

6    "Search Warrant Gleaton."  That was not written at the time

7    Mr. Hodivsky went to the Foley jail, was it?

8    A.    That's correct.

9    Q.    Okay.  So when Mr. Hodivsky goes to the jail, he

10   surrenders these particular items, including the cell phone

11   that you already had a warrant to seize?

12   A.    That's right.

13   Q.    Why did you -- why didn't you seize the phone from him

14   when you went to his residence?

15   A.    We were in a hurry to get him to jail and get him into

16   custody and book him in.

17   Q.    Well, you weren't in a hurry when you first went to the

18   court and told Judge Scully you needed a warrant for his cell

19   phone.  Wouldn't it have been very easy for you to take in

20   custody of the very thing that you have a warrant to be seized

21   at the time of his arrest?

22   A.    That's true.

23   Q.    You didn't think that was important?

24   A.    I didn't think it would matter when I actually seized it.

25   When he got it and it was entered into evidence as -- entered

1   into his jail property, I left a copy of the search warrant and

2   took the cell phone because I wanted everything documented.

3   Q.    Well, what if he left his cell phone at his residence?

4   A.    Well, we would have seized it at the residence.

5   Q.    But your search warrant gives you the right to go to the

6   shop, not to his residence.  So if he left his cell phone at

7   the residence, how are you going to obtain this valuable

8   evidence, Detective Gleaton?

9   A.    The search warrant.

10  Q.    Let me finish my question, please.  How are you going to

11  obtain this valuable evidence that you needed for your case if

12  he had left it at his home?

13  A.    The search warrant --

14  Q.    The search warrant --

15  A.    The search warrant was good for the cell phone, wherever

16  it may be found.

17  Q.    Well, no, sir.  Isn't it true that the search warrant said

18  you could go to his shop and search for these devices?

19  A.    The search warrant was for the shop and for cell phones.

20  Q.    Right.  The cell phone located at the shop.  I'll be happy

21  to show you the cell phone warrant if you would like me to to

22  refresh your recollection, but it says cell phone at the shop,

23  doesn't it?

24  A.    It doesn't say cell phone at the shop.  It says cell

25  phones particularly.

1  Q.    So you take it to mean that on Defendant's Exhibit 1 that

2  even though you have -- the only address listed in there of

3  Taras Hodivsky, Jr., his property, even though it's not his

4  property on County Road 28, it's your opinion that you could

5  have gone with that warrant and seized the phone in his home on

6  Hearthstone Drive?

7  A.    Well, the warrant is not for his home on Hearthstone

8  Drive, but the warrant is for cell phones.  And, in hindsight,

9  it would have been better if I put "cell phones wherever they

10 may be found."

11 Q.    Well, as a matter of fact, it says this on this

12 application here.  Take a look with me, if you will.  It says

13 what you are trying to seize here are phones, computers --

14 we'll just talk about phones because that's what we are dealing

15 with here.  It gives you the right to seize phones, and it says

16 here is located or concealed in or upon place, premises, and

17 vehicle to be searched, the property of Taras Hodivsky on

18 County Road 28.

19        So despite your testimony that you could go to the

20 home, that's not what the warrant said; isn't that true?

21 A.    The cell phone is property of Taras Hodivsky, Jr.

22 Q.    That's not what your warrant says, despite what you

23 believe that your search warrant says --

24        THE COURT:  We are not arguing with him.  Just ask

25 the next question.

Case 1:19-cr-00080-KD-B   Document 192-1   Filed 04/23/2020   Page 135 of 257   PageID 062
Case: 19-14844   Date Filed: 07/10/2020   Page: 135 of 257

DIRECT - JOHN GLEATON

1        MR. STANKOSKI:  I understand.

2        Judge, I move Defendant's 2 for evidence purposes for

3   the suppression hearing.

4        THE COURT:  If you don't have extra copies, bring

5   them up so I can be looking at them.  I have some of that that

6   was attached to the motions, but I don't have your Exhibit 1.

7        MR. STANKOSKI:  I understand, Judge.  These are a

8   whole new set.  They may contain different exhibits than may

9   have been attached.  I apologize.

10       THE COURT:  And remind me again.  You arrested him at

11   his house where?

12       THE WITNESS:  On Hearthstone Drive.

13       THE COURT:  Hearthstone Drive.

14       MR. STANKOSKI:  Judge, again, I don't know if I got

15   it in for the record.  Readmit No. 2 for purposes of the

16   suppression hearing today.

17       THE COURT:  Okay.  It's admitted.

18       MS. CHAPPELEAR:  No objection.

19    [Defendant's 2 was received in evidence.]

20  BY MR. STANKOSKI:

21  Q.   Let's go back to the cell phone original warrant that you

22  have.  Now, even though you got this warrant on January

23  the 22nd, you didn't effectuate this warrant until 2 days

24  later; is that correct?

25  A.   Explain what you mean by "effectuate."

Case 1:19-cr-00080-KD-B Document 192 Filed 04/23/2020 Page 136 of 257 Page ID 968
Case: 19-14844 Date Filed 9/10/2020 Page: 136 of 257

29

DIRECT - JOHN GLEATON

1   Q.   You didn't serve it and go down and do what the search

2   warrant authorized you to do until 2 days later; is that

3   correct?

4   A.   There was portions of the warrant that was effectuated

5   when I seized the cell phone.

6   Q.   Well, that wasn't done on January -- well, let me back up

7   and ask you this:  When do you contend that you seized the cell

8   phone?  Let's start with that.  What day is it that you

9   contend?

10  A.   It was when he was arrested, subsequent to his arrest at

11  the jail when I took his cell phone.

12  Q.   That's what you contend is that you executed the warrant

13  was when you went to jail?

14  A.   That's when part of the warrant was executed.  The other

15  part was executed at his property 2 days later.

16  Q.   Let's take a look, if you will, at this document here.

17  This is the search warrant return and inventory.  You are aware

18  of the fact that when you serve a search warrant, you have to

19  make a return and inventory the items that you have seized; is

20  that correct?

21  A.   That's correct.

22  Q.   All right.  The date of this particular return is the only

23  one I've ever seen for the cell phone warrant is dated January

24  the 24th of 2019.  That date being right here, two days

25  later.  Do you have a document in your possession that shows

Case 1:19-cr-00080-KD-B    Document 192    Filed 04/23/2020    Page 137 of 257   PageID #:
Case: 19-14844    Date Filed: 9/10/2020    Page: 137 of 257

30

DIRECT - JOHN GLEATON

1  that you executed the warrant on the day Mr. Hodivsky was

2  arrested to take the cell phone?

3  A.   No, save for the evidence of the previous listed evidence

4  that you provided.

5  Q.   Right.  And I would assume because I've checked with the

6  Baldwin County clerk's office, you didn't file a return for

7  January 22nd saying that you seized the cell phone on January

8  the 22nd, did you?

9  A.   No.

10  Q.   Let's go down here and look and see what you identify on

11  here.  The first thing that you identify on this return on

12  January the 24th is one cell phone, Galaxy S9; is that right?

13  A.   Correct.

14  Q.   And it's your testimony that you seized that on January

15  the 22nd and just included this on the 24th return?

16  A.   That's correct.

17  Q.   Did you provide a copy of the return or any return on

18  Mr. Hodivsky on January the 22nd?

19  A.   I left him a copy of the search warrant --

20  Q.   Right.

21  A.   -- in his jail belongings.

22  Q.   Okay.  And then taking a look down here, it appears to me

23  left at residence on refrigerator in workshop.  Is that where

24  you take this return on the 24th?

25  A.   On the 24th, that's where his return was left, yes.

Case 1:19-cr-00080-KD-B  Document 192-1 Filed 04/23/21  Page 138 of 257  PageID #:
Case: 19-14844  Date Filed: 09/10/2020  Page: 138 of 257

DIRECT - JOHN GLEATON

31

1  Q.   Okay.  So, now, you've got the cell phone in your

2  possession and -- or the jail has it.  When did Detective

3  Gleaton get the phone in his hands?

4  A.   On the 22nd.

5  Q.   What did you do when you got it?

6  A.   I immediately turned it into airplane mode and turned it

7  off.

8  Q.   Why did you turn it into airplane mode?

9  A.   So that nobody could remotely disable it or do anything to

10 tamper with any evidence.

11 Q.   After you turned it to airplane mode and then turned it

12 off, where did you put it?

13 A.   I put it in our evidence locker.

14 Q.   Okay.  And when is the next time you physically accessed

15 the phone?

16 A.   When I brought it to -- after I secured the second warrant

17 to search the device, I accessed the phone out of the evidence

18 locker and took it to an investigator to download the contents.

19 Q.   When you were doing this investigation and executing these

20 warrants, did you prepare a police narrative?

21 A.   I did.

22 Q.   So you could memorialize what you were doing?

23 A.   I did.

24 Q.   I'll ask you some questions about your -- I'll show you

25 what I have marked as Defendant's Exhibit 8.  Is this a copy of

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/20   Page 137 of 257   PageID 966
Case: 19-14844   Date Filed: 08/10/2020   Page: 139 of 257

32

DIRECT - JOHN GLEATON

1  your Alabama Uniform Incident Offense Report that you used

2  during the course of your investigation?

3  A.   It appears to be one, yes.

4  Q.   And I've redacted all the information about the minor

5  child in this.  If you'll read quickly to yourself that bottom

6  paragraph.

7         MS. CHAPPELEAR:  He hasn't been asked a question yet.

8         THE COURT:  Why don't you ask him a question.

9  BY MR. STANKOSKI:

10 Q.   Do you recall the events that gave rise to your

11 investigation?

12        THE COURT:  Ask him a specific question.  If he can't

13 answer it, then we'll let him refresh his recollection.  How

14 about that?

15        MR. STANKOSKI:  Do you want me to pull this back?

16        THE COURT:  Yeah.  That's normally how it works.

17        MR. STANKOSKI:  Gotcha.

18 BY MR. STANKOSKI:

19 Q.   Do you recall stating in your narrative that the cell

20 phone had been maintained --

21        MS. CHAPPELEAR:  Objection, Your Honor.

22        THE COURT:  Let him finish.

23 BY MR. STANKOSKI:

24 Q.   Do you recall that the -- you saying in your narrative

25 that the device in this matter had been maintained in airplane

Case 1:19-cr-00080-KD-B    Document 192-1    Filed 04/23/2    Page 140 of 257    Page ID D.

Case: 19-14844    Date Filed: 02/10/2020    Page: 140 of 257

33

DIRECT - JOHN GLEATON

1   mode?

2   A.    I probably used the wrong verbiage, but I had put it into

3   airplane mode to prevent anything from being transmitted to or

4   from it to preserve any evidence that was on it.

5   Q.    So your testimony today would be different than what you

6   put on your narrative about maintained or you used the wrong

7   term, "maintained"?

8   A.    I don't know what you mean by the question.

9   Q.    Well, do you recall writing up in your report that you --

10  that the cell phone was maintained in airplane mode?  That

11  implies to me an ongoing type activity, maintain.

12  A.    That would be inaccurate because I put it in airplane

13  mode, and I locked it in his locker and left it there until I

14  needed to get it retrieved.

15  Q.    So even though you had the phone in your possession, you

16  did not look in the phone?

17  A.    No, I did not.

18  Q.    But you did turn it on to put it into airplane mode.  How

19  did you put that phone into airplane mode?

20  A.    I turned it on, and I went to the settings screen and

21  switched the switch to airplane mode and immediately turned it

22  off.

23  Q.    Okay.  So, now, you've got the cell phone in your

24  possession, and you now want to attempt to obtain some data off

25  the phone; is that correct?

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/20   Page 34 of 137   PageID# 768
Case: 19-14844   Date Filed: 03/10/2020   Page: 141 of 257

34

DIRECT - JOHN GLEATON

1    A.    I don't obtain data off the phone.  I send it to somebody

2    else to do that.

3    Q.    Remind me again, when did you send that phone to someone

4    else?

5    A.    I'm not sure.  I secured another warrant for the data on

6    the phone, and I took it to Officer Bibby, who was trained to

7    download phones, contents --

8    Q.    Okay.

9    A.    -- at Foley P.D.

10   Q.    I'll show you what I have marked as Defendant's Exhibit 3.

11   Is this a copy of your warrant -- and I'll refer to this

12   warrant that was submitted to the judge on January 30th as

13   the cell phone data warrant.  Is this your application for that

14   particular search warrant?

15   A.    Yes.

16   Q.    Now, on this particular application that you submitted to

17   Judge Scully, the first thing you say on this is that what you

18   want to look at or look into is the cell phone of Taras

19   Hodivsky containing stored electronic data, evidence of the

20   crimes alleged in this case.

21         Might I assume that the crimes alleged in this case

22   is rape in the first degree and sexual because of a minor under

23   12?

24   A.    That's correct.

25   Q.    And you would, again, agree with me that looking at data

DIRECT - JOHN GLEATON

1  in a phone does not support either one of those crimes?

2  A.   Data in a phone can support crimes because of the

3  information --

4  Q.   I'm sorry.  I may not have been clear in my question.  The

5  data in the phone would not support the crimes that you told

6  the judge you were looking for evidence of, that being rape in

7  the first degree --

8  A.   The data would corroborate the victim's statement.

9  Q.   That's not my question, Detective Gleaton.  My question

10 is, that data in that phone has nothing to do with rape 1 or

11 sexual abuse of a minor child, does it?

12 A.   If you say so.

13 Q.   I can show you the law again.  If you find an element --

14 A.   If you say so.

15        MS. CHAPPELEAR:  Your Honor, I believe he's answered

16 the question.

17        THE COURT:  What's your objection?  Asked and

18 answered?  Overruled.

19 BY MR. STANKOSKI:

20 Q.   Okay.  And so we continue on.  And you say electronic

21 devices store image and videos which would show the stored

22 pornographic images that were said to have been shown to the

23 victim by the defendant.  Yet, you've admitted today that the

24 victim never told you that she was shown pornographic images.

25 Those are your words.

Case 1:19-cr-00080-KD-B   Document 192-1  Filed 04/23/20   Page 143 of 257   PageID #:
Case: 19-14844   Date Filed: 09/10/2020   Page: 143 of 257
925

36
DIRECT - JOHN GLEATON

1    A.   She inferred that they were sexual activity between the

2    boys and girls.

3    Q.   I understand she inferred --

4    A.   She was a six-year-old child.

5    Q.   I get you on that, but we are only sticking with the facts

6    here that you went to the judge.  She didn't say that --

7    according to your testimony today, she didn't say there was

8    pornographic images today?

9    A.   What she said inferred there was pornographic images on

10   the phone.

11   Q.   She inferred it, but she didn't say it.  Those are your

12   words on the application; is that correct?

13   A.   That's correct.

14   Q.   Okay.  And, then again, despite the fact that there were

15   additional boxes on there that you can check to actually

16   support the crime that you are looking for or, I guess, check a

17   box that says corroborate a victim's story, you say I'm looking

18   for evidence of rape 1 or sexual abuse of a child under 12;

19   correct?

20   A.   Correct.

21   Q.   And the same type of material is on your affidavit; is

22   that correct?

23   A.   That's correct.

24   Q.   And, again, you say on this affidavit that you are looking

25   for data from Mr. Hodivsky's phone which would tend to prove

Case 1:19-cr-00080-KD-B   Document 192-1   Filed 04/23/21   Page 144 of 257   PageID #:
Case: 19-14844   Date Filed: 06/10/2020   Page: 144 of 257

37
DIRECT - JOHN GLEATON

1    his involvement or exonerate him as a suspect?

2    A.   That's correct.

3    Q.   Or assist the state in bringing the real criminal to

4    justice; right?

5    A.   That's correct.

6    Q.   And, again, like I asked you the first question about the

7    seizure of the phone, that's a very unusual technique to be

8    looking for data on a phone to corroborate someone's story;

9    correct?

10   A.   No, sir.  It's not -- I don't believe that's correct.

11   Q.   Well, let me --

12   A.   Well, we use corroborative evidence to support a victim's

13   statement --

14   Q.   I understand.

15   A.   -- in criminal investigations all the time.

16   Q.   Let me reask my question.  You testified earlier that you

17   never issued a warrant that you can recall to seize a cell

18   phone to corroborate someone's story?

19   A.   Not solely to corroborate a story.

20   Q.   Right.  I'm asking you the same question here.  Have you

21   ever used a warrant to obtain data to corroborate someone's

22   story off of a device?

23   A.   Not solely to obtain data to corroborate a story, but,

24   yes, we've used corroborative information in investigations for

25   years.

Case 1:19-cr-00080-KD-B Document 192-1 Filed 04/23/20 Page 145 of 257 PageID #: 972
Case: 19-14844    Date Filed: 08/10/2020    Page: 145 of 257

38

DIRECT - JOHN GLEATON

1  Q.    Do you ever put that in an application for a search

2  warrant, either affidavit or application, that that's the

3  purpose that you are using the search warrant for, whether it

4  be in part or in whole that you are using it to corroborate

5  someone's story?

6  A.    It could be -- it could be entered into some affidavits, I

7  guess.

8  Q.    Somewhere some time over your 30-year career, do you

9  recall those cases that you did that in?

10  A.    I don't recall.

11  Q.    Okay.  And if we take a look at the actual search warrant

12  that was issued by Judge Scully, I assume the language up top

13  was cut and pasted from your affidavit and application, is that

14  correct, the top part here?  It looks to be the same?

15  A.    It looks to be the same.

16  Q.    Okay.  And, again, the actual search warrant itself, you

17  are looking for evidence of the crimes alleged in this case.

18  And, again, just for the record, we note that what we are

19  talking about is the crimes that you have checked in here

20  rape 1 and sexual abuse of a minor under 12?

21  A.    That's correct.  Those are the crimes that I was focused

22  on.

23  Q.    Okay.  And then if we look at the search warrant return,

24  that was obtained on January the 30, the warrant.  Is this the

25  return that you filed dated February 5th of 2019?

1    A.    That's correct.

2    Q.    Okay.  Now, after you got the warrant on the 30th, when

3    did you turn this phone over to -- is it Bibby you gave --

4    A.    Detective Bibby.

5    Q.    When did you give the phone to Detective Bibby?

6    A.    I'm not exactly sure.  There was some documentation that

7    we signed chain of custody when they transferred the phone.

8    Q.    Would it have been before you got the warrant on

9    January 30th?

10   A.    No, of course not.

11   Q.    It would have been after?

12   A.    Yes, sir.

13   Q.    But you don't recall when?

14   A.    I'm not sure.  There was some question in my mind whether

15   or not we were going to -- the F.B.I. was going to examine the

16   phone or I would use Mr. Bibby.

17   Q.    Okay.  And did you decide to use Mr. Bibby?

18   A.    He was available in Foley, and it's easier to drive to

19   Foley than to Mobile.

20   Q.    Okay.  So when did Detective Bibby give you the results so

21   you knew what to file on your return of this warrant on

22   February the 5th?

23   A.    He gave me the results of the phone some time after the

24   return upon execution because I did not -- I was not able to

25   actually get up with him to -- for him to give me all the data.

1   Q.   Okay.  So did you have a conversation with him before he

2   got the data?

3   A.   The conversation, he told me on the phone that there was

4   items of child -- adult and child pornography on the phone.

5   Okay.

6   Q.   So based upon what Detective Bibby told you, you didn't

7   see it?  He just called you and told you that there was

8   adult --

9   A.   He was still in the process of examining the phone because

10  it takes quite a bit more time than the 10 days allowed by a

11  search warrant return.  So when we returned the search

12  warrants, we have to -- he was continuing the process of

13  examining the phone.

14  Q.   And, on this particular return, you say you served it on

15  Mr. Taras Hodivsky through his attorney, Michael Pylant?

16  A.   Yes.

17  Q.   When did you go to Michael Pylant and hand him a copy of

18  that return?

19  A.   I e-mailed him a copy, I think.  I believe.

20  Q.   Would that have been on February the 5th when you returned

21  this with the court?

22  A.   I think so.

23  Q.   Do you have a copy of any e-mails in your files?

24  A.   I don't remember.  I thought that I had sent him one.  It

25  may have been over the fax machine, or it may have been over

Case 1:19-cr-00080-KD-B   Document 92-1   Filed 04/23/20   Page 148 of 257   PageID #: 930
Case: 19-14844   Date Filed: 07/30/2020   Page: 148 of 257

41

DIRECT - JOHN GLEATON

1   the --

2            MR. STANKOSKI:  Judge, I move Defendant's 3 into

3   evidence for purposes of the suppression hearing.

4            MS. CHAPPELEAR:  There's no objection.  There may

5   need to be some redactions for the child's name, but other than

6   that, no.

7            THE COURT:  Okay.  You need to have redacted the

8   child's name.  I see the child's name.

9            MR. STANKOSKI:  I'm sorry.  I didn't know that was in

10  there.  Is it --

11           THE COURT:  Yes.  It's on page 2.  I see it.  It may

12  be in other places too, but I do see it on page 2 of the

13  affidavit.

14           MR. STANKOSKI:  Yes, ma'am.  Before we conclude

15  today, I'll make sure the originals have that redacted.

16           THE COURT:  Okay.

17  BY MR. STANKOSKI:

18  Q.   So, Detective Gleaton, when is it that you actually

19  reviewed any of the data obtained from Mr. Hodivsky's phone?

20  A.   I don't know exactly the date.  I remember it was some

21  time after the search warrant return.

22  Q.   Okay.  And, correct me if I'm wrong, but the program that

23  was used to extract the data is the Cellebrite extraction

24  program; is that correct?

25  A.   That's correct.

DIRECT - JOHN GLEATON

1  Q.   And all data was pulled off Mr. Hodivsky's phone; is that

2  right?

3  A.   I can't answer that question.  I'm not trained on

4  Cellebrite, and I understand there's others that can better

5  answer that question.

6  Q.   If Detective Bibby was here today --

7  A.   Yes.

8  Q.   He can probably answer that, couldn't he?

9  A.   Yes.

10  Q.   Did you look at any of the reports?

11  A.   I looked at the Cellebrite extraction report.  He had

12  password protected it so that it would be protected from

13  anybody watching it or looking at it.

14  Q.   Okay.

15  A.   I did see images that appeared, to me, to be child

16  pornographic images on the extraction report.

17  Q.   And -- but you saw that there was other data that was

18  lifted from the phone as well?

19  A.   There's quite a bit of data on the phones.

20  Q.   Right.

21  A.   And I'm sure that it was all lifted or taken from the

22  phone to corroborate the time and date stamp so the images and

23  various things.  But he can probably better answer those

24  questions.

25  Q.   Yeah.  Well, there was documents obtained off of that,

DIRECT - JOHN GLEATON

1   Word documents?

2   A.   I don't know.  I don't recall.

3   Q.   Text messages?

4   A.   Yes.  That would have been -- some of the images may have

5   been images transmitted by text messages.

6   Q.   Right.  All evidence of any app that was put on his phone

7   was downloaded in that report, wasn't it?

8   A.   There was a lot of stuff that was downloaded on the phone.

9   Like I said, I can't -- the experts can better explain what

10  they found.

11  Q.   But you are generally familiar with the Cellebrite

12  program.  That's a complete data dump; right?

13  A.   No, sir.  There are some apps that do not -- are not

14  downloadable from Cellebrite.  So there's some things that

15  can't -- that they can't get.

16  Q.   Okay.  And you would agree with me that your warrant only

17  allows you to go into stored images and videos; correct?

18  A.   The warrant said stored images and videos.

19  Q.   Right.  So if data was taken --

20  A.   Also time and date stamps.

21  Q.   Right.

22  A.   So the file structure of the phone would tend to prove or

23  disprove the time and date stamps associated with the images.

24  Q.   You would agree with me, then, that there was more taken

25  out of that phone than just images and videos; correct?

Case 1:19-cr-00080-KD-B   Document 92-1 Filed 04/28/22   Page 44 of 137   PageID #: 1978
Case: 19-14844   Date Filed: 03/10/2020   Page: 151 of 257

44

DIRECT - JOHN GLEATON

1   A.   Cellebrite -- Cellebrite is a process that he can probably

2   better describe to you, and the way it works --

3   Q.   But you are familiar with the fact that there was more

4   taken out of that phone than just what your warrant said?  Your

5   warrant said --

6   A.   The device -- the device --

7   Q.   Detective Gleaton, just let ask my question, please before

8   you interrupt me, if you don't mind.

9        You know -- from looking at the Cellebrite extraction

10  report, you know that there was more data taken out of that

11  phone other than images and videos?  You know that, don't you?

12  A.   Cellebrite takes a lot of data --

13       THE COURT:  Are you moving to suppress anything other

14  than the pornographic --

15       MR. STANKOSKI:  Yes, ma'am.

16       THE COURT:  Okay.  Well, that was not made clear in

17  your motion.  What are you moving to suppress?

18       MR. STANKOSKI:  Everything.  All the data that was

19  obtained -- there was some datas that were obtained through a

20  third-party app, a third-party cloud-based app.  There were

21  text messages that were downloaded.  There were documents that

22  were downloaded.

23       THE COURT:  Okay.  Is the Government using anything

24  from the phones other than the pictures?

25       MS. CHAPPELEAR:  I'm sorry, Judge.  Could you say

Case 1:19-cr-00080-KD-N   Document 192-1   Filed 04/23/2020   Page 153 of 257   PageID #: 1079
Case: 19-14844   Date Filed: 08/10/2020   Page: 152 of 257

45

DIRECT - JOHN GLEATON

1    that again?

2          THE COURT:  I said is the Government planning to

3    introduce evidence from the phone other than the pictures?

4          MS. CHAPPELEAR:  No, not other than the images or

5    videos.

6          MR. STANKOSKI:  Oh, then they can dismiss Count 1 and

7    2 that came from the MEGA app.

8          THE COURT:  No, no, no.  That's not what I just said.

9    Maybe I wasn't clear.  I asked the Government, are you planning

10   on using evidence from the phone, any place in the phone, that

11   is other than pictures, whatever pornographic pictures you

12   found.  Did you find videos and pictures?

13         MS. CHAPPELEAR:  There's videos and pictures.  And

14   then inside the MEGA app, which Detective Gleaton has -- was

15   not involved with.

16         THE COURT:  Right.

17         MS. CHAPPELEAR:  There was communication about images

18   and videos.

19         THE COURT:  All right.  So you are planning to

20   introduce something other than the pictures and the videos?

21         MS. CHAPPELEAR:  Correct.

22         THE COURT:  Like text messages or something?

23         MS. CHAPPELEAR:  No.

24         THE COURT:  What do you mean by "communications"?

25         MS. CHAPPELEAR:  It's -- I believe we'll hear from

Case 1:19-cr-00080-KD-B   Document 192-1   Filed 04/23/20   Page 153 of 257   PageID #: 935
Case: 19-14844   Date Filed: 05/10/2020   Page: 153 of 257

46

DIRECT - JOHN GLEATON

1  Detective Bibby and Agent Middleton about what the MEGA app is.

2  It's a communication app.

3         THE COURT:  Is it like Messenger or something?

4         MR. STANKOSKI:  It's like Dropbox, Judge.

5         THE COURT:  You are still out of my league.

6         MR. STANKOSKI:  I'm sorry.  It's a cloud-based

7  document storage device that what do you is you download it on

8  your phone or your computer.  You put documents into the MEGA

9  app.  It goes out into the cloud, and it's stored on a remote

10  server.  And you can access that from any other computer

11  anywhere you want from any other location.

12         THE COURT:  Okay.

13         MR. STANKOSKI:  It's what I do with my office is

14  Dropbox is what I use.

15         THE COURT:  Okay.  What types of communications are

16  in there?  Letters or --

17         MS. CHAPPELEAR:  Exchanges of child pornography.

18         THE COURT:  Okay.

19         MS. CHAPPELEAR:  It was links.  It was communications

20  regarding, you know, this is a specific e-mail address you can

21  go to, here's the password, you can access that e-mail address,

22  go into the drafts folder, there you'll see images of child

23  pornography.

24         THE COURT:  So, here again, what you are trying to

25  introduce from the MEGA app are pictures and --

1          MS. CHAPPELEAR:  It's links to pictures.

2          THE COURT:  Oh, I get it.  Links to -- in other

3   words, here is where you can go and see something?

4          MR. STANKOSKI:  Right.  And there's also chats on

5   there too.

6          THE COURT:  Chats that you are trying introduce?

7          MS. CHAPPELEAR:  Where they'll say, "Do you have this

8   series?"

9          "Yes, I have this series."

10          "I'll send you this series if you send me these

11   series."

12          MR. STANKOSKI:  And that's the solicitation charge.

13   That's Count 1 that came from a third-party app that created

14   the chats.

15   BY MR. STANKOSKI:

16   Q.   So, Detective Gleaton, let me back up, and I'm going to

17   ask you some questions about the third-party apps.

18   A.   Understood.

19   Q.   You would agree with me that you easily could have

20   remedied a lot of this problem if you had just obtained one

21   warrant on January the 22nd?

22   A.   One warrant on January 22nd?

23   Q.   Right.  You could have gone to the judge on

24   January 22nd, and you could have applied for a warrant for

25   the DNA buccal swab; correct?

DIRECT - JOHN GLEATON

1    A.    Correct.

2    Q.    You could have gotten, within that warrant, bodily fluids

3    or genetic material at the shop; correct?

4    A.    That's correct.

5    Q.    You also could have obtained a seizure of the cell phone;

6    is that right?

7    A.    That's correct.

8    Q.    And you could have obtained the images from the phone all

9    in one warrant; is that correct?

10   A.    That's -- I suppose I could have done it that way, yes.

11   Q.    But, instead, you broke it up into three parts; right?

12   A.    That's correct.

13   Q.    And it's not that hard to prepare an application for

14   search warrant and take it to a judge, is it?

15   A.    Well, as we've seen, if you misstate anything in the

16   application, it can be scrutinized quite thoroughly.

17   Q.    Right.  I'm not asking whether he would grant it or she

18   would grant it or not.  It's not hard for you to take your

19   preprinted template that you use in Summerdale and fill in the

20   information on the application in your affidavit?

21   A.    I can fill in applications for -- I mean, there's a lot of

22   specific language that we have to --

23   Q.    I'm sorry.  I'll ask you again.  If I'm not being clear,

24   let me know.  It's not hard, is it --

25   A.    No.

Case 1:19-cr-00080-KD-B   Document 192-1   Filed 04/23/2   Page 45 of 25   PageID #
Case: 19-14844   Date Filed: 08/10/2020   Page: 156 of 257

49

DIRECT - JOHN GLEATON

1    Q.    -- to take --

2              THE COURT:  I don't see whether it's hard or not is

3    relevant.

4    BY MR. STANKOSKI:

5    Q.    Okay.  But, be that as it may, you did not obtain a

6    warrant for third-party apps, did you?

7    A.    I had no knowledge of any third-party apps, to begin with.

8    Q.    Right.

9    A.    So how would I have obtained a warrant for it?

10   Q.    Well, once you got into the phone and started looking at

11   the data -- excuse me.  Once you got -- once you had your

12   expert get into the phone and start looking for photographs and

13   images, was it ever brought to your attention that you might

14   need to go back and get a warrant for a third-party app like

15   the MEGA app?

16             MS. CHAPPELEAR:  Your Honor, he's already testified

17   that he's not the one who did the phone review.  He just

18   reviewed the results.

19             THE WITNESS:  I just reviewed the results, and I had

20   no idea up until recently what the MEGA app was.

21   BY MR. STANKOSKI:

22   Q.    Let me ask it to you and you can just answer this yes or

23   no then.  You never went back and got any search warrants, did

24   you, whether you knew you were supposed to or not or whether

25   you had knowledge of it --

Case 1:19-cr-00080-KD-B Document 192 Filed 04/23/2020 Page 157 of 257 PageID #:
Case: 19-14844    Date Filed: 03/10/2020    Page: 157 of 257

50

DIRECT - JOHN GLEATON

1    A.    The search warrant --

2    Q.    Let me finish my question, please, Detective Gleaton.  You

3    never went back and got a warrant for any third-party apps at

4    all, did you?

5    A.    No, sir, I didn't.

6    Q.    The only warrant that you have ever gotten, as it relates

7    to cell phone images and photographs, was the January 30th

8    one; is that correct?

9    A.    That's correct.

10   Q.    And, based upon that warrant, that's what the F.B.I.

11   traveled under when you turned this evidence over to Special

12   Agent Carolyn Middleton; is that correct?

13           MS. CHAPPELEAR:  Objection.  Lack of knowledge.

14           THE WITNESS:  I don't know.  I don't know how I can

15   answer that question.

16   BY MR. STANKOSKI:

17   Q.    Did you turn over the phone to Special Agent Carolyn

18   Middleton?

19   A.    Yes.  At some point, yes.

20   Q.    Did you obtain a warrant for anything before you turned

21   that over to Carolyn Middleton?

22   A.    No.

23   Q.    Did you inform Carolyn Middleton that you already knew

24   that there was child pornography on the phone at the time you

25   gave her the phone?

Case 1:19-cr-00080-KD-B    Document 92    Filed 04/23/20    Page 158 of 257    PageID 935
Case: 19-14844    Date Filed: 04/10/2020    Page: 158 of 257

51
DIRECT - JOHN GLEATON

1    A.    She had access to -- I gave her access to my entire case

2    file.

3    Q.    So the answer would be "yes"?

4    A.    So, yes, that would be the answer.

5    Q.    Okay.  You told her that you had evidence of child

6    pornography, and then you asked the F.B.I. then to look into

7    the phone?

8    A.    That's -- well, I asked them to make sure to look into the

9    phone and make sure -- we don't have -- I don't know -- I don't

10   have the expertise that the F.B.I. does obviously, and I wanted

11   them to continue looking at the phone to make sure that there

12   was not something else that we missed as far as images.

13            MR. STANKOSKI:  Judge, just for the record, I'm going

14   to move in Defendant's Exhibit 4 and 5, which are the

15   definitions of the crimes that were alleged in the search

16   warrant.  That would be Defendant's 4 and 5.

17            THE COURT:  If there's no objection, it's admitted.

18        [Defendant's 4 and 5 were received in evidence.]

19            MR. STANKOSKI:  Judge, may I have one moment?

20            THE COURT:  Okay.

21            MR. STANKOSKI:  That's all of this witness, Judge.

22            THE COURT:  I think the Government wants to ask you

23   some questions.

24

25

CROSS - JOHN GLEATON

### CROSS-EXAMINATION

1
2    BY MS. CHAPPELEAR:

3    Q.   Good afternoon, Detective Gleaton.

4    A.   Hey.

5    Q.   Let's start with the CAC interview of the alleged child

6    victim.  You indicated that she had made some type of reference

7    to having seen images?

8    A.   That's correct.

9    Q.   Okay.  Can you expound upon that at all?  What do you

10   remember from what she said?

11   A.   What I remember is she said that she saw boys and girls,

12   and somehow she inferred that they were involved in sexual

13   activity by her motions of her hands.  And she was having

14   difficulty, I think, finding the correct words and verbiage

15   being 6 years old.

16          But through the interview, it seemed as if there may

17   have been sexual activity of people on the phone that she was

18   shown.  In my experience, it is oftentimes children are groomed

19   by being exposed to child pornography or adult pornography in

20   order for a person to more easily obtain compliance by a

21   victim, especially a young child that has no experience in

22   sexual activity.

23   Q.   So, based on your training and experience, the words that

24   she did use to describe what she saw to you indicated that she

25   had seen people engaged in sexual activity?

Case 1:19-cr-00080-KD-B    Document 192   Filed 04/23/2020   Page 160 of 257   PageID 937
Case: 19-14844    Date Filed: 02/10/2020    Page: 160 of 257

53

CROSS - JOHN GLEATON

1    A.    Correct.

2    Q.    And that CAC interview, was it recorded?

3    A.    Yes, it was.

4    Q.    So if there's any question about exactly what she said,

5    it's been recorded?

6    A.    That's correct.

7    Q.    Okay.  And did she specifically say that she saw those

8    images or videos on the defendant's phone?

9    A.    Yes.

10   Q.    Okay.  And, based on that and some of the other things

11   that she said during her CAC interview, you got those two

12   search warrants, those January 22nd, search warrants?

13   A.    Right.

14   Q.    Okay.  And you got those from Judge Scully; is that

15   correct?

16   A.    That's correct.

17   Q.    And is he a judge that you regularly obtain search

18   warrants from?

19   A.    Not regularly.  He just happened to be the closest

20   available judge at the time.  He was at the Foley satellite

21   courthouse, which was convenient -- conveniently kept me from

22   having to drive to Bay Minette to find a judge.

23   Q.    And I believe it's marked currently as Defendant's

24   Exhibit 1, which defense counsel was referring to as the cell

25   phone warrant, which actually encompasses a number of different

1   things; is that correct?

2   A.   That's correct.

3   Q.   And it includes seizure of various types of electronic

4   devices and storage media?

5   A.   That's correct.

6   Q.   And you've mentioned previously in your testimony just now

7   that in your experience you've -- it's not uncommon for

8   perpetrators of child sexual abuse to show children child

9   pornography to groom them; is that right?

10  A.   That's correct.

11  Q.   Based on your training and experience, is it common for

12  people who commit crimes of sexual violence against children to

13  also possess images of the child abuse or child exploitation of

14  children?

15  A.   It's very common.

16  Q.   Okay.  And, in your experience and training, can

17  possession of images that portray the sexual abuse or

18  exploitation of children corroborate allegations of a specific

19  child who has made allegations of sexual abuse?

20  A.   Yes.

21  Q.   In your time investigating child sexual abuse, have you

22  ever investigated cases where the perpetrator has taken

23  photographs or videos of his abuse of a child?

24  A.   Yes.

25  Q.   Does that child always have knowledge that those

1  photographs or videos or images have been taken?

2  A.   No.  Sometimes they do not know.

3  Q.   Okay.  I'd like to talk about when you arrested the

4  defendant.  You said that you arrested him at his house; is

5  that right?

6  A.   That's correct.

7  Q.   And tell me again where his cell phone was at the time of

8  his arrest.

9  A.   It was on his kitchen counter.

10  Q.   So it was out in plain view?

11  A.   In plain view, yes.

12  Q.   Okay.  And at that time you gave his phone back to him; is

13  that right?

14  A.   That's correct.  It had his I.D. in it, and I put it in --

15  I put it in his pocket, as the defense counsel said.

16  Q.   Did he object to you giving the phone back to him?

17  A.   No.

18  Q.   When you did execute the search warrant of the crime

19  scene --

20  A.   Yes.

21  Q.   -- was that just Summerdale Police, or was the F.B.I.

22  assisting you with that?

23  A.   I had to -- I got the assistance of the F.B.I., the

24  evidence response unit, because it's a major crime scene.  And

25  they assisted me with the collection of evidence there, and I

CROSS - JOHN GLEATON

1    couldn't get them on the 22nd.  It had to be two days later

2    after the -- before they could get off with that.

3    Q.    I'm sorry.  So the F.B.I. was assisting you in the state

4    investigation beginning on January 24th of 2019?

5    A.    Yes.

6    Q.    Before anyone even looked into the phone?

7    A.    Correct.

8    Q.    All right.  When you seized the phone, you said you

9    powered it on and put it into airplane mode and powered it off?

10   A.    Yes.

11   Q.    Did you ever turn it back on again?

12   A.    No, I did not.

13   Q.    Did you ever take it out of airplane mode again?

14   A.    No, sir -- no, ma'am.

15   Q.    With respect to the search warrants applications,

16   affidavits, and the search warrants themselves, you were asked

17   several questions about the checkmark box where you list the

18   crimes being investigated?

19   A.    Uh-huh.

20   Q.    Is it your practice to always list everything single

21   possible crime that could possibly be charged in a particular

22   case?

23   A.    No, ma'am, it's not.

24   Q.    So, for example, in this case, the defendant could be

25   charged with rape; correct?

Case 1:19-cr-00080-KD-B    Document 192    Filed 04/23/20    Page 164 of 257    PageID #: 946
Case: 19-14844    Date Filed: 06/10/2020    Page: 164 of 257

57

CROSS - JOHN GLEATON

1   A.   Correct.

2   Q.   Sexual abuse of a minor under 12; correct?

3   A.   Correct.

4   Q.   Kidnapping?

5   A.   Correct.

6   Q.   Assault?

7   A.   Assault, that's correct.

8   Q.   Showing pornography to minors?

9   A.   Correct.

10  Q.   So there are any number of charges that he could have been

11  charged with?

12  A.   That's correct.

13  Q.   But the two most serious charges were rape and sexual

14  abuse; is that right?

15  A.   That is correct.

16  Q.   And then, within the body of the affidavit itself, did you

17  outline all relevant information as known to you at the time?

18  A.   I did.

19  Q.   And that included the allegation that the alleged child

20  victim had been shown pornography on the defendant's phone?

21  A.   That's correct.

22  Q.   Okay.  There was some questions about whether or not you

23  used search warrants, basically what do you use search warrants

24  for?

25  A.   Uh-huh.

Case 1:19-cr-00080-KD-B    Document 192    Filed 04/24/23    Page 165 of 257    PageID 992
Case: 19-14844    Date Filed: 08/10/2020    Page: 165 of 257

58

CROSS - JOHN GLEATON

1    Q.    And, as I understand it, the answer is to obtain evidence;

2    is that right?

3    A.    That's correct.

4    Q.    Okay.  And sometimes that evidence can corroborate a

5    victim's account of what happened?

6    A.    That's correct.

7    Q.    And sometimes it can actually prove to be exculpatory for

8    the defendant?

9    A.    It can exonerate someone, yes.

10   Q.    So your purpose in obtaining a search warrant is to obtain

11   evidence; is that right?

12   A.    To preserve the evidence, first and foremost, so that it's

13   there and available to us.  Once we have a search warrant, it

14   allows us to look at the evidence.

15   Q.    And is that what you did in this case?

16   A.    That's what I did in this case.

17   Q.    I'm not going to ask you a lot of questions about the

18   Cellebrite data dump right now because I understand that's not

19   your area of expertise.  Have you had the opportunity, in your

20   training and experience in investigating cases like these, to

21   look through cell phone data dumps, for lack of a better word?

22   A.    Yes, I have in many cases.

23   Q.    Okay.  Are you -- have you ever had a case where

24   contraband is found in a mislabeled folder or mislabeled

25   application?

Case 1:19-cr-00080-KD-B    Document 192-1 Filed 04/23/20    Page 166 of 257    PageID #:
Case: 19-14844    Date Filed: 08/10/2020    Page: 166 of 257

59

CROSS - JOHN GLEATON

1    A.    Yes, I have.  I have found images stored in folders where

2    the images are not normally stored.

3    Q.    Do perpetrators sometimes try to hide the contraband in

4    places that would, perhaps, be unexpected to a layperson?

5    A.    Yes.  They have also been known to relabel file names so

6    that they look like a text file or document file when actually

7    they are an image file.

8    Q.    Can it sometimes be necessary to search an entire phone to

9    find contraband?

10   A.    Yes.

11   Q.    When you received the report from Detective Bibby that had

12   the contents of the phone, did you look at -- did you start

13   with looking at just the images and videos that have been

14   produced by the report?

15   A.    Yes.  The report has several tabs that you can select,

16   which makes it easy for you to scroll through just images, and

17   that's what I did to start with.  There was other tabs that had

18   other types of information and data associated with them that I

19   really wasn't interested in because I was focused on the images

20   contained in the main folders of the phone where images are

21   stored.  Once I saw a bunch of images that looked to me as

22   though they were child pornography, that confirmed what

23   Detective Bibby had told me.

24   Q.    So I just want to be clear so we can go through each one

25   of the search warrants that you applied for and were given.  So

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/20   Page 167 of 257   PageID #:
Case: 19-14844    Date Filed: 08/10/2020    Page: 167 of 257
949

60

CROSS - JOHN GLEATON

1   you first applied for a search warrant for the defendant's DNA

2   to get a buccal swab; is that right?

3   A.   That's correct.

4   Q.   And you submitted an application and an affidavit, and

5   then were granted that search warrant; is that correct?

6   A.   That's correct.

7   Q.   And then you submitted an application and an affidavit for

8   sources of potential biological evidence?

9   A.   That's correct.

10  Q.   At the crime scene?

11  A.   That's correct.

12  Q.   And also for any potential electronic device or removable

13  storage media that could contain images of pornography?

14  A.   Yes.

15  Q.   And you were granted that search warrant?

16  A.   I was.

17  Q.   And then, once you did obtain an electronic device that

18  potentially could have those images on it, you then went and

19  obtained a third search warrant to actually be able to get into

20  that device; is that correct?

21  A.   That's correct.

22  Q.   You submitted an application and an affidavit, appeared

23  before a judge?

24  A.   That's correct.

25  Q.   And that judge issued you that search warrant?

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/2020   Page 168 of 257   PageID 95
Case: 19-14844   Date Filed: 05/10/2020   Page: 168 of 257

REDIRECT - JOHN GLEATON

61

1    A.    That's correct.

2    Q.    And you only did that after you were executing a lawful

3    arrest warrant against the defendant?

4    A.    Correct.

5    Q.    At which time you saw his cell phone out in plain view?

6    A.    That's correct.

7          MS. CHAPPELEAR:  Okay.  One second, Your Honor.

8    Thank you.  That's all.

9          MR. STANKOSKI:  Your Honor, may I follow up?

10         THE COURT:  Okay.

11                    **REDIRECT EXAMINATION**

12   BY MR. STANKOSKI:

13   Q.    Detective Gleaton, I think when the Government was asking

14   you questions about the minor child telling you how he showed

15   these images to her, the only thing she said was a phone; is

16   that correct?

17   A.    She said a phone, but a phone can contain digital

18   storage -- a digital storage device within it, and phones can

19   also be attached to the cloud that has means to store items

20   of --

21   Q.    I'm sorry.  I wasn't clear in my question.  My question

22   is, he said he showed it to her on a phone; correct?

23   A.    That's correct.

24   Q.    Yet, your warrant goes beyond what the victim told you,

25   and you asked for other storage devices, like a computer, a

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/20   Page 169 of 257   PageID #:
Case: 19-14844   Date Filed: 05/10/2020   Page: 169 of 257

62

REDIRECT - JOHN GLEATON

1   phone, or other storage devices?

2            THE COURT:  Does the Government --

3            Hold on.

4            Is the Government planning on introducing any

5   evidence from a computer or other storage device?

6            MS. CHAPPELEAR:  No, Your Honor.

7            THE COURT:  Then it's irrelevant.

8            MR. STANKOSKI:  Okay.

9   BY MR. STANKOSKI:

10  Q.   I think -- and I forgot to ask you about this.  When you

11  went to the -- when you went to the shop to actually execute

12  the cell phone search warrant, the seizure search warrant, did

13  you look around the shop for those devices, the phones or

14  anything else?

15  A.   Yes.

16  Q.   Didn't find anything?

17  A.   We found some old CDs that turned out to be music CDs that

18  we found other devices -- other things, I think, that were --

19  ended up not being anything that were usable or had any

20  information of value on it.

21  Q.   Okay.  And when the Government asked you about all the

22  list of potential charges that the defendant could have faced

23  in this matter, you would agree with me that you didn't let

24  Judge Scully know any of those additional charges, did you?

25  A.   I let him know about the most serious allegations that

1    I --

2    Q.    I know the most serious one.  But the Government asked you

3    he could have been charged with kidnapping and assault and

4    other offenses involving a minor child.  Judge Scully didn't

5    know that, did he?

6    A.    The focus of my investigation was what I --

7    Q.    Detective Gleaton, it's a simple question.  You didn't let

8    Judge Scully know that, did you?

9    A.    I didn't consider that to be a focus of my investigation.

10    Q.    Right.  You just listed the most serious charges that you

11    have which were on your application; right?

12    A.    That's correct.

13    Q.    Okay.  Now, the Government asked you again about issuing a

14    search warrant to corroborate the information.  Have you ever

15    issued a search warrant, not an arrest warrant, but a search

16    warrant where information came back to you that you chose not

17    to pursue the investigation against the defendant?

18    A.    I'm not aware of a particular circumstance, but I have --

19    I've had situations in which I had -- I've had exculpatory

20    evidence found in cases.  And I'm not sure if I've had any

21    specific search warrants that have done so.  But in the

22    investigation of many cases over the years, whenever

23    exculpatory evidence or evidence that tends to exonerate

24    someone is found, I tend to use it to do so.

25    Q.    Right.  But my question was specific to warrants.  You

Case 1:19-cr-00080-KD-B   Document 192-1 Filed 04/24/23   Page 64 of 137   PageID #: 953
Case: 19-14844   Date Filed: 05/10/2020   Page: 171 of 257

64
REDIRECT - JOHN GLEATON

1   ever issued a search warrant obtaining information that came

2   back that didn't corroborate a story and you just closed your

3   investigation?

4   A.    I don't recall --

5   Q.    That's what I --

6   A.    -- if I have or I haven't.

7   Q.    And you would agree with me because that's not what you

8   use search warrants for mostly; right?

9   A.    Well, I don't know that I agree with you, but...

10  Q.    And when the Government was asking you about the

11  additional contraband that may be on a phone, it may be

12  important to look at additional contraband on the phone.  There

13  is no dispute that you didn't ask for everything to be seized

14  from the phone, did you, looking for additional contraband?

15  You only asked for images and videos?

16  A.    Image files are data files and so are any other type of

17  file that's stored on the phone.

18  Q.    But your warrant didn't say any and all data from the

19  phone, did it?

20  A.    It said image files, and files are stored -- can be stored

21  in any number of locations on a phone and they can be either

22  image files or data files.

23  Q.    Well, if you were concerned that somebody might have

24  surreptitiously downloaded something into an area that you

25  might not be able to readily find, don't you agree with me that

Case 1:19-cr-00080-KD-B    Document 192    Filed 04/20/2020    Page 1 of 237   PageID #:
Case: 19-14844    Date Filed 09/10/2020    Page: 172 of 257

REDIRECT - JOHN GLEATON

65

1  it would be best practice to apply for that in your search

2  warrant and say give me everything because he may be hiding

3  something?

4  A.   Yes.  But you also know that a judge would also not allow

5  a search warrant if it was too broad.

6  Q.   Right.  And you didn't do that in this case, did you?

7  A.   I specifically -- I specifically tailored my warrant for

8  the data and the images that I wanted -- that I knew would

9  possibly be beneficial in this case.

10 Q.   And even though you specifically tailored it, you know

11 that it went beyond what you specifically tailored it and got

12 everything?

13 A.   Well, it ended up being that way.

14         MR. STANKOSKI:  Right.  Thank you.

15         THE COURT:  When you got the search warrant for the

16 automotive shop, you were expecting, because the child told you

17 that's where he showed her the phone, you were expecting to

18 find the phone there?

19         THE WITNESS:  No, ma'am.  That's where the actual

20 rape happened, and I was expecting to find DNA evidence there.

21         THE COURT:  Oh, okay.

22         THE WITNESS:  I didn't know where I would find his

23 phone, but I likely felt that his phone would be on his person.

24         THE COURT:  But you didn't arrest him at the

25 automotive shop?

```
 1              THE WITNESS:  No, ma'am.

 2              THE COURT:  Okay.  All right.  Any other questions?

 3              MS. CHAPPELEAR:  No, thank you, ma'am.

 4              THE COURT:  Thank you, sir.

 5         Mr. Stankoski, I'm guessing you have some authority

 6   to show me that you've made much hay over the fact that

 7   corroborating evidence cannot be seized under the checkmark of

 8   evidence of a criminal --

 9              MR. STANKOSKI:  Before I do that, Judge, can I call

10   my next witness?  Detective Bibby?

11              THE COURT:  Well, yeah.  But --

12              MR. STANKOSKI:  Judge, if you -- well, that's not the

13   crux of my motion to suppress, that he improperly used the

14   warrant for corroborative evidence.

15         The crux of my case is based upon the United States

16   versus Winn case, that the officer in this case improperly

17   cited crimes, and he's looking for evidence that don't support

18   those crimes.  And that's the case that we cited.  That's

19   our --

20              THE COURT:  And that's exactly what I'm saying,

21   though.  You are saying corroborating evidence doesn't support

22   the crime of sexual abuse.

23              MR. STANKOSKI:  Right.

24              THE COURT:  You keep going to elements, and I'm

25   guessing you have some kind of case that will tell me that
```

Case 1:19-cr-00080-KD-B   Document 192  Filed 04/23/21   Page 47 of 257   PageID #: 958
Case: 19-14844   Date Filed: 05/10/2020   Page: 174 of 257

67

1    corroborating evidence is not evidence.

2              MR. STANKOSKI:  I'm misusing the term.  It's "nexus."

3    "Nexus" is the term that I should be using in this case.

4              THE COURT:  Okay.

5              MR. STANKOSKI:  Because what I'm arguing with the

6    case is that there was no probable cause, insufficient probable

7    cause, because there's no nexus in the evidence that he is

8    seeking the search warrant to prove those particular crimes.

9              THE COURT:  Okay.  That's your argument.  All right.

10             MR. STANKOSKI:  And that's what the <u>Winn</u> says.  In

11   the <u>Winn</u> case, Judge, a guy was at the a pool taking pictures

12   of females at the pool.  He's rubbing his genitals, and he's

13   taking pictures.

14             They went and got a search warrant based upon that,

15   but what they said in their search warrant was that it was

16   evidence of public indecency or disorderly conduct.  And the

17   Court went through the analysis to look and say, look, there is

18   no nexus between what you are looking for in this evidence of

19   the phone to support those particular crimes.  That's what you

20   are telling the detached and neutral magistrate is I'm looking

21   for evidence of these particular crimes -- Rape 1, Sex Abuse 1.

22   Photographs don't show that.  Images don't show that.  The data

23   don't show that.

24             THE COURT:  That's your argument?

25             MR. STANKOSKI:  That's my argument, and that's -- the

DIRECT - CALEB BIBBY

```
1    case law supports that.

2           THE COURT:  All right.  All right.  Well, okay.  I'm

3    just trying to get your argument down.  Go ahead and call your

4    next witness.

5           MR. STANKOSKI:  We call Detective Bibby.

6                          CALEB BIBBY,

7        having been first duly sworn, testified as follows:

8           THE CLERK:  You may be seated.

9                       DIRECT EXAMINATION

10   BY MR. STANKOSKI:

11   Q.    State your name for the Court, please.

12   A.    Caleb Bibby.

13   Q.    How are you employed, Detective Bibby?

14   A.    I'm a detective with the Foley Police Department.

15   Q.    In what capacity are you employed?

16   A.    I'm a detective.

17   Q.    Right.  What do you do?  What are your job --

18   A.    Investigate criminal matters and I also work with Mobile

19   Police Department in their cyber intel unit working with

20   electronic crimes.

21   Q.    What type of training or experience do you have in the

22   cyber electronics field?

23   A.    I've been trained by Cellebrite as a certified Cellebrite

24   operator, also a certified physical analyst.

25   Q.    And when did you first come into possession of Taras
```

Case 1:19-cr-00080-KD-B    Document 192    Filed 04/23/20    Page 176 of 257    Page ID #:
Case: 19-14844    Date Filed: 08/10/2020    Page: 176 of 257

69

DIRECT - CALEB BIBBY

1    Hodivsky's cell phone in this matter?

2    A.    When Detective Gleaton brought it to me, along with a

3    signed copy of the search warrant.

4    Q.    Okay.  When was that?

5    A.    I do not remember the date.

6    Q.    Was it after January the 22nd?

7    A.    I do not remember the date.  I don't have the -- it was

8    whenever the -- after the search warrant for the phone was

9    signed.

10    Q.    You need to be specific because there were several search

11    warrants --

12    A.    For the data.

13    Q.    Okay.  That would be January 30th, some time after

14    January 30th?

15    A.    Yes, I believe.

16    Q.    Did you go to Summerdale, or did he bring it to you in

17    Foley?

18    A.    It was brought to me.

19    Q.    What did you do?  How did you do your examination of the

20    phone?

21    A.    First I started off, I took the phone out of the

22    packaging.  It was packaged up, labeled, with his case

23    information on it.  Pulled it out.  I looked at the phone to

24    see what model it was, the IMEI number to see if -- to see if

25    all that stuff matched the search warrant.  Pulled it out, and

DIRECT - CALEB BIBBY

1   I turned it on.  When I turned it on, it was in airplane mode,

2   so I didn't have to worry about any signals coming in or going

3   out.  What airplane mode means the antennas were turned off.

4            I opened up my Cellebrite program, which is UFED for

5   a PC.  I plugged up the phone.  It auto-detected that phone,

6   which was a Samsung S9, I believe.  I'm not exactly the --

7   remember what exact model it was.

8            It auto-detected the phone.  Once it did that, I

9   started up the analysis -- or the dump of the phone, where it

10  pulled a physical and -- I believe they did a physical, file

11  system -- I might have done all three, physical, file, and

12  logical of the phone.  And then, after that was done, I turned

13  the phone back off, placed it back into the evidence bag.

14  Q.   I'll ask you a couple of questions about that.  The

15  physical search, that means you physically turned the phone on

16  and manually --

17  A.   No, sir.

18  Q.   Okay.

19  A.   "Physical" means the program, the software, does a -- they

20  call it a physical -- a physical dump of the phone.  There's

21  three different types of data dumps on the phone.  One is a

22  physical where you get the most amount of data.

23  Q.   Okay.

24  A.   And then the second one is a file system.  And the third

25  is the logical.  And it steps down from there about how much

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/20   Page 47 of 257   PageID #:
Case: 19-14844   Date Filed: 09/10/2020   Page: 178 of 257

71

DIRECT - CALEB BIBBY

1   data it actually pulls.

2   Q.   All right.  So the file system would be you go into the

3   Cellebrite like a computer and actually look through the files

4   that are saved in the phone; is that correct?

5   A.   I don't go through the phone.

6   Q.   No.  I'm talking about the program.  When you do a file

7   system search or dump, it goes into the saved files in the

8   phone --

9   A.   I couldn't tell you where it goes into.  It's a program

10  that somebody else created.

11  Q.   I got you.  So you just plug it in and it goes; right?

12  A.   Yes.  I have three options to do a download of file

13  system, a physical, and a logical.  Those are my three options,

14  and I can't -- I can't tell it not to do certain things or to

15  do certain things.

16  Q.   So when Detective Gleaton brought you the search

17  warrant -- first of all, did you realize that it was only a

18  search warrant for images and photos?

19  A.   I read the search warrant.

20  Q.   Okay.  Are you telling me that the Cellebrite program has

21  no ability to restrict the type of data to only extract what

22  the warrant allowed?

23  A.   In a physical file, in a physical dump and a file system

24  dump, I cannot choose what I want to pull out of the phone,

25  what I want the Cellebrite system, Cellebrite software to

1    actually put from the phone.

2    Q.   Okay.  When Detective Gleaton brought you the cell phone

3    and since you are the computer and technology guy and you knew

4    the warrant only called for images and photos, why would you

5    use a full data dump software system to obtain the data versus

6    taking your finger and rolling through the phone to go to the

7    photo album or gallery or images section, which would have been

8    consistent with the warrant?

9    A.   I would never do that, to begin with, because that changes

10   the data in the phone, for one.  And I want to keep the phone

11   as it was when I got it.  So I don't go and access any

12   programs.  I don't go and access anything.

13         And then, two, images can come from anywhere in the

14   phone.  You have images in your photo gallery.  You have images

15   in your text messages.  If somebody sends you a text message

16   and it has an image in it and you don't click "save," it's

17   still there, but it's not in your photo gallery.  It's the same

18   for any and every program that a file, be it a picture or

19   anything like that, it can be in that app but not downloaded to

20   your camera roll and that's why it grabs all that information.

21   Q.   So if I hear what you are saying, it's -- to comply with

22   the warrant, it would either be you would have to obtain a

23   program that you could restrict it just to images or files,

24   assuming it could do that, or it would be a labor-intensive

25   manual search where not only would you roll through the

Case 1:19-cr-00080-KD-B   Document 192-1 Filed 04/23/21   Page 180 of 257   PageID 907
Case: 19-14844   Date Filed 06/10/2020   Page: 180 of 257

73
DIRECT - CALEB BIBBY

1    galleries and look but you would have to go through the text

2    messages and see if there's any images attached to a text

3    message?

4    A.   Or any other apps.

5    Q.   Okay.  Or any other app or any other third-party app that

6    you go into that you go in and take a look at.

7               Now, when the program is done and you extracted this

8    data, did you review the data that was taken out of the phone?

9    A.   I reviewed the Cellebrite report, yes.

10   Q.   Okay.  On the Cellebrite report -- first of all, there was

11   a Word document that was located on there, was there not?

12   A.   I don't know.

13   Q.   You don't recall?

14   A.   I didn't look at the Word documents.

15   Q.   Okay.  Well, do you know if Word documents were obtained

16   through the Cellebrite extraction program?

17   A.   It very well could have.

18   Q.   Okay.  You know the warrant didn't allow for Word

19   documents --

20   A.   I didn't --

21   Q.   -- correct?

22   A.   Again, the Cellebrite -- the program that I used, I did

23   not tell it that I only want pictures.

24   Q.   Right.  And I understand you are not going to be able to

25   answer this; I just need a "yes" or "no" for the record.  But

DIRECT - CALEB BIBBY

1   on the report, did you know that text messages were downloaded?

2   A.   Yes.

3   Q.   Okay.  Did you know that there was no warrant for text

4   messages?

5   A.   There are video -- pictures that can be obtained from text

6   messages.

7   Q.   Okay.  Did you sort through those text messages that

8   videos attached?

9   A.   I went through the majority of all the text messages to

10  where you have different columns.

11  Q.   Okay.

12  A.   And there's a column for attachments.  It has a little

13  paper clip on it.  I went down through all the text messages,

14  MMS messages, and I looked at each one that had a paper clip to

15  see what kind of images, pictures, whatever it may be, attached

16  to it.  It could have been a weird little GIF -- what do they

17  call it?  A G-I-F.

18  Q.   GIF?

19  A.   GIF.  It could have been a little video.  It could have

20  been one of those.  I don't know.  So I went through to see

21  what it was to see if we had any other images that might have

22  gotten caught in text messages but that was not transferred to

23  images.

24  Q.   And you would agree with me there was no child porn in the

25  text messages images clicked; were there?

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/21   Page 182 of 257   PageID 909
Case: 19-14844   Date Filed: 06/10/2020   Page: 182 of 257

75

DIRECT - CALEB BIBBY

1   A.   I don't believe so.

2   Q.   And then there was just -- just raw data obtained from a

3   third-party app or third-party apps that were put on his phone

4   as well?

5   A.   There's some.

6   Q.   Okay.  And you know the search warrant didn't allow any

7   data from any third-party apps; correct?

8   A.   It included pictures and images.

9   Q.   Well, I know it included pictures and images, but it

10  didn't cover third-party apps, did it?

11  A.   If it is -- are you referring to the third-party apps in

12  the cloud?

13  Q.   Yes.

14  A.   Okay.  Well, the phone was in airplane mode.  There's no

15  way that the Cellebrite software could go to the cloud and

16  receive -- retrieve any of that.

17  Q.   But you don't know if any of those pictures came from the

18  third-party app or were used to transmit through the

19  third-party app, do you?

20  A.   It very well could have, but it was on the device itself.

21  If Cellebrite pulled a picture or an image or a video --

22          THE COURT:  I think it would be helpful to stop for a

23  minute and let's talk a little bit about your theory because

24  then maybe I can formulate better questions --

25          MR. STANKOSKI:  I understand.

 1          THE COURT:  -- and understand where you are going.

 2          It seems to me what you are saying is that the

 3   phone -- you know, that once they had authority to get the

 4   phone, they got the phone, they had authority to look for

 5   pornographic images on the phone.  So we all agree to.

 6          All right.  So what you are saying is they should

 7   have just gone to the photo section and looked, that if they

 8   are going to go to another section of the phone, like the data

 9   apps that you are speaking of, that they needed to different

10   search warrant to go into that room, so to say.

11          MR. STANKOSKI:  That's a good analogy.

12          THE COURT:  All right.  Then let me give you another

13   analogy.  You have a search warrant for a gun.  That's what I

14   give you.  I sign a search warrant saying that, yes, you know,

15   there's probable cause that this gun was used to commit a

16   crime.

17          And so I give the police officer a search warrant to

18   go look for this gun.  The case law is quite clear that they

19   don't have to just go in the house and look in the gun cabinet

20   because that's where guns are normally kept.  They can go look

21   in the freezer.  They can go look in the underwear drawer

22   because anywhere a gun reasonably could be stored or might be

23   stored or hidden, they can go look.

24          Now, they couldn't go look, you know, in a

25   two-inch-by-two-inch jewelry box because, well, guns -- a gun

1    couldn't be stored in a two-inch-by-two-inch jewelry box.

2            So what are you saying?  You are saying they couldn't

3    go look in the freezer?

4            MR. STANKOSKI:  That's a fair question, Judge.

5    <u>Raleigh versus California</u> is the leading case that talks about

6    third-party apps and information that's obtained on a phone,

7    and it goes through great lengths and details to talk about a

8    16 gigabyte -- if you can't tell, Judge, I'm a bit of a tech

9    nerd myself -- 16 gigabyte phone, 64 gigabyte phones, that they

10   can store millions of data images on any particular phone.

11           You can have bank records on your phone.  You can

12   have third-party apps.  You can have apps that tell you when

13   you are pregnant.  You can have apps that belong to political

14   parties.  You can have workout apps.  You've got an app for

15   everything.  There is an app for everything.

16           <u>Raleigh versus California</u> first says that a cell

17   phone because it is a mini computer and it contains so much

18   more information that would never be available in your home

19   unless that stuff was in your home.  But it gets greater

20   protection than a home, and it talks about specifically in

21   there why the law is now evolved into, first, you have got to

22   get a warrant for the phone itself because it's so much

23   information that's in there.

24           So <u>Raleigh v. California</u> would first support the

25   proposition that, unlike going into a home -- and you are

DIRECT - CALEB BIBBY

1  correct.  If you say a search warrant in a home, that doesn't

2  limit me from going into a room in the home.  Okay?

3       Raleigh v. California says, well, cell phones are a

4  little bit different.  But let me give you another analogy.  If

5  you have a search warrant for a car and you found a key inside

6  the car, you can't go take the key and go open up what it

7  opens.  That -- you have to have another warrant for that.

8       THE COURT:  I agree with that part.

9       MR. STANKOSKI:  And that's also cited in some newer

10 cases that talk about cell phones and the protection involved.

11 There's actually a great case out of the Southern District of

12 Texas that just came out less than 30 days ago that talk about

13 when you -- when a cell phone is obtained, is that tantamount

14 to giving a key somewhere and what you have to do and what your

15 expectation of privacy is beyond that.

16      That's my simple answer to you, Judge, is that when

17 you are dealing with cloud-computing apps -- and, by the way,

18 the F.B.I. do it all the time.  They go into phones.  And when

19 they want information from someone's e-mail address, they go

20 issue a subpoena to Google.  They don't go through the e-mail

21 address that's located on the phone.  If there's third-party

22 apps that necessarily are password protected, sometimes the

23 password is auto-filled in there.  Well, the warrants don't say

24 that you can go into a third-party app, even if the password is

25 already placed in there.  Those go out to the cloud.  It's a

Case 1:19-cr-00080-KD-B   Document 192-1   Filed 04/23/20   Page 20 of 37   PageID #:
Case: 19-14844   Date Filed: 08/10/2020   Page: 186 of 257

79

DIRECT - CALEB BIBBY

 1    different branch.

 2              No more could you have a search warrant to issue a

 3    phone and then start looking for bank records.  If you go into

 4    my bank, you can't go into Regions beyond that and start

 5    looking at my bank records and that.  That's not -- it's

 6    overbroad.

 7              THE COURT:  I probably need to read Raleigh again,

 8    but my memory of Raleigh is that it was a search incident to an

 9    arrest and they didn't have a warrant for the phone.

10              MR. STANKOSKI:  It was.  But that -- you are correct.

11    It doesn't -- it's not the same principle, but, since Raleigh,

12    there's been, you know, 20 cases -- not 20 cases.  There's been

13    1,000 cases.

14              THE COURT:  Well, give me one.

15              MR. STANKOSKI:  Well, I cited most of them in my

16    brief.  I'd be anticipate to take a look.

17              THE COURT:  I'll look again.

18              MR. STANKOSKI:  I don't have anything exactly

19    specifically on point here, Judge.  I'm arguing the general

20    proposition that the warrant itself not only was defective, but

21    it's overbroad what they obtained, that you can't go

22    rummaging -- and that's the Coolidge, United States versus

23    Coolidge -- you can't rummaging through a person's effects and

24    things, unless the warrant is particularly described to those

25    particular things.  And when it's particularly described, you

1   have to stick within the context of what you are looking for.

2            THE COURT:  All right.

3            MS. MURPHY:  May I say one thing, Your Honor, about

4   the analogy?  It's factually and legally incorrect.  He's

5   talking about finding a key in the car and using it to go

6   somewhere else.  That analogy is intended to apply in the facts

7   of this case that they found the app and then accessed

8   information on the cloud.  That would be a key.

9            In this case, they are still searching the car.  They

10  are searching underneath the seat.  They are opening the glove

11  compartment.  They are looking in the trunk because all of the

12  information, as the detective has said, the phone was in

13  airplane mode.  The antennas were down.  It could not reach

14  out.  All of the information was within the four corners of the

15  telephone.

16            THE COURT:  Okay.

17            MR. STANKOSKI:  Judge, here's a quote from the Winn

18  case that I was talking about earlier.  In this case, the

19  detective, he tailored it somewhat.  But they said here, "The

20  bottom line was if Detective Lambert wanted to seize every type

21  of data from the cell phone, then it was incumbent upon him to

22  explain in the complaint how and why each type of data was

23  connected to Winn's criminal activity and he did not do so.

24  Consequently, the warrant was overbroad because it allowed the

25  police to search for and seize broad swaths of data without

Case 1:19-cr-00080-KD-B   Document 192 Filed 04/24/20   Page 188 of 257   PageID #:
Case: 19-14844   Date Filed 09/10/2020   Page: 188 of 257
970
81

DIRECT - CALEB BIBBY

1    probable cause it believed to constitute evidence of public

2    indecency."

3              THE COURT:  All right.  I read that.  That's on

4    page 11 of your brief.  But this search warrant didn't do that.

5    This search warrant allowed for them to get photos and videos

6    of the phone.

7              MR. STANKOSKI:  Then it needs to stick with that and

8    not chats through a third-party app.  It didn't -- the warrant

9    doesn't say you can go into the MEGA app and find evidence that

10   he's out there, they say, soliciting for child pornography.

11   They -- the warrant doesn't say you can get chats.

12             So for them to go into a third-party app and obtain

13   data and say that's him out there advertising and selling and

14   looking, the warrant doesn't allow that.  It only allows for

15   images and photos.

16             THE COURT:  But if they go into the freezer and they

17   find a dead body, they don't just close the freezer and leave

18   the dead body in there.

19             MR. STANKOSKI:  No, they don't, but if the warrant

20   doesn't tell them they can go in there, I'm sorry.  But the

21   dead body is out if the warrant doesn't say --

22             THE COURT:  The warrant told them they could go

23   anywhere they could find pictures.

24             MR. STANKOSKI:  Right.

25             THE COURT:  And in that app, they can find pictures.

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/24/20   Page 189 of 257   PageID #:
Case: 19-14844    Date Filed: 08/10/2020    Page: 189 of 257

82

DIRECT - CALEB BIBBY

1    MR. STANKOSKI:  Yes.  They can conceivably find

2  pictures if they go through that app, but that's not what they

3  are using.  They are not using the pictures from the app as

4  evidence in this case.  They are using the content of the

5  language that was there.

6    THE COURT:  Right.  That's the dead body.  Like, they

7  find something other than what the warrant told them they could

8  find, but they were in a place where they could be legitimately

9  looking for the gun, or in this case the images.

10    MR. STANKOSKI:  I would argue, no, they need a

11  separate warrant for that, but if Your Honor doesn't --

12    THE COURT:  Well, I'm trying --

13    MR. STANKOSKI:  I understand.

14    THE COURT:  -- to hear you and I'm trying to see if

15  there's some case law that I'm -- because I'm often not up on

16  case law.

17    MR. STANKOSKI:  I wish there was better case law on

18  this, Judge.  But, you know, also what they found in there too

19  was Microsoft Word documents that has information on that.

20  Well, the warrant didn't say they could get Microsoft Word

21  documents out of that, but that was all downloaded, is part of

22  the massive data dump.  Now, it's the same concept.

23    THE COURT:  Yeah.  I mean, I'm trying to think.

24  Okay.  So they pull open a file drawer in the house looking for

25  the gun.  And that doesn't -- that doesn't give them the right

DIRECT - CALEB BIBBY

1   then to open, you know, flat folders and, you know, look at

2   documents because, obviously, flat folders are not going to

3   contain a gun.

4          MR. STANKOSKI:  Right.

5          THE COURT:  Even though they are there legitimately.

6   Had they pulled it open and they saw something obvious there,

7   you know, but if they -- what you are trying to say is, it's

8   like going through the little folders that are flat.  There's

9   no way that they could have found --

10          MR. STANKOSKI:  You can't --

11          THE COURT:  Hold on.

12          -- where they could no found the gun in the little

13   flat folders.

14          MR. STANKOSKI:  But you can't tell, and that's the

15   problem with computers.

16          THE COURT:  That's the problem.

17          MR. STANKOSKI:  That's a problem.

18          THE COURT:  And in the computer it's like -- that's

19   why I needed to understand so we can ask him the questions of

20   could you find -- could you find the gun in the flat folder,

21   could you find the photo in whatever app or whatever you were

22   in.

23          MR. STANKOSKI:  Well, let's go back to what I think

24   Special Agent Carolyn Middleton will probably testify to.  I

25   could be wrong about this, but, oftentimes, when searches a

1  phones reveal there may be illicit evidence contained within

2  the Snapchat app, they go get a warrant through Snapchat.

3          THE COURT:  What they do or might do or might have

4  common practice to do is not the issue.  The issue is what's

5  required by the Constitution.

6          MR. STANKOSKI:  And I think it is required.  I think

7  if you go into Facebook, I think if you go into MEGA, I think

8  if you go into any third-party app, it's required.

9          THE COURT:  Any third.  Okay.  So that's where --

10 there's the 20 cases I need that you say you cited in here.

11         MR. STANKOSKI:  Well --

12         THE COURT:  I'm not seeing them.

13         MR. STANKOSKI:  Don't mistake me, Judge.  I have no

14 cases on current technology.  It's changing by the minute.  I

15 don't have any cases that talk about --

16         THE COURT:  Well, what's this case out of Texas that

17 you are telling me about?

18         MR. STANKOSKI:  That is -- just one moment, Judge.

19 This is not in my brief by the way, Judge.  I'll give a copy to

20 the Government on this.

21         Judge, there's a couple of other lines of cases that

22 I'm relying on, getting back to this issue about exceeding the

23 scope of the consent and what it's geared for.  There's a case

24 out of Texas called Oglesby.  And then let me hand this to the

25 Government too.  There's another case called In Re the search

DIRECT - CALEB BIBBY

1    of an iPhone.

2            In Oglesby -- Judge, in Oglesby, they found the

3    defendant in the case breaking and entering into a vehicle, and

4    when they went to investigate it, they found a cell phone

5    laying into the vehicle.  The officer then goes down and gets

6    the search warrant to get into the cell phone.  And the court,

7    in Oglesby, said there is no nexus between breaking and

8    entering into a vehicle and searching through his cell phone.

9    We are looking at the crime.

10           THE COURT:  Okay.  Now, we are back to the first

11   issue.

12           MR. STANKOSKI:  Back to the first issue.  I'm

13   pointing that out to you.

14           And there's also another case -- I'm just pointing

15   this out to Your Honor too.  This is a new case, too, that's

16   not in my brief.  And it's the In Re The Matter of the Search

17   of the White iPhone.  It's the case that -- it was a S.O.R.N.A.

18   violation, but when they went to make the arrest for the

19   S.O.R.N.A. violation, they also executed a search on his phone.

20           And, again, the Court said there's no nexus between

21   the crime that you are looking for under the warrant, the

22   evidence of the crime that you are attempting to prove.  I'm

23   just using those in addition to the Winn case.

24           But back to the technology --

25           THE COURT:  Well, you keep using the word "nexus,"

1   but, you know, every case talks about that what you have to do

2   is there has to be a reasonable probability that you'll find

3   evidence of either -- you have contraband or evidence of the

4   crime in a particular place described.

5           All right.  And so you keep going back that child

6   pornography on a phone is not evidence of child abuse.

7           MR. STANKOSKI:  Not evidence of rape or sex abuse.

8           THE COURT:  Of a child?

9           MR. STANKOSKI:  Yes.

10          THE COURT:  Okay.  Are you familiar with the Federal

11  Rule of Evidence 414?

12          MR. STANKOSKI:  I don't think so.

13          THE COURT:  Federal Rule of Evidence 414 says,

14  despite what we know about, you know, 404(B) evidence and not

15  allowing it in, if you have evidence of -- in a child

16  molestation case or child sexual abuse case, basically other

17  evidence of child abuse is admissible.  Okay?  It's just

18  admissible.  And they defined child abuse to include child

19  pornography.

20          So what I'm saying is, you try that case here in

21  federal court, child abuse here in federal court, and child

22  pornography comes in hands down, no questions asked, under 414.

23          All right.  So I went to look to see if Alabama had a

24  similar rule, and according to Gamble rules you don't yet, but

25  by the actions of the Criminal Court of Appeals, they have

1    effectively adopted rule 414 of the Federal Rules of Evidence.

2    And, generally, will allow the admission of other evidence of

3    child abuse, which includes child pornography.  All right.  So

4    even under 414, it's evidence of child abuse.

5              MR. STANKOSKI:  Right.

6              THE COURT:  Even if we -- never mind that it's

7    also -- obviously was corroborating.  You seem to not think

8    that corroborating evidence is evidence of a crime.

9              MR. STANKOSKI:  I'm saying that that's an improper

10   use of a search warrant, to corroborate somebody's statement.

11             THE COURT:  No.  But the search warrant allows -- let

12   give you that definition again.  Contraband or evidence of a

13   crime.  And I don't agree with the Government's proposition

14   that it can, you know -- you are over there searching for, you

15   know, child abuse, and you find -- you can just do any crime,

16   you know, be connected to any crime.

17             But it's connected to child abuse.  And I don't know

18   if you are talking about the nexus here.  Let's use your

19   example of the guy that was out by the pool, you know, and was

20   charged with obscenity and disorderly conduct.  But he was

21   taken --

22             MR. STANKOSKI:  Well, he wasn't charged with that.

23   He wasn't charged with that.  What he was charged with was the

24   child porn in federal court.  It's exactly the same.

25             THE COURT:  Okay.  He's charged with child porn in

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/24/20   Page 195 of 257   PageID #:
Case: 19-14844   Date Filed: 08/10/2020   Page: 195 of 257

88

DIRECT - CALEB BIBBY

1    federal court?

2            MR. STANKOSKI:  Yes.

3            THE COURT:  Okay.  Right, right, right.  But he's

4    charged with child porn in federal court.  And what you are

5    saying is disorderly conduct has nothing to do with child porn.

6            MR. STANKOSKI:  Exactly.

7            THE COURT:  Okay.

8            MR. STANKOSKI:  Exactly my point.

9            THE COURT:  But he's charged with child porn here,

10   and he's charged with sexual abuse of a child in state court.

11   And what I'm trying to tell you is that the law says it's the

12   same.  It is evidence.  One is evidence of the other, and

13   that's evidence of this.

14           MR. STANKOSKI:  My only argument to that would be the

15   Rules of Federal Evidence are admissibility-type standards at

16   trial.  It would be similar to Alabama 404 --

17           THE COURT:  But you only get to admit evidence that's

18   relevant.

19           MR. STANKOSKI:  Right.  But when you go and -- I'll

20   just see it as apples and oranges because we are talking about

21   a search warrant.

22           THE COURT:  And evidence is anything that has a

23   tendency to make a fact either true or not.

24           MR. STANKOSKI:  Right.

25           THE COURT:  So corroborating evidence is evidence.

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/2   Page 196 of 257   PageID#
Case: 19-14844   Date Filed: 07/10/2020   Page: 196 of 257
978

89

DIRECT - CALEB BIBBY

1          MR. STANKOSKI:  But that's not --

2          THE COURT:  I'm trying real hard to figure out your

3   argument.

4          MR. STANKOSKI:  I understand, Judge.  It's very

5   simple what I'm arguing.  You might not agree with it.

6          THE COURT:  Okay.

7          MR. STANKOSKI:  But the corroboration aside,

8   corroboration aside, I'm just traveling under the case of

9   United States versus Winn that says when you go to a neutral

10  and detached magistrate and you say, Judge, I believe this

11  defendant committed these particular crimes, that your evidence

12  that you are looking for has to be evidence used in those

13  particular crimes.

14         THE COURT:  Okay.  Well, that's what we just said.

15         MR. STANKOSKI:  Right.

16         THE COURT:  Child pornography can be used to prove

17  child sex abuse.

18         MR. STANKOSKI:  No, it can't.  It can be used as

19  evidence to be -- for a jury to hear and decide, but it's not

20  evidence of the elements.

21         THE COURT:  Wait.  It doesn't have to be -- okay.

22  That's where we are going off the rails is there's no case law

23  that says it has to be evidence of an element.  It has to be

24  evidence of the crime.

25         MR. STANKOSKI:  But how can it be?  How can child

Case 1:19-cr-00080-KD-B   Document 192-1   Filed 04/24/23   Page 197 of 257   PageID #: 978
Case: 19-14844   Date Filed: 03/10/2020   Page: 197 of 257

90

DIRECT - CALEB BIBBY

1    porn be evidence of Rape 1?  I mean, the -- I know what the

2    elements of Rape 1 are.  It's the improper contact.  It's not

3    looking at pornographic images on a phone.  It's not the same.

4    Your Honor may not agree with me, but I don't know what else to

5    say other than to say that having child porn on a phone

6    cannot -- is not to be used as an element of the offense for

7    Rape 1.

8              It might be admissible as 404(B) to show, you know,

9    pattern, knowledge, scheme.  It might be evidence of that, but

10   it's not evidence of the actual crime itself.  Could it be

11   evidence that he might be more likely to commit it?  It's

12   possible and if the rules allow it and it's not overly

13   prejudicial.  But it can't be used to meet the elements of the

14   crime.  That's the crime.

15             THE COURT:  I know.  You are adding the word

16   "elements," and that's why I keep asking you for case law.

17             MR. STANKOSKI:  Well, that's what Winn says.  All I

18   can travel on --

19             THE COURT:  That's not what Winn says.  But go ahead.

20   Let's get back to where you were because I think it's

21   important.  We've got an expert here.  We can argue the law

22   after he leaves.  So I think it's very important for you, your

23   case, and your record to make me understand about this phone

24   and apps.  Okay?  So go ahead with those questions.

25

Case 1:19-cr-00080-KD-B   Document 192-1 Filed 04/23/20   Page 198 of 257   PageID 925
Case: 19-14844   Date Filed: 08/10/2020   Page: 198 of 257

91
DIRECT - CALEB BIBBY

1    BY MR. STANKOSKI:

2    Q.    All right.  Detective Bibby, when the Cellebrite

3    extraction report is done, does it remove data from third-party

4    apps on to the report?

5    A.    Some.

6    Q.    Okay.  Is there any way to control the Cellebrite program

7    to tell it what type of third-party apps or what not

8    third-party apps?

9    A.    No, because some third-party apps are specifically

10   encrypted to where forensic programs will not read it, and then

11   some are not encrypted to where they can read it.

12   Q.    Have you ever done an extraction on a phone where you had

13   to go back and manually extract data from the phone or are you

14   just limited to using the Cellebrite program?

15   A.    I've done extractions, and then I've got the data.  And

16   then I've gone in, and I looked at the phone and said, okay, I

17   know that's not on there.  So I will take a picture of it or

18   take a video of it or something to document that I went onto

19   the phone and I found that.

20         And, again, this phone is in airplane mode and

21   there's no way that it can get on the Internet or go to the

22   cloud to retrieve anything else.  It's on the device itself.

23   So I want to make sure that when I do an exam of a phone that I

24   get anything and everything of possible evidentiary value.

25   Q.    Have you ever obtained a phone where you are doing the

DIRECT - CALEB BIBBY

1    Cellebrite extraction report where you have -- you, in your

2    investigation, have gone back and gotten another warrant for

3    additional information inside the phone that you couldn't get

4    to?

5    A.    No.

6    Q.    Never done a warrant for Snapchat?

7    A.    Oh, are you talking about external --

8    Q.    I'm talking about you saw something on a phone that you

9    thought might be evidence in a Snapchat or in a Facebook app or

10   something like that where you --

11   A.    If it's on the phone, it's on the phone.  I don't have to

12   subpoena or search warrant to Snapchat or Facebook or anything

13   like that because if it's on the phone, it's on the phone

14   itself.  It's on that device.

15   Q.    Have you ever tried to go through like a

16   password-protected program where you tried to get off the phone

17   and go through the third-party cloud?

18   A.    No, I haven't.

19   Q.    Okay.  You've never seen the reason to do that, or do you

20   just limit solely your search to what's on the phone?

21   A.    To solely what is on the phone.

22   Q.    Okay.  And have you ever had a situation where you needed

23   to go at all beyond the phone and look for something else?

24   A.    I'm sure if some of my cases that I've had.

25   Q.    Have you ever issued a search warrant to obtain

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/24/20   Page 200 of 257   PageID #: 982
Case: 19-14844   Date Filed: 02/10/2020   Page: 200 of 257

93

DIRECT - CALEB BIBBY

1   information from an Internet provider?

2   A.   Yes.

3   Q.   Okay.  Did you not go through the phone to get to the

4   Internet provider or the phone to get to the Internet

5   connection?

6   A.   That case had nothing to do with the actual device.

7   Q.   Okay.  E-mails.  You had to issue a warrant to obtain

8   additional information about e-mails, or have you been able to

9   go through a phone to get that?

10  A.   You can go through several avenues that way.  You can go

11  through -- if it's on the phone, then it's on that device, and

12  you have that from an extraction.  If you want additional

13  information from Gmail or whoever it is, you get a search

14  warrant and search that to Gmail or Google.

15  Q.   And that would be deleted e-mails that would no longer be

16  on the phone?

17  A.   Yeah.

18  Q.   Okay.  But you do recognize that if you go into a phone

19  and look at an e-mail, even though it may appear to be on the

20  phone, that's accessible to other devices, through other

21  places; correct?

22  A.   But the phone was in airplane mode, so there was no way

23  that that phone was talking to the server.  There's no possible

24  way that the device that's in my possession normally, if I have

25  the capability of putting it in airplane mode, it goes into

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/20   Page 1 of 257   PageID #:
Case: 19-14844   Date Filed: 03/10/2020   Page: 201 of 257

94

DIRECT - CALEB BIBBY

```
 1   airplane mode.  If I don't have the capability of putting it in
 2   airplane mode, then it goes into what is called a Faraday box,
 3   which has signal blocking material where you put it inside this
 4   box and you can plug all your wires in and you can do all your
 5   extraction while the device is in there and powered on and
 6   there is no possible way whatsoever that it could hit a tower.
 7   It could not hit a WiFi signal or anything like that.
 8            MR. STANKOSKI:  That's all, Judge.
 9            THE COURT:  So when you ran this program and stuff,
10   it was exactly what was on the phone, not anything
11   downloaded --
12            THE WITNESS:  There was nothing -- there was no live
13   data.
14            THE COURT:  Is that what it's called, live data?
15            THE WITNESS:  Live data.
16            From the time I received the phone, it was in
17   airplane mode.  There was never any additional information
18   received on that phone from the time I got it.  I can testify
19   to that because it was always in airplane mode.
20            THE COURT:  Okay.  This MEGA app that he's speaking
21   of, what -- I mean, I don't know how to compare it so anything
22   that I know about.  But -- all right.  Here's what I'm going to
23   do.  Like, on my computer I have an icon -- I don't even know
24   if that's what they are called anymore.  I have an icon that
25   called Word, and I can go into my Word and without an Internet
```

Case 1:19-cr-00080-KD-B    Document 192-1    Filed 04/23/2020    Page 202 of 257    PageID 29
Case: 19-14844    Date Filed: 04/10/2020    Page: 202 of 257

95

DIRECT - CALEB BIBBY

1    and I can go into my Word and pull up stuff that's in there.

2    It might be briefs.  It might be orders.  It might be whatever.

3            Okay.  So when I ask you what's inside the app,

4    that's what I mean, like what kind of stuff can be in the MEGA

5    app?

6            THE WITNESS:  From what I understand the MEGA app is,

7    the MEGA app is a file-sharing app.

8            THE COURT:  It's a file-sharing app.

9            THE WITNESS:  File-sharing app, which allows for you

10    to share any type of file and also to communicate to other

11    people to find out what files you want to send them or you want

12    to get in return.

13            But it's still -- it has all that information in it.

14    Even though it was not talking to the cloud, it still had stuff

15    in it.  It still had files.  It might have had files that were

16    transferred or received.  It had communications transferred or

17    received.

18            THE COURT:  Okay.  And when you -- when you download

19    this on to the Cellebrite thing -- I don't even know how to ask

20    this question.  You don't take the data off the phone.  You are

21    copying the data onto something?

22            THE WITNESS:  It is an image of the phone.  It is a

23    mirror image of what the phone is.

24            THE COURT:  Okay.  So you pull the mirror image off.

25    And when you go into that MEGA app, is the MEGA app somewhere

DIRECT - CALEB BIBBY

1    you could find pictures?

2              THE WITNESS:  A MEGA app, yes, you could find

3    pictures.  Now, Cellebrite did not grab the MEGA app because it

4    has encryption.  It has an encryption.  It has -- the way it's

5    built is Cellebrite cannot see it for some reason.  It's

6    software.  It's technology.  So these people that created the

7    MEGA app have coded it and made it so that forensic programs

8    can't see it.  But you go into it, and that's where you would

9    transfer --

10             THE COURT:  Wait.  Well, how did you go in it then?

11             THE WITNESS:  I'm not the one that went in and

12   actually got the information off the MEGA app.

13             THE COURT:  Okay.  Let me try again.  Cellebrite did

14   a mirror image over here?

15             THE WITNESS:  Uh-huh.

16             THE COURT:  Okay.  Then you put the phone aside.  You

17   didn't --

18             THE WITNESS:  Once I did the download of the phone, I

19   unplug it.  I put it somewhere else, and I only go off of

20   what's on my screen.

21             THE COURT:  Okay.  So what you just said confused me.

22   So Cellebrite did pull that MEGA app.

23             THE WITNESS:  It did not.

24             THE COURT:  It did not image it.  So it's not a

25   mirror image of the phone.

Case 1:19-cr-00080-KD-B   Document 192   Filed 04/23/20   Page 204 of 257   PageID #: 986
Case: 19-14844   Date Filed: 08/10/2020   Page: 204 of 257

97

DIRECT - CALEB BIBBY

1          THE WITNESS:  Well, it's a mirror image of what it

2    can see.

3          THE COURT:  Okay.  Mirror image of what it can see.

4          So then the next time you -- what did you run to get

5    the MEGA app off the phone?

6          THE WITNESS:  I didn't get -- I didn't do anything

7    with the MEGA app.

8          THE COURT:  Okay.

9          THE WITNESS:  But I can tell you that every picture

10   has a what's called a file path.

11         THE COURT:  A what?

12         THE WITNESS:  A file path.  Basically, it's a name.

13   It says this is this picture blah, blah, blah.  It has lines

14   and numbers, characters.  It might say camera roll or something

15   like that.

16         Several of the pictures in the file path stated MEGA,

17   M-E-G-A, which would make me or somebody think that, hey, that

18   could have come from the MEGA app.

19         THE COURT:  Oh, okay.  So the pictures you got off of

20   other places that was on Cellebrite, the image Cellebrite gave

21   you, had MEGA as part of the photos?

22         THE WITNESS:  That's -- in the file path, that says

23   that's where it came from.

24         THE COURT:  Okay.  Maybe you can help.  Do you have

25   questions?

CROSS - CALEB BIBBY

```
 1              MS. CHAPPELEAR:  Just very briefly.

 2                        CROSS-EXAMINATION

 3   BY MS. CHAPPELEAR:

 4   Q.   Detective, when you are looking for a phone is it possible

 5   if you find a Word document that's Word document would contain

 6   an image or images?

 7   A.   Yes.

 8              THE COURT:  Yeah.  I didn't understand what you

 9   asked.

10   BY MS. CHAPPELEAR:

11   Q.   If you are looking at a phone and you come across a Word

12   document, it could contain an image within the Word document or

13   a link to an image within the Word document.

14   A.   Yes.

15   Q.   And that's true with apps as well; correct?

16   A.   Yes.

17   Q.   They could contain images or links to images?

18   A.   Yes.

19   Q.   And, with respect to the MEGA app, the file-sharing app,

20   that does require an Internet connection for the user to

21   communicate with other users at some point; right?

22   A.   Yes.  The app was created so that if I want to send you

23   something and I needed to know what you are wanting, I have to

24   be able to communicate with you.  But if I don't have an

25   Internet, that metal wall is up and I can't send you anything.
```

Case 1:19-cr-00080-KD-B    Document 192    Filed 04/24/23    Page 206 of 257
Case: 19-14844    Date Filed: 08/10/2020    Page: 206 of 257

99

CROSS - CALEB BIBBY

1   I can't communicate with you.  But all my stuff is still right

2   here and all the stuff that I've already gotten is still right

3   there.

4   Q.   So all the past memorialized conversations are stored

5   locally on the phone?

6   A.   Yes.  They very well can be, yes.

7   Q.   And so that's what is contained within the MEGA app that

8   you can see when it's in airplane mode?  You can see the past

9   memorialized conversations, and you don't need an Internet

10  connection to get those?

11  A.   Yes.

12  Q.   Okay.

13         THE COURT:  If he didn't do the MEGA, is there

14  another witness?

15         MS. CHAPPELEAR:  Yes.

16         THE COURT:  Okay.  That's the only location that you

17  are challenging as far as that they should have gotten a

18  warrant for?

19         MR. STANKOSKI:  That's correct.

20         THE COURT:  Okay.

21         MR. STANKOSKI:  Well, I mean, with the exception of

22  just all the images.

23         THE COURT:  Oh, yes, I'm talking about this

24  particular -- your particularity argument.

25         MS. CHAPPELEAR:  No further questions.

1          THE COURT:  Anything else?

2          MR. STANKOSKI:  No.

3          THE COURT:  Thank you, sir.

4          All right.  Next witness.

5          MR. STANKOSKI:  Call Carolyn Middleton.

6          THE CLERK:  Ms. Middleton, if you would please raise

7    your right hand.

8                     **CAROLYN MIDDLETON,**

9          **having been first duly sworn, testified as follows:**

10         THE CLERK:  You may be seated.

11                    **DIRECT EXAMINATION**

12   BY MR. STANKOSKI:

13   Q.    Please state your name for the court, please.

14   A.    It's Carolyn Middleton.

15   Q.    Are you an agent with the F.B.I.?

16   A.    I am.

17   Q.    How long have you been employed in that capacity?

18   A.    Almost 17 years.

19   Q.    When did you first come in contact with the information or

20   phone related to the Hodivsky case?

21   A.    I first came -- I got the case file from Detective Gleaton

22   on, it looks like, February 21st.  I went to his office and

23   met with him about this, and he gave me his case file at that

24   time, which included Detective Bibby's cell phone download.  I

25   did not get the actual phone from him at that time.  That was

Case 1:19-cr-00080-KD-N   Document 92-2   Filed 04/02/23   Page 101 of 125   PageID 535
Case: 19-14844   Date Filed: 09/10/2020   Page: 208 of 257

101

DIRECT - CAROLYN MIDDLETON

1    later.  But I got the download which gave me the information

2    that he found through the Cellebrite.  It was solely what the

3    Cellebrite gave us.

4    Q.    I assume before you had this meeting that you had a phone

5    conversation with Detective Gleaton about getting the F.B.I.

6    involved in this aspect?

7    A.    Actually, I was involved from the beginning.  I'm on our

8    evidence response team, and I helped facilitate the search out

9    at -- at the Summerdale location.

10   Q.    When is the first time that you learned, either through a

11   telephone conversation or a personal meeting, that there was

12   possible child porn related to the Hodivsky matter?

13   A.    It would have been -- it's got to be right before the

14   21st of February when we first met.  It was probably a day or

15   two before that.  I don't have a specific date and time.  But

16   it was by telephone.

17   Q.    Detective Gleaton called you and told you that this had

18   been involved?

19   A.    He did, yes.

20   Q.    And did he tell you that he go the this information from

21   the Cellebrite report?

22   A.    He did.

23          MR. STANKOSKI:  Just a moment, Judge.

24   BY MR. STANKOSKI:

25   Q.    Agent Middleton, did you mean to say February 21st or

Case 1:19-cr-00343-KD-N    Document 92-2    Filed 04/22/23    Page 209 of 257   PageID 536
Case: 19-14844    Date Filed: 03/10/2020    Page: 209 of 257

102

DIRECT - CAROLYN MIDDLETON

1  January 21st?

2  A.   When we very first learned about the case, like initially

3  learned about any of it, when he reached out to the F.B.I. or

4  assistance with the search, that would have been in January, I

5  believe.  I don't remember -- wait a minute.  When did we do

6  the search?

7  Q.   February 24th, I think, is when everybody --

8  A.   He would have reached out to me before that time.

9  Q.   Right.  When he reached out to you before that time, did

10  he tell you that there was evidence of child porn that had been

11  located or found?

12  A.   He told me that the girl had been -- there had been a

13  forensic interview done and that she described images what they

14  believed to be pornography that was shown to her in her

15  forensic interview.

16  Q.   Okay.  But Detective Gleaton didn't have anything to

17  verify that other than the minor victim's statement to him at

18  that time?

19  A.   It was part of a forensic interview, so he had the minor

20  victim's statement as part of that forensic interview.

21  Q.   But the first time that he actually learned that there was

22  something backing up the story was on -- or the first time you

23  learned about it was February 21st when he told you?

24  A.   That's correct.  In the phone call preceding our meeting,

25  which would have been a day or two before that, but when he --

Case 1:19-cr-00240-KD-N  Document 92  Filed 04/22/25  Page 210 of 257  PageID #: 537
Case: 19-14844   Date Filed: 03/10/2020   Page: 210 of 257

103

DIRECT - CAROLYN MIDDLETON

1   when he actually gave me the Cellebrite download was on the

2   21st of February, correct.

3   Q.   Do you have any particular expertise in the Cellebrite

4   program or cybercrimes or --

5   A.   No, not necessarily.

6   Q.   What do you do mostly just as an agent?  I mean, are you

7   assigned --

8   A.   I work crimes against children.  So I deal with these

9   issues a lot.

10  Q.   Okay.

11  A.   I see a lot of child pornography, review a lot of child

12  pornography, but I'm in no way a computer expert.

13  Q.   Okay.  So let's get to the crux of the matter here.  At

14  some point you obtained the physical phone yourself in your

15  hand; is that correct?

16  A.   That's correct.

17  Q.   When did you obtain that and how did you obtain that?

18  A.   Well, hold on.  Let me -- let me get that information for

19  you.  He was arrested then.  I believe I obtained that phone

20  from him -- it was on or around March 20th or so.  I have

21  long reviewed -- I had already looked at the Cellebrite

22  download.  I had seen a lot of information in the Cellebrite

23  download regarding the file paths that Detective Bibby

24  discussed, the child pornography.  I found over 2,400 images of

25  what I believed were probably child pornography.  I would have

Case 1:19-cr-00040-KD-N   Document 92   Filed 04/23/20   Page 41 of 87   PageID 558
Case: 19-14844   Date Filed: 09/10/2020   Page: 211 of 257

104

DIRECT - CAROLYN MIDDLETON

1  to send them to NCMEC to have them identified as I did.  And I

2  found some video on there that I thought were probably child

3  pornography.  And at that time we were -- we felt strongly that

4  he was --

5  Q.  Let me talk to you.  My question is, when did you obtain

6  the phone.  You've kind of gone beyond that.

7  A.  Right.  But I'm making a clarification here.  If you --

8  Q.  Well, your lawyer can ask you about clarification.

9          THE COURT:  Well, just --

10  BY MR. STANKOSKI:

11  Q.  My question is, when did you obtain the phone?

12  A.  On or about -- it was around March 20th.

13  Q.  Okay.  So on March the 20th of 2019, when you are handed

14  the phone, is that when you did your physical inspection of the

15  phone?

16  A.  Yes.  And let me clarify the word "physical."  You are

17  reading off of my 302.  I should have used the word "manual."

18  A manual review of the phone.

19  Q.  Okay.

20  A.  And what that means, the difference between that and what

21  Detective Bibby did, Detective Bibby did a physical extraction

22  of the phone.  That's him taking -- making a mirror image of

23  the digital information on that phone.  What I did is take the

24  phone out of its packaging, its evidence packaging, turn it on,

25  it opened up into airplane mode, so it was still in airplane

Case 1:19-cr-00000-KD-N Document 92 Filed 04/22/23 Page 212 of 257 PageID #: 539
Case: 19-14844    Date Filed: 09/10/2020    Page: 212 of 257

105

DIRECT - CAROLYN MIDDLETON

1    mode, just as it was when Detective Bibby had it.  I left it in

2    airplane mode.  And what I -- and then I actually looked at the

3    phone.  So I'm looking at the in my hand.  I'm not doing any

4    digital extraction.  I'm not doing any kind of digital --

5    excuse me -- examination of any kind.  It's me looking at the

6    phone.

7    Q.    And when you went to the phone, you are the one who

8    located the MEGA app that was on the phone?

9    A.    That's true, yes.

10   Q.    And that was on the, I believe, according to your report,

11   on the home screen of the phone?

12   A.    It was -- yes, it was.  And there were two pages of his

13   home screen, and it was one of the apps on his home screen.

14   Q.    Was it on the first home screen or the second home screen?

15   A.    I believe it was on the second.

16   Q.    Okay.  So you swipe over to the second home screen, you

17   see the app, and then you click the app with your finger?

18   A.    That's correct.

19   Q.    App opens up?

20   A.    App opens up.

21   Q.    Okay.  Do you notice whether or not it's

22   password-protected that has been auto-filled into the app?

23   A.    I did not notice anything like that.  It said the -- there

24   was a user name, and it was Joe something.  It was a very

25   generic name.  And then there was an e-mail address, something

1    like JHodivsky or something like that Hodivsky@, maybe,

2    Gmail.com.

3    Q.    And so, as you went into the app, I believe your video

4    shows you were the one who clicked the chat button?

5    A.    That's right.

6    Q.    That then dropped a chat?

7    A.    That's correct.

8    Q.    Somewhere in your report, I've seen either hand-typed or

9    actually extracted, did you extract the chats from MEGA app?

10   A.    No, absolutely.  The phone was in airplane mode.

11   Q.    No, no, no, no.  Maybe I'm misstating my question.  In

12   your reports, I've seen the actual chats.

13   A.    Oh, yes.  You can see the actual chats.

14   Q.    All right.  How did you get them on your report is what

15   I'm asking.

16   A.    I hand-typed them.

17   Q.    That's what I'm asking.

18   A.    Yes, sir.

19   Q.    There was no program that you used to take that off?

20   A.    No, sir.  There was very labor-intensive.

21   Q.    Okay.  So you are the one who hand-typed all the chats

22   there?

23   A.    That's correct.

24   Q.    It's undisputed that at the time you went to the MEGA app,

25   there was no other warrant that had been obtained by anybody

DIRECT - CAROLYN MIDDLETON

1    allowing you today to do that?

2    A.    That is correct.

3    Q.    Your manual examination of the phone, you are traveling

4    under Detective Gleaton's cell phone data warrant; is that

5    correct?

6    A.    That's right.

7    Q.    Okay.  And did you inspect any other apps on

8    Mr. Hodivsky's phone other than the MEGA app?

9    A.    The reason the MEGA app was of such interest to me is

10   because off of -- if you look at the Cellebrite report, some of

11   the images that we found were -- had the words "MEGA" or "MEGA

12   downloads" in the file path.

13          So those are images that were stored on the phone

14   that the Cellebrite were extracted during the Cellebrite

15   report.  And it said "MEGA" or "MEGA download."  I recognized

16   the MEGA app as an end-to-end encryption app that is not

17   uncommonly used by people that trade in child pornography.

18   That's why it caught my interest as an investigator.

19   Q.    And the MEGA app is also used for other things too?

20   A.    Oh, absolutely.  Many, many legitimate uses.  Most

21   definitely.

22   Q.    Okay.

23   A.    But this was a child pornography case, and that's why it

24   caught my interest.

25   Q.    Did you -- during your manual examination, did you locate

DIRECT - CAROLYN MIDDLETON

1    any images in the chat dialogue in the MEGA app?

2    A.    I saw links to images and MP4s.  So they were video files.

3    There were a number of video files.  They would not work

4    because the phone was in airplane mode.

5    Q.    These would be links that would take you through the MEGA

6    app, or they would take you somewhere else?

7    A.    Well, if the phone were not in airplane mode, I assume

8    that they would take me somewhere else.

9    Q.    Okay.

10   A.    Those links would not play with the phone in airplane

11   mode.

12   Q.    Okay.  But the chats were located on there, and you don't

13   know how the chats got there, do you?

14   A.    I assume the way they get onto any phone, that they were

15   communicating with another person on another end when the phone

16   was not in airplane mode.

17           MR. STANKOSKI:  I understand.  Okay.  That's all.

18           THE COURT:  Do you have any -- maybe it would help

19   me, if you had any examples of what she's talking about where

20   MEGA was in the image description.

21           MS. MURPHY:  Path.  Do you have any of the file

22   paths?

23           THE WITNESS:  I do.

24           MS. CHAPPELEAR:  I believe they are reflected, too,

25   in the --

Case 1:19-cr-00040-KD-N   Document 92-2   Filed 02/28/23   Page 216 of 257   PageID #543
Case: 19-14844   Date Filed: 09/10/2020   Page: 216 of 257

109

DIRECT - CAROLYN MIDDLETON

```
 1            THE WITNESS:  In this the affidavit, there's some,

 2   and I have a copy right here.

 3            THE COURT:  Which affidavit is that?

 4            THE WITNESS:  So this --

 5            THE COURT:  Let's mark this.

 6            THE WITNESS:  This one is going to be more --

 7            THE COURT:  I'm going to let -- I think that one may

 8   be marked.

 9            MS. CHAPPELEAR:  Yes.  Well, I can just direct the

10   judge.

11            THE WITNESS:  Page 14.

12            THE COURT:  All right.  I'm sorry.  Guys, there's a

13   lot of paperwork up here.  Give me an exhibit number.

14            MS. CHAPPELEAR:  Well, it's --

15            THE COURT:  Is it something that's already been

16   admitted by the defense?

17            MS. CHAPPELEAR:  It's her affidavit to her federal

18   search warrant.  So it's on PACER.  I have a copy of it here,

19   if you would like.

20            THE CLERK:  We are looking at Document 3.

21            MS. MURPHY:  Mark it and introduce it.

22            MS. CHAPPELEAR:  I have it marked as Government's

23   Exhibit D2.  I can show it to --

24            THE COURT:  It's not attached to one of your motions

25   or your response; right?
```

Case 1:19-cr-00080-KD-N   Document 92   Filed 04/22/23   Page 217 of 257   PageID #: 544
Case: 19-14844   Date Filed: 9/10/2020   Page: 217 of 257

110
DIRECT - CAROLYN MIDDLETON

1          MS. CHAPPELEAR:  Correct.

2          THE COURT:  Okay.  Just remember, the only thing I

3   have is what's attached to your motions or what's been

4   introduced in this case -- I mean, in this hearing today.

5   So --

6          THE CLERK:  What's your docket number?

7          THE WITNESS:  3-1.

8          THE CLERK:  3-1.  What page?

9          MS. CHAPPELEAR:  It's on page 17.  Starts on page 17.

10          THE CLERK:  Okay.

11          MS. CHAPPELEAR:  Goes to -- through page 18.

12          THE COURT:  And you are marking that as Government's

13   Exhibit 1 or 3.

14          MS. CHAPPELEAR:  I'll mark it as Government's

15   Exhibit 1.

16          THE COURT:  Well, I think you already have a 1.

17          What's her next number, Melanie.

18          THE CLERK:  For the Government it's 1.

19          THE COURT:  Oh, that's right.  It was the defense

20   that introduced.  Government's Exhibit No. 1 is the federal

21   search warrant.

22          MS. CHAPPELEAR:  It's the affidavit in support of the

23   search warrant, yes, Your Honor.

24          THE COURT:  Okay.  All right.  Is that your only

25   copy?

```
 1                 MS. CHAPPELEAR:  I have other copies.

 2                 THE COURT:  All right.  Thank you.

 3                 All right.  Your directing me to page what?

 4                 MS. CHAPPELEAR:  17.

 5                 THE COURT:  I see it.  17.  All right.  Go ahead and

 6    ask your questions.

 7                          CROSS-EXAMINATION

 8    BY MS. CHAPPELEAR:

 9    Q.   Agent Middleton, is that the affidavit that you prepared

10    of the search warrant?

11    A.   This is actually the one from the criminal complaint, but

12    it's remarkably similar.

13    Q.   All right.  Thank you.  And, in there, do you outline some

14    of the images that were found during Detective Bibby's download

15    of the phone?

16    A.   Yes, I did.

17    Q.   And do those images have particular file paths?

18    A.   They do.

19    Q.   And some of those images relate to a file path for an

20    SD card; is that correct?

21    A.   That's correct.

22    Q.   And some of the images relate to a file path that says

23    "MEGA"?

24    A.   That's correct.  And many have both.  They have SD card

25    and MEGA within the file path.
```

Case 1:19-cr-00003-KD-N Document 92-2 Filed 04/20/23 Page 219 of 257 PageID #: 546
Case: 19-14844    Date Filed: 04/10/2020    Page: 219 of 257

112

CROSS - CAROLYN MIDDLETON

```
1              THE COURT:  I'm still looking for one that says
2   "MEGA."  I'm sorry.
3              THE WITNESS:  Look for -- if you look under No. 6,
4   No. 7, No. 8.
5              THE COURT:  Okay.
6              THE WITNESS:  Got it.
7              THE COURT:  I see it.  Page 19.
8   BY MS. CHAPPELEAR:
9   Q.   Let's first explain what an SD card is, just in case
10  there's some confusion about that.  What is an SD card?
11  A.   An SD card -- again, I am not a computer expert but an
12  SD card, as I know it, is removable media.  It's a little
13  device that you can store digital evidence on or digital data
14  on.
15  Q.   So like an old digital -- not even old, in digital
16  cameras, when you took photos and sometimes your little card
17  gets full and then you have to swap it out for another one,
18  those are SD cards?
19  A.   They are SD cards.  And they come in a number of sizes.
20  The ones you put in phones are very, very small, and what that
21  is, is it's my understanding it's additional storage for data
22  for somebody who wants to have one on their phone.  And you can
23  move it in and out, just like a thumb drive.
24  Q.   If the phone has a port for an SD card?
25  A.   If the phone has a port for an SD card, that's correct.
```

Case 1:19-cr-00240-KD-N   Document 92   Filed 02/10/2020   Page 220 of 257   PageID #: 547
Case: 19-14844   Date Filed 09/10/2020   Page: 220 of 257

113
CROSS - CAROLYN MIDDLETON

1  Q.   And then the file path with the MEGA app.  What does that

2  mean to you?

3  A.   That means, to me, that -- so that file path, what that

4  tells me is, it is associated with MEGA which, of course, would

5  piqued my interest because of the nature of my work.  And then

6  after that on many of them, it says "MEGA downloads."  And so

7  that made me think that it was downloaded to the actual device.

8  Q.   Okay.  So if you are -- let's talk about, like, text

9  messages, which I think is a little bit easier to understand.

10  So if I send you a text message and I attach a photo to it --

11  A.   Yes.

12  Q.   -- it remains within the text messaging little button on

13  my phone?

14  A.   Correct.

15  Q.   Unless you click on the photo and download it to your

16  phone; is that right?

17  A.   That's right.  If I save the image in some way.

18  Q.   Okay.  So then you can access that photo on your phone

19  regardless of whether or not there's an Internet connection

20  because it is saved locally to your phone then?

21  A.   That's right.

22  Q.   So when you see an image that has a file path of MEGA app,

23  does that mean to you that someone has exchanged a photo on the

24  MEGA app but then separately downloaded it onto the local

25  storage of their phone?

Case 1:19-cr-00080-KD-N   Document 92-2 Filed 04/22/23   Page 221 of 257   PageID #: 1548
Case: 19-14844   Date Filed: 09/10/2020   Page: 221 of 257

114

REDIRECT - CAROLYN MIDDLETON

1    A.    That's what I believed probably happened with these

2    images.  It told me that it came in to the phone, to the

3    device, or a device, maybe an SD card or something.  It ended

4    up on this phone at some point in its life through MEGA.

5    Q.    Through MEGA.  Okay.  And the MEGA app when it -- it's an

6    app on the phone that you can go to and you can see what the

7    person has done within the MEGA app while they had an Internet

8    connection, but it's just memorialized when it's in airplane

9    mode?

10   A.    That's correct.  That's correct.

11          MS. CHAPPELEAR:  Okay.  That's it.  Thank you.

12                    **REDIRECT EXAMINATION**

13   BY MR. STANKOSKI:

14   Q.    Do you have an SD card for the phone?

15   A.    There is no SD card for this phone.  That was one of the

16   reasons I wanted to physically see the phone because I could

17   see in the file path that it had said "SD card" for many of the

18   images, and so I wanted to know if there was stored on a

19   removable piece of media or if at some point maybe -- and I'm

20   speculating as to how that happened -- there may have been an

21   SD card put into the phone at some point, all of the images

22   were downloaded to the device and the SD card was removed but

23   they were left behind on the device.  So there was no SD card

24   in his phone.

25   Q.    But there are images saved into the phone that have an

Case 1:19-cr-00084-KD-N   Document 92-2 Filed 04/20/23   Page 222 of 257   PageID #: 549
Case: 19-14844   Date Filed: 09/10/2020   Page: 222 of 257

115

1    "SD" file path?

2    A.   Correct.  That tells me that at some point they came into

3    contact with an SD card.  They may have been stored on one at

4    some time.

5    Q.   But there is no SD card for this phone?  All images were

6    saved on the physical phone itself?

7    A.   They were on the phone itself.

8          THE COURT:  Would the term "SD" still appear in the

9    file path description if it came from somebody else that it was

10   on their SD and then they sent it to me and I have saved it?

11   Would that SD -- is that where the SD came from?

12         THE WITNESS:  I'm not certain.  I couldn't tell you

13   that for certain.  And, again, I'm not a computer expert.  I

14   know that the files on this phone, it was in the path.

15         THE COURT:  Thank you.

16         Any other witnesses from the defense?

17         MR. STANKOSKI:  That's all.

18         THE COURT:  Okay.  Thank you, ma'am.

19         All right.  And from the Government?  Did you have

20   witnesses?

21         MS. CHAPPELEAR:  No, Your Honor.

22         THE COURT:  Okay.  All right.  We'll go back to legal

23   arguments here.  We'll try to take them one at a time.

24         MR. STANKOSKI:  Judge, if I may and I think you know

25   my argument that's made as in general.  I do want to point out

Case: 1:19-cr-00040-KD-N   Document 192-2 Filed 05/22/23   Page 223 of 257   PageID #: 550
Case: 19-14844   Date Filed: 05/10/2020   Page: 223 of 257

116

1  to the court.  I know I've used this term "nexus" a couple of

2  times in here.  But I want you to know that I didn't just make

3  that term up.  You know, the <u>Warren versus Hayden</u> case says

4  specifically in there there must be a nexus between the items

5  seized and the criminal activity.  United States versus --

6          THE COURT:  Okay.  I'll give you that nexus.

7          MR. STANKOSKI:  Gotcha.

8          THE COURT:  It has to be criminal -- evidence of a

9  crime.  I think that's where we are differing is what is

10 evidence of a crime.  You are saying it has to be evidence of

11 an element of a crime and I'm saying it has to be evidence of a

12 crime.

13         MR. STANKOSKI:  Right.  Pretty much.  I would say --

14         THE COURT:  And I don't think you've cited me any

15 cases that says it has to be evidence of an element of a crime.

16 That's what I keep trying to say to you.  I'm not making myself

17 clear.

18         MR. STANKOSKI:  No.  You are making yourself clear,

19 and I'll concede there are no cases that say that the evidence

20 they are looking for has to be evidence of an element of the

21 crime.  It has to be -- it has to be related to the crime and

22 that's our position.

23         THE COURT:  Yeah.  I think that's not your best

24 argument today.

25         MR. STANKOSKI:  Okay.

Case 1:19-cr-00080-KD-B   Document 92-2 Filed 04/20/23   Page 224 of 257   PageID #: 551
Case: 19-14844   Date Filed: 09/10/2020   Page: 224 of 257

117

```
 1          THE COURT:  I think that if you want to spend some

 2    time talking to me about the MEGA app and why it was that when

 3    the F.B.I. got it that they should have gone and gotten a

 4    search warrant for the MEGA app.  I'll hear you on anything you

 5    want to say.

 6          MR. STANKOSKI:  I understand.

 7          THE COURT:  But I would like to understand that part

 8    of your argument.

 9          MR. STANKOSKI:  Back to my general arguments again is

10    that where you are going, a third-party cloud-computing-based

11    app.  You are required specifically to, in my opinion, to get a

12    warrant based upon that, that it exceeds the warrant on its

13    face.

14          All they asked for was images and videos.  And,

15    furthermore, they really didn't even say what time frame they

16    are looking at because a phone can go back until the date that

17    you got the phone.  I mean, this could be 1997 when he obtained

18    his first Galaxy S1 phone, Mr. Hodivsky.  And each year, as he

19    upgraded, all the way to the S9 in 2017 or 2018, that data

20    could continue to updated and transmitted to the phone.  So

21    again --

22          THE COURT:  Are you saying a staleness argument at

23    this point, that we don't know when the child -- well,

24    actually, it says -- oh, we know when the child was

25    interviewed, but you are saying we don't know when he allegedly
```

1    showed her pictures on his phone.

2            MR. STANKOSKI:  That's correct.  And he says in his

3    warrant, look, I'm looking for evidence of the date and time of

4    these particular images.  He doesn't even specify in his

5    warrant that I'm looking for the evidence to take place during

6    this particular time that it happened.

7            The full Cellebrite data dump, it goes back forever

8    and obtains everything.  So, really, the argument is

9    overbroadness.  When you go get a search warrant and you don't

10   limit it specifically in time and scope, it's overbroad by its

11   very nature.  And so when you go and you dump everything out of

12   a phone and get everything back to its inception, you are

13   getting way more than what the warrant told you you could get.

14           THE COURT:  I'm not sure I remember that argument in

15   your brief.

16           MR. STANKOSKI:  I may not --

17           THE COURT:  Overbroad because failed to allege time

18   frame.

19           MR. STANKOSKI:  Right.  And I didn't know that

20   because I hadn't had a chance to cross-examine Detective

21   Gleaton on his affidavit and application.  Don't forgot, Your

22   Honor, there was a misdescribed location in there as to the

23   seizure of the phone.  There was a lot of --

24           THE COURT:  Misdescribe -- oh, because he said

25   property of his as opposed to property used by him or

Case 1:19-cr-00084-KD-B   Document 92  Filed 04/20/23   Page 226 of 257   PageID# 553
Case: 19-14844   Date Filed: 09/10/2020   Page: 226 of 257

119

1  something.

2          MR. STANKOSKI:  Remember, here's what happened.

3  January the 22nd, Detective Gleaton gets the search warrant,

4  a seizure warrant, for the phone.  They go in there and they

5  arrest Mr. Hodivsky, only he doesn't seize the phone.  As a

6  matter of fact, he tells him, you might want to bring this with

7  you and I'm going to shove it in your back pocket so that we

8  could take it to the jail.  It then goes to the jail and sits

9  there in somebody's custody in the jail.

10          And Detective Gleaton testifies that somewhere along

11  the line in his mind that he executed the search warrant on the

12  day he was arrested.  Well, he didn't.  His return on the

13  search warrant specifically says January 24th, that's when I

14  got these items, and he says I got these items on

15  January 24th at this property.  And he puts Galaxy S9 phone

16  on there.  Well, he didn't -- he didn't execute the warrant on

17  that date, on January 24th.  And he didn't get it from the

18  property that he said he got it from on the return because he

19  didn't take the phone from the shop.  So --

20          THE COURT:  So what?  Okay.  Finish off your thought.

21  So where -- why is it to be suppressed because of that?  Tell

22  me why.  What law says it gets suppressed?

23          MR. STANKOSKI:  I'm looking at the totality of the

24  circumstances about the search warrant that was obtained and

25  the manner in which it was executed and used.  That's just part

```
 1   and parcel of the totality of the circumstances.

 2            But at some point he goes back to the jail and says,

 3   okay, now I'm getting this phone here, but the warrant said go

 4   get it from the shop.  So he somehow gets it out of the jail,

 5   writes search warrant on the side of the jail receipt, and then

 6   takes it into his possession.  But, really, you've got the crux

 7   of the rest of my arguments based on that, Judge, based upon

 8   all our case law that we cited in there.

 9            THE COURT:  But I'm trying to understand that one.

10   So the fact that he actually seized it from the jail as opposed

11   to seizing it from the automotive shop is grounds for

12   suppression because of why?

13            MR. STANKOSKI:  It just shows the totality of the

14   circumstances behind the improper use of the search warrant.

15            THE COURT:  I'm not -- I don't understand that

16   argument.  Here again, let me ask the question again.  The fact

17   that he seized it from the jail as opposed to having seized it

18   from the place where it was -- where he thought it was going to

19   be, in the automotive shop, or where the search warrant allowed

20   him to search for it, why is that a problem?

21            MR. STANKOSKI:  There may be no issue there, Judge.

22            THE COURT:  Because I'm thinking that when a police

23   officer goes in to arrest somebody, he could have just taken

24   the phone right then.  I mean, the phone was sitting there, and

25   he knew he had a warrant for a phone.  And he convinced a
```

1    magistrate or a district judge that there was evidence of a

2    crime or there could be evidence of a crime on there.  He could

3    have just seized it right then because it was in plain view.

4    He couldn't have gone and searched for the phone in that house.

5    That's where he would have overstepped his bounds.  But do you

6    disagree that seeing the phone sitting right there, he could

7    have just picked it up?

8              MR. STANKOSKI:  No.  I don't disagree.  He could have

9    seized it the moment he got in there.

10             THE COURT:  Okay.  So I think that's a nonissue.  I

11   can't see your issues.

12             MR. STANKOSKI:  I understand, and I'll withdraw that

13   as far as an argument being made as to why --

14             THE COURT:  So what we are down to is, first of all,

15   you are still, like, well, it's not a nexus to the criminal

16   elements.  And then your next argument is that the -- the

17   search warrant was overbroad because it didn't limit it in time

18   and scope.

19             MR. STANKOSKI:  What they got was overbroad versus

20   what they sought.

21             THE COURT:  Okay.  Well, it didn't limit them to --

22   well, then I don't understand.

23             MR. STANKOSKI:  Well, that's two-fold.  My first

24   argument on that would be they said images and videos.  What

25   they got was everything.

Case: 1:19-cr-00040-KD-N   Document 92-2   Filed 04/22/23   Page 229 of 257   PageID #: 556
Case: 19-14844   Date Filed: 04/10/2020   Page: 229 of 257

122

1            THE COURT:  Okay.

2            MR. STANKOSKI:  That alone is overbroad.

3            THE COURT:  Right.  That's overbroad.  And then you

4    have the little subset.

5            MR. STANKOSKI:  And then I have a subsection to that,

6    which is if they are looking for images or videos, it's not

7    tailored to any particular time frame.  They can go back as far

8    as they want.  So it's not particular enough.

9            THE COURT:  All right.  So you've got the

10   particularity.

11           MR. STANKOSKI:  And then, as we talked about earlier,

12   I've got my position that I feel they should have gotten a

13   search warrant to go into any other app on the phone.  That

14   search warrant they have did not allow them to go into

15   third-party apps.

16           THE COURT:  Okay.  Anything else you want to add

17   before I turn to the Government for their response?

18       [The defendant and counsel confer off the record.]

19           MR. STANKOSKI:  I think that's all, Judge.

20           THE COURT:  All right.  Who is going to do the legal

21   argument here?

22           MS. CHAPPELEAR:  Thank you, Your Honor.  As you have

23   articulated, the search warrant authorized the agents here to,

24   the law enforcement officials, to go in anywhere they could

25   reasonably expect to find evidence of the crime articulated,

```
 1   and they did.

 2            So it was limited in that they were only allowed to

 3   look for images and photos.  They went in looking for images

 4   and photos.  That's where Detective Bibby began his search of

 5   the extraction within the images and photos, but they also

 6   expect to find images and photos and links to images and photos

 7   in various apps.

 8            And then, once they were in those apps, they found

 9   additional criminal evidence of a new crime.  They did have a

10   lawfully issued search warrant in this case.  They complied

11   with that.  And to any extent that the defense argues that they

12   didn't, they were relying on that search warrant that was

13   issued to them by a judge and a magistrate who found probable

14   cause to issue the search warrant.  So pursuant to Leon, they

15   are acting in good faith.

16            THE COURT:  Yeah.  I'm going to come back and let you

17   tell me why Leon doesn't apply.  Not yet.  But let her finish.

18            MR. STANKOSKI:  Yes, Your Honor.

19            MS. CHAPPELEAR:  Generally, Your Honor, that's the

20   crux of the Government's response.

21            THE COURT:  Okay.  All right.  Tell me why Leon -- if

22   assuming everything you said was right --

23            MR. STANKOSKI:  There's two reasons why the good

24   faith exception doesn't apply.  One is what I talked about

25   earlier, which Your Honor doesn't exactly agree with me, but
```

Case: 1:19-cr-00840-KD-N Document 99-2 Filed 04/20/23 Page 231 of 257 Page ID #: 558
Case: 19-14844    Date Filed: 03/10/2020    Page: 231 of 257

124

```
1    that's okay.  That's the evidence that they are looking for is

2    not what they went to the judge saying.

3            THE COURT:  Oh, okay.  So you are saying they didn't

4    let the judge know everything.

5            MR. STANKOSKI:  Yes.  And that is cited in the cases,

6    you know, the Winn case and the Oglesby case where they talk

7    about that in there that defeats the good faith exception when

8    probable cause is not there.

9            THE COURT:  And remind me again what exactly you

10   contend they didn't tell the judge.

11           MR. STANKOSKI:  They don't tell him all the crimes

12   that they could be charged with.  They don't specifically let

13   the judge know -- we are back to the same argument we talked

14   about earlier.  I'm just traveling with what Winn says.  Winn

15   says that the good faith exception to defeated when there is no

16   probable cause issued to warrant.  There's no probable cause

17   when there's no nexus between the evidence that they are

18   looking for and the crime that's asserted.  Those are all the

19   cases that we cited in the brief is that you can't just go

20   free-range searching looking for something as evidence in a

21   case against somebody.  That defeats probable cause.

22           Also, the good faith exception doesn't apply when

23   it's not particular enough, and we talked about that.  Now,

24   this part, it's our back to our two-fold argument.  One is it's

25   overbroad, the results they got.  That defeats the good faith
```

```
1    exception.  And then subsection of that, which is not limited

2    to --

3              THE COURT:  Well, that only defeats the good faith --

4    like, if I said, okay, yeah, you are right.  It wasn't

5    particular enough.  But, you know, reasonable people could

6    disagree on that, the good faith exception applies.  It's only

7    when it's just so obvious to any, you know, breathing human

8    being that it wouldn't apply that the good faith exception goes

9    away; right?

10             MR. STANKOSKI:  I disagree with that that it's not --

11   every officer --

12             THE COURT:  What's the standard then.  Tell me what

13   the standard is.

14             MR. STANKOSKI:  Let me go back to Oglesby case

15   because it --

16             THE COURT:  It is in that there?

17             MR. STANKOSKI:  The Oglesby case talks about --

18             THE COURT:  And you are saying the Oddsley case?

19             MR. STANKOSKI:  Oglesby.

20             THE COURT:  Oh, I don't have that one.  Okay.

21             MR. STANKOSKI:  So elements of whether a good faith

22   exception would apply.  If the issuing magistrate judge was

23   misled by information in the affidavit, the affiant knew was

24   false or would have known reckless disregard for the truth

25   doesn't apply.  Where the issuing magistrate judge wholly
```

Case: 1:19-cr-00084-KD-N   Document 92-2   Filed 04/22/23   Page 233 of 257   PageID 560
Case: 19-14844   Date Filed: 05/10/2020   Page: 233 of 257

126

1    abandoned his or her judicial oath.  Doesn't apply.

2            Where the warrant is based on an affidavit so lacking

3    in indicia of probable cause as to render official belief in

4    its existence entirely unreasonable.  I got probable cause and

5    they say it in a wordy way.

6            THE COURT:  So lacking in probable cause it would be

7    unreasonable for anybody to believe that there was probable

8    cause.  That's what I was trying to say.

9            MR. STANKOSKI:  Where the warrant is so facially

10   deficient in failing to particularize the place to be searched

11   or things to be seized that the executing officers cannot

12   reasonably presume it to be valid.

13           THE COURT:  All right.

14           MR. STANKOSKI:  And in Oglesby case, they -- by the

15   way, they did try to rely on the good faith exception and they

16   said in this case because there's no nexus.  This is the case

17   where the phone was in the car on the breaking and entering.

18           THE COURT:  Right.

19           MR. STANKOSKI:  That's an easy case to analogize.  He

20   was charactered with breaking, and they got a search for the

21   cell phone.  But they found that lack of nexus didn't meet the

22   probable cause element, and, as a result, good faith exception

23   didn't apply.

24           In Winn, it was a little bit more interesting because

25   what they found in this case was that the officer actually

Case: 1:19-cr-00080-KD-N   Document 92-2   Filed 04/20/23   Page 234 of 257   PageID #: 561
Case: 19-14844   Date Filed: 06/10/2020   Page: 234 of 257

127

 1    recklessly obtained the search warrant.  And that's the one

 2    where they went in and said, look, why did you say to the

 3    magistrate or judge you are charging him -- or there's evidence

 4    of the crime of public indecency.  Why did you say that when

 5    you are looking for photographs and images on this?

 6              And, by the way, they went to a states attorney, and

 7    they kind of got the states attorney to assist in preparing

 8    this warrant.  And they said, look, that's even more evidence

 9    of good faith.  But they said not in this case.  The officers

10    were actually reckless by applying for that, not specifying the

11    specific crime that -- yeah, they also beat up on the officer a

12    little bit in this case and said that he, in this one part of

13    his application for affidavit, he said public indecency and

14    then, in another part, they said disorderly conduct.

15              And they, look, you are even making typos in this.

16    And I'm going to look at the totality of all this to figure out

17    why we find that your search warrant goes beyond what we say

18    for probable cause.  So in the Oglesby case and the Winn case,

19    both of the things that I'm arguing in this case make the good

20    faith exception not applicable.

21              THE COURT:  Okay.  All right.  So in this case I

22    find, first of all, that the witnesses that testified are

23    credible.  And I find that the first search warrant -- let's

24    just go through them -- the first search warrant that was

25    applied for asked for the search based on a child having told

1   them that she was shown pictures of children engaging in sexual

2   conduct.  The fact that the officer used the word pornography

3   doesn't lessen the truthfulness of what he says to the judge.

4   So I don't find that there was anything untruthful or that he

5   hid anything from the judge in that case.

6         But, anyway, so there obviously was -- where he used

7   the term the property of Taras Hodivsky, and then he describes

8   the property.  The property has to be accurately described, but

9   the case law that talks about describing property accurately it

10  means like the address, what the house looks like, so that the

11  agents won't go search the wrong property, which, of course,

12  we've had happen before, but that's why it has to be described

13  particularly.

14        And I don't find that the surplus language of "the

15  property" would have in any way confused the officers executing

16  the warrant as to what property was allowed to be searched.  So

17  I don't find that there was anything wrong with that.

18        So they -- the thing about it is that this warrant

19  basically authorized them to seize a cell phone to try to find

20  evidence of what the child -- to corroborate the child's

21  statement that she was shown the child pornography.  So I find

22  that that is a legitimate seizure or a legitimate evidence to

23  be seized.  Corroborating evidence is evidence likely to make a

24  fact either true or not true.

25        And so it doesn't have to be an element of the crime

Case: 1:19-cr-00080-KD-N   Document 92-2   Filed 04/22/22   Page 236 of 257   PageID #: 563
Case: 19-14844   Date Filed: 08/10/2020   Page: 236 of 257

129

1   to be evidence that's to be seized.  But, at the end of the

2   day, it was not this warrant really that the phone was seized

3   under.

4         So what we have is then the officers go, knowing that

5   a child has said that she's been shown, you know, child sex --

6   child pornography on a phone, they go to arrest the defendant.

7   And so they are in the house legitimately.  There's been no

8   challenge to that warrant.  And they see -- they see a phone

9   that appears to belong to the defendant.  They could have

10  seized the phone at that moment as far as I'm concerned.  They

11  weren't searching.  They didn't go there to search for the

12  phone.  Now, if they had intent to seize that when they went to

13  arrest him, there's actually a Supreme Court case talking about

14  that like.  Like if their intent was to get evidence while they

15  arrested him, then, you know, there's a problem, but I haven't

16  heard any evidence of that.

17        So they get -- they don't get the phone there, but

18  they take it back and they get the phone when they are at the

19  jail.  All right.  So, so far, your argument fails.

20        Now, when we get the phone, they run it through the

21  Cellebrite program because at this point the -- they are

22  allowed to -- well, first of all, excuse me.  They go get a

23  second warrant, and I think this is important and I think it is

24  important that they did this.  They go get a second warrant to

25  now search the contents of the phone for images and videos.

1          So at that point they have to right to search

2    anywhere on that phone that will take them to images and

3    videos.  I think it's important that it was in airplane mode

4    because if they used that phone to go to other houses, to go to

5    other places and pull stuff, then I think that's a problem.  I

6    think that's where maybe some of your case law is directing us

7    not to allow them to go to.

8          But at this point it's just a container is the best

9    way to describe this phone.  It's a container with evidence in

10   it, and so they can go look in that container anywhere there

11   possibly could be images.  And having already pulled down

12   images from other parts of the phone and having some clue that

13   the MEGA app possibly contained these images because it uses

14   the word "MEGA" on some of these images, they had every right

15   to open that closet and see if there were images as they were

16   allowed to do under the second search warrant.  So I don't see

17   any problem with them having searched for and gone into that

18   room and gone into the MEGA app to find what they found.

19          Now, while they are in the room legitimately

20   searching for pictures, if they find other evidence of the

21   crime, then, of course, that's admissible evidence and not due

22   to be suppressed.

23          Now, we go to your particularity argument.  I didn't

24   hear the Government talk about that, and I would like for you

25   to talk about that.  That's where he says that the -- he makes

1    an argument that the -- that the search warrant didn't give a

2    time frame when you went to the judge as to when the child said

3    she saw child porn on the phone.

4              Do you have any argument about that?  She could

5    have -- this could have -- I don't know how long this happened

6    to her.  There's nothing indicating how long this has been

7    going on.  The only thing she said is it happened 100 times or

8    something.  But I don't know if this had been going on for a

9    year, two years, or if this is something that she saw on phone

10   5 years ago -- well, that would be highly unlikely.  But you

11   know what I'm saying.  What's your response to that?

12             MS. CHAPPELEAR:  I believe she indicated that the

13   abuse had been happening or about a year.  But what we don't

14   know is which of the images she was shown.  So it would be hard

15   to limit the scope of the warrant to a particular time frame as

16   to when the images got on the phone.

17             THE COURT:  Okay.  Wait.  Did you include that?  Is

18   that included -- not you, but was it included in the warrant

19   that this abuse had been happening to her for a year.

20             MS. CHAPPELEAR:  I believe it says --

21             THE COURT:  All right.  Direct me to that.  Let me

22   find my warrant.

23             MS. CHAPPELEAR:  Well, it says in the affidavit,

24   which I believe would be the second page of Defendant's

25   Exhibit 1.

```
 1          THE COURT:  Okay.  This is -- oh, it's Defendant's

 2   Exhibit 3.

 3          MS. CHAPPELEAR:  Oh, I'm sorry.  Do you have these

 4   exhibits?

 5          THE COURT:  You are talking about the September --

 6   excuse me -- January 30^th warrant?  The second warrant?

 7          MS. CHAPPELEAR:  Yes.  There's -- that she had been

 8   numerous times subjected to sexual contact.  I believe in the

 9   affidavit -- that's -- on the affidavit for the data of the

10   cell phone, it just talks about numerous times, but in -- in

11   the affidavit on Defendant's Exhibit 1, which is for the

12   seizure of the phone, she describes numerous times being

13   subjected to sexual contact and that it started when she was in

14   kindergarten, the previous school year.

15          MR. STANKOSKI:  But, Your Honor, that was only to

16   obtain the phone, not to obtain --

17          THE COURT:  You need to wait one minute before you

18   say anything.  I need to catch up.  For some reason I can't

19   find the exhibit.  I got the Government's Exhibit 1.  Do you

20   have it down there?

21          THE CLERK:  No, ma'am.  They didn't give it to me.

22          THE COURT:  They gave it to me.  No, I don't want

23   another one.  I know it's up here.  I haven't moved from this

24   chair.  Oh, did you take it to redact it?

25          MR. STANKOSKI:  I did.  That's the redacted package,
```

Case: 1:19-cr-00040-KD-N    Document 92-2   Filed 04/22/23    Page 240 of 257    PageID #: 567
Case: 19-14844    Date Filed: 02/10/2020    Page: 240 of 257

133

```
1    Judge.

2           THE COURT:  May I see Exhibit 1?

3           THE CLERK:  Oh, yes, ma'am.

4           THE COURT:  So you are directing me to page 2 of

5    Exhibit 1?

6           MS. CHAPPELEAR:  Correct.  It indicates that the

7    child had reported that the abuse had occurred the prior school

8    year, in her kindergarten year.  And then also on the second

9    page of Exhibit 3, the detective notes that the images, if

10   displayed on an electronic device, are likely still be present

11   on the device.

12          THE COURT:  All right.  Now, what were you going to

13   say?

14          MR. STANKOSKI:  To answer your question, Judge, the

15   information is more specific on the first search warrant.  It's

16   not on there at all on the second search warrant.  It just says

17   it's been going on for some time and she was shown the images.

18   There's no time frame on the second search warrant.

19          THE COURT:  Yeah.  I think he is correct that there's

20   really no time limit on the second phone, but I do recall that

21   the officer, the first officer that testified, Mr -- Detective

22   Gleaton said that, you know, it was his experience that

23   these -- that these images were maintained from long periods of

24   time.  People don't usually delete them off their phones and

25   stuff, which is one reason, to one of your questions, on why he
```

Case: 1:19-cr-00040-KD-N   Document 92-2   Filed 04/22/23   Page 241 of 257   PageID #: 568
Case: 19-14844   Date Filed 03/10/2020   Page: 241 of 257

134

1     was asking for the search warrant.

2              I think that the search warrant should have included

3     the time frame, the second one, but I don't find that it's the

4     totality of the circumstances surrounding this would require me

5     to suppress the evidence because of that, and, if nothing else,

6     it is saved by the <u>Leon</u> exception because I certainly don't

7     find that it's so lacking in probable cause or particularity

8     that no reasonable person could believe that executing it would

9     have been a violation of the Constitution.

10             So I think I've covered all your arguments.  Have I

11    missed any of your arguments?

12             MR. STANKOSKI:  No, ma'am.

13             THE COURT:  All right.  So based on that, I do deny

14    your motion to suppress.

15             Here's Exhibit 1, Melanie.

16             Is there anything else we need to take up from the

17    defense?

18             MR. STANKOSKI:  No, ma'am.

19             THE COURT:  From the Government?

20             MS. CHAPPELEAR:  Thank you, Your Honor.

21             THE COURT:  All right.  Thank you.  We are in recess.

22        [Recess.]

23             THE COURT:  Just one thing for the record.  Is it

24    okay if Government's Exhibit 1 be Government's Exhibit 1,

25    pages 1 and 19, rather than put that whole thing into the

1    record again?

2              MS. CHAPPELEAR:  No, that's fine, Your Honor.

3              MR. STANKOSKI:  All right.  Thank you, Judge.

4         [Recess.]

Case 1:19-cr-00080-KD-N   Document 92   Filed 04/20/23   Page 243 of 257   PageID #: 570
Case: 19-14844   Date Filed: 02/10/2020   Page: 243 of 257

136

```
 1              CHRONOLOGICAL INDEX OF WITNESSES

 2                                    PAGE  LINE  VOL

 3   JOHN GLEATON

 4   DIRECT BY MR. STANKOSKI:  . . . . . . . . . 2    20    1
     CROSS BY MS. CHAPPELEAR:  . . . . . . . .52     2    1
 5   REDIRECT BY MR. STANKOSKI:  . . . . . . . .61   12    1

 6   CALEB BIBBY

 7   DIRECT BY MR. STANKOSKI:  . . . . . . . . .68   10    1
     CROSS BY MS. CHAPPELEAR:  . . . . . . . . .98    3    1
 8

 9   CAROLYN MIDDLETON

10   DIRECT BY MR. STANKOSKI:  . . . . . . . . 100   12    1
     CROSS BY MS. CHAPPELEAR:  . . . . . . . . 111    8    1
11   REDIRECT BY MR. STANKOSKI:  . . . . . . . 114   13    1

12

13

14             INDEX OF EXHIBITS RECEIVED

15                                    PAGE  LINE  VOL

16   Defendant's 1 . . . . . . . . . . . . . . .21    5    1

17   Defendant's 2 . . . . . . . . . . . . . . .28   19    1

18   Defendant's 4 . . . . . . . . . . . . . . .51   18    1

19   Defendant's 5 . . . . . . . . . . . . . . .51   18    1

20

21

22

23

24

25
```

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
MOBILE, ALABAMA  36602   (251) 690-3371

Case 1:19-cr-00040-KD-N   Document 92 Filed 04/27/23   Page 244 of 257   PageID #: 1026
Case: 19-14844   Date Filed: 06/10/2020   Page: 244 of 257

137

```
 1   STATE OF ALABAMA)
                    :
 2   COUNTY OF MOBILE)
                        UNITED STATES OF AMERICA
 3                              VS.
                          TARAS HODIVSKY, JR.
 4                       CASE NO. CR19-00040

 5

 6          I, Melanie Wilkins, do hereby certify that the above

 7   and foregoing transcript of proceedings in the matter

 8   aforementioned was taken by me in machine shorthand, and the

 9   questions and answers thereto were reduced to writing under my

10   personal supervision using computer-aided transcription, and

11   that the foregoing represents a true and correct transcript of

12   the proceedings upon said hearing.

13

14          I further certify that I am neither counsel nor

15   related to the parties to the action, nor am I in anywise

16   interested in the result of said cause.

17   Pages 1 to 137, inclusive.
     Dated:  April 24, 2020.
18

19

20                          _____
                            Melanie Wilkins
21                          Registered Merit Reporter
                            Certified Realtime Reporter
22                          Official Court Reporter
                            United States District Court
23                          Southern District of Alabama
                            113 St. Joseph Street
24                          Mobile, Alabama  36602
                            (251) 690-3371
25
```

# DOC 100

```
1              IN THE UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF ALABAMA

3                        SOUTHERN DIVISION


4     ------------------------------------
                                          ) CRIMINAL NO. CR19-00080
5     UNITED STATES OF AMERICA,           ) COURTROOM 4B
                                          ) U.S. FEDERAL COURTHOUSE
6                                         ) MOBILE, ALABAMA
      VS.                                 ) SEPTEMBER 27, 2019
7                                         )
      TARAS HODIVSKY, JR.,                )
8                                         )
                   DEFENDANT.             )
9     ------------------------------------)


10

11                        SENTENCING HEARING
              BEFORE THE HONORABLE KRISTI K. DuBOSE
              CHIEF UNITED STATES DISTRICT COURT JUDGE
12

      APPEARANCES:
13

      FOR THE           U.S. Attorney's Office
14    GOVERNMENT:        By:  Katherine Chappelear, Esq.
                         By:  Maria E. Murphy, Esq.
15                       Assistant U.S. Attorney
                         63 South Royal Street, Suite 600
16                       Mobile, Alabama  36602

17    FOR DEFENDANT TARAS HODIVSKY, JR.:

18                       Stankoski Myrick, LLC
                         By:  Daniel Robert Stankoski, Jr., Esq.
19                       8335 Gayfer Road Ext.
                         Fairhope, Alabama  36532
20
                         Michael A. Pylant, P.C.
21                       By:  Michael A. Pylant, Esq.
                         P.O. Box 1322
22                       Fairhope, Alabama  36533

23    COURT REPORTER:    Melanie Wilkins, RMR, CRR
                         Federal Official Court Reporter
24

25
```

MELANIE WILKINS, RMR, CRR, OFFICIAL COURT REPORTER
MOBILE, ALABAMA  36602   (251) 690-3371

```
1              Proceedings reported by machine stenography.

2                  Transcript produced by computer.

3         [September 27, 2019, 9:05 a.m.  The defendant is present

4      with counsel in open court.]

5              THE COURT:  All right.  Call the case.

6              THE CLERK:  We are on the record for a sentencing

7  hearing in Criminal No. 19-80, the United States of America

8  versus Taras Hodivsky, Jr.

9              What says the Government?

10             MS. CHAPPELEAR:  Ready, Your Honor.

11             THE CLERK:  What says the defendant?

12             MR. STANKOSKI:  Ready.

13             THE COURT:  All right.  Mr. Hodivsky, the probation

14 office has calculated your guidelines to be a level 42.  You

15 have a criminal history involving possession of MDMA, but your

16 category is still a Category I.  Your guideline range is

17 360 months.

18             There's no objection to that calculation; is that

19 correct?

20             MR. STANKOSKI:  No, ma'am.

21             THE COURT:  All right.  And this was a case where the

22 Government entered into a plea with you pursuant to

23 rule 11(c)(1)(C), and after having considered your sentencing

24 guideline report, I have accepted that plea.

25             Is there anything you want to say on his behalf?
```

```
1              MR. STANKOSKI:  I do, Judge.  I just have some

2    arguments to be made on the fines that will be assessed in this

3    matter.

4              THE COURT:  Okay.

5              MS. CHAPPELEAR:  Your Honor, at this point the United

6    States would object to those arguments.  He filed a notice of

7    no objections to the presentence report.

8              MR. STANKOSKI:  Your Honor, the presentence report

9    contains a range of fines in this matter.  So I should be

10   allowed to argue as to what range is appropriate.  We did not

11   accept any particular fine to be imposed.

12             THE COURT:  Well, she's not prepared to rebut; that's

13   what her point is.  Her point is, you need to file an objection

14   to the -- let's see.  Let me see what she's -- the page on

15   restitution.  Pages --

16             MR. STANKOSKI:  We don't necessarily object to

17   restitution.

18             THE COURT:  Not restitution.  It's the fine.  Well,

19   I'll let you argue on the fine.

20             MR. STANKOSKI:  Thanks, Judge.  If you'll recall in

21   this matter by taking a look at the presentence report, which

22   the facts in this matter have been not been objected by the

23   defendant or the U.S. Attorney's Office.  Mr. Hodivsky at the

24   time of his arrest was working for his father's fencing company

25   that being known as Hodivsky Fencing Company.
```

1           He was caring for his parents, who were not in the

2    greatest of health.  His father is age 72.  His mother is age

3    69.  He has one sibling that lives over in the state of

4    Florida.  And so, in essence, we would be arguing to Your Honor

5    his parents are, in essence, his dependents in this matter as

6    he's been caring for them.

7           He has accepted a term of 30 years in this matter.

8    He's age 40.  Suffers from chronic pain in his extremities due

9    to rheumatoid arthritis.  He had back surgery in 2014, and

10   Mr. Hodivsky is not in excellent health himself.  When he's

11   released in this matter, he will be between the ages of 65 and

12   70, depending on the percentage of his sentence that he serves.

13          When he's released at that time, the world of

14   technology, skill, and trade will have passed him by.  He will,

15   in essence, when he's released from jail, be unemployable due

16   to the time length that he's going to spend plus his status as

17   a convicted sex offender.  Most likely, Mr. Hodivsky's only

18   source of income would be in the form of Social Security.

19          Mr. Hodivsky has a two-year associates degree from

20   Coastal Community College, that being in arts.  His only real

21   employment that he's had, he was a salesperson at a men's

22   clothing store, he worked as a server at Lamberts Café, and,

23   later, he worked at his father's fence company.

24          The only skills that Mr. Hodivsky possesses are those

25   in lawn maintenance, small auto repairs, and doing fencing

Case 1:19-cr-00080-KD-B   Document 202-2   Filed 04/22/23   Page 250 of 257   PageID #: 1032
Case: 19-14844   Date Filed: 03/10/2020   Page: 250 of 257

5

```
1    work.  He has no assets to speak of at this time.  He has a

2    home located in Foley that, yes, made a value is $200,000.  He

3    has a mortgage on that home in the amount of $170,000.  The

4    mortgage is being paid out of what monies Mr. Hodivsky has

5    left, which is enough for one last payment on the mortgage

6    home, the mortgage to be paid on the home.  At that time there

7    will be no further payments, and we expect the home will go

8    into foreclosure.

9           He has credit card debts in the amount of $3,000,

10   which are not being paid.  He has medical bills in the amount

11   of $5000 that are not being paid.  His parents hired his

12   attorneys to represent him in this matter.  He is completely

13   indigent at this time.

14           THE COURT:  Wait a minute.

15           MR. STANKOSKI:  He will --

16           THE COURT:  Let me ask because we may could

17   short-circuit this.  There's $164,000 in restitution.  Then

18   there's mandatory fines of about 12,200, I think.  Did you

19   want -- are you asking for additional amounts?

20           MS. CHAPPELEAR:  There are mandatory special

21   assessments.

22           THE COURT:  That's what I meant, of the 12,200

23   mandatory special assessment.

24           MS. CHAPPELEAR:  Well, there's -- there's the $100

25   special assessment for each count.  Then there's been an
```

```
 1   additional $5,000 mandatory special assessment for each count,
 2   and then the Court has the discretion under the Amy, Vicky,
 3   Andy Act to impose additional special assessments up to $35,000
 4   on Count 1 and up to $17,000 on Count 3.  And then there is the
 5   issue of restitution, which is $164,000.
 6           THE COURT:  Right.  So my question is beyond the
 7   $164,000 and the mandatory minimum special assessments, are you
 8   asking for additional?
 9           MS. CHAPPELEAR:  No, Your Honor.
10           MR. STANKOSKI:  That's no problem with us, Judge.
11   The only thing I'd ask, then, if the mandatory assessments are
12   imposed, I'm going to be asking for two additional requirements
13   of the judge.  One, that he be sentenced close to home, so his
14   family can spend time and visit with him.  And, secondly, upon
15   the conclusion of the appeal time in this matter because the
16   phone in this matter belongs to his father's company and his
17   father -- and he's still paying for that, I would ask the
18   Government to wipe the phone off and return that back to his
19   family.  Other than that, those are the conditions we are
20   requesting at this time.
21           THE COURT:  Well, the second one, I won't be able to
22   help you with today.  You can file the appropriate motion, and
23   the Government can file the response as to that one.  I'm not
24   sure who has custody of that phone.  Lots of time, it's the
25   state, and then he has to go through the state to get it.
```

```
 1              MR. STANKOSKI:  I think the F.B.I. has possession of

 2    the phone.

 3              THE COURT:  Who has custody of it?

 4              MS. MURPHY:  The F.B.I. has it, Your Honor, but there

 5    are pending state charges in which the phone is expected to be

 6    evidence.

 7              THE COURT:  So do y'all plan to turn it over to the

 8    state.

 9              MS. MURPHY:  Yes, ma'am.

10              MR. STANKOSKI:  It was my understanding that the

11    state is dismissing the charges.

12              THE COURT:  Well, I wouldn't know.

13              MR. STANKOSKI:  I understand.

14              THE COURT:  There's remedies that you can file

15    pursuant to federal law and -- but I've just had this come up

16    before where those were filed and then we get into it and find

17    out the state has custody.  But you figure out who has custody

18    and you file it in the correct court.

19              MR. STANKOSKI:  Well, I know the F.B.I. has custody

20    at this time.  Other than that, I don't --

21              THE COURT:  They probably won't release it until they

22    know that the state's not going to pursue charges.

23              MR. STANKOSKI:  Yeah.  While we are on the record, if

24    the state dismisses the charges, does the federal government

25    have any objection to returning the phone?
```

Case 1:19-cr-00080-KD-B   Document 102   Filed 04/22/23   Page 253 of 257   PageID #: 1035
Case: 19-14844   Date Filed: 05/10/2020   Page: 253 of 257

8

```
1              MS. MURPHY:  You have to wait until the time for

2   appeal.

3              MR. STANKOSKI:  Other than the appeal time has run.

4   I understand that.  But, beyond that, if the state dismisses

5   the case, so we don't have to go through this again, does the

6   government object to this?

7              MS. MURPHY:  We have to check on the technology

8   available to -- that there's currently contraband on the phone,

9   and we typically don't return it.  We destroy it.  So we'll

10  look into, and if it's possible --

11             THE COURT:  All right.  Anything else?

12             MR. STANKOSKI:  That's all.

13             THE COURT:  And, Mr. Hodivsky, would you like to say

14  anything?

15      [The defendant and counsel confer off the record.]

16             THE COURT:  You are not required to.  It's just your

17  opportunity if you would like to say anything before I impose

18  sentence.

19      [The defendant and counsel confer off the record.]

20             MR. STANKOSKI:  No, ma'am.

21             THE COURT:  Okay.  All right.  Well, I have

22  considered the Government's plea agreement with you and

23  considering the nature of the charges and the harm that you

24  have imposed on this child as well as others in your commission

25  of this offense, I find that the 30 years is an appropriate
```

1    sentence.  If you'll stand, I'll read your sentence.

2              Pursuant to the Sentencing Reform Act, it the

3    judgment the Court that Taras Hodivsky, Jr., is hereby

4    committed to the custody of the Bureau of Prisons for a term of

5    360 months as to each counts, 1 and 3, said terms to run

6    concurrently.

7              I recommend that you be imprisoned at an institution

8    where you may receive mental health counseling or if you

9    volunteer at the Federal Corrections Institution where you may

10   participate in the Sex Offender Treatment Program.

11             I also recommend that you be housed as close to home

12   as possible.

13             Upon release from imprisonment, you'll be placed on

14   supervised release for a term of 15 years as to Counts 1 and 3

15   to run concurrently.  I find that this length of a pretrial --

16   excuse me -- of a supervised release term is called for

17   considering the nature of the underlying offense.

18             Within 72 hours from release from the Bureau of

19   Prisons, you are to report to the probation office in the

20   district to which you are released.

21             While on supervised release, you shall not commit any

22   federal, state, or local crimes.  You are prohibited from

23   possessing a firearm or other dangerous device.

24             It is ordered that you make restitution in the amount

25   of $164,415.  And I will attach to the final J and C the

Case 1:19-cr-00080-KD-B   Document 102-2   Filed 04/24/23   Page 255 of 257   PageID #: 1097
Case: 19-14844   Date Filed: 07/10/2020   Page: 255 of 257

10

1    amounts and names of the parties to which these are owed.

2    Restitution is due immediately and payable in full.  You are to

3    make payments to the victims on a pro rata basis.  If full

4    restitution is not immediately paid, you'll be subject to the

5    Bureau of Prisons' Inmate Financial Responsibility Program in

6    which case you'll be paying at least $50 a month while

7    incarcerated.

8            As a special condition of SRT, the probation office

9    shall pursue collection of any unpaid balance.

10           You'll be subject to mental health -- when you are on

11   supervised release, mental health treatment and model search of

12   your property and person upon reasonable suspicion that you

13   violated your conditions of release.

14           Also, sex offender treatment and location monitoring,

15   as deemed appropriate by the probation officer as well as sex

16   offender registration.

17           I find that you don't have the ability to pay a fine

18   in addition to that, so a fine is not imposed.

19           I have sentenced you at the low end of the guideline

20   range based on your plea agreement with the Government.

21           It is ordered that you pay a special assessment of

22   $100 pursuant to 18 U.S.C. 3013, a $5,000 assessment pursuant

23   to 3014, and a $5,000 -- excuse me -- special assessment

24   pursuant to the Amy, Vicky, Andy Act as to Counts 1 and 3 for a

25   total of $12,200, which is due immediately.

Case 1:19-cr-00080-KD-B    Document 102-2  Filed 04/24/23    Page 256 of 257    PageID #: 1038
Case: 19-14844    Date Filed: 08/10/2020    Page: 256 of 257

11

```
 1            Objections?

 2            MR. STANKOSKI:  No objection.

 3            MS. CHAPPELEAR:  None.  Thank you, Your Honor.

 4            THE COURT:  The sentence is imposed as stated.  You

 5   have 14 days to file a notice of appeal.  Thank you.

 6            THE CLERK:  Dismiss Count 2?

 7            THE COURT:  Count 2 is dismissed.

 8            MS. MURPHY:  Yes, Your Honor.

 9            THE COURT:  They are dismissed.  Thank you.  All

10   right.  We are in recess.  Thank you.

11       [Recess.]

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:19-cr-00080-KD-B   Document 102-2   Filed 04/24/23   Page 226/12 257 of 257   PageID #:
1,039
Case: 19-14844   Date Filed: 09/10/2020   Page: 257 of 257

12

```
1   STATE OF ALABAMA)
                    :
2   COUNTY OF MOBILE)
                          UNITED STATES OF AMERICA
3                                    VS.
                            TARAS HODIVSKY, JR.
4                          CASE NO. CR19-00080

5

6           I, Melanie Wilkins, do hereby certify that the above

7   and foregoing transcript of proceedings in the matter

8   aforementioned was taken by me in machine shorthand, and the

9   questions and answers thereto were reduced to writing under my

10  personal supervision using computer-aided transcription, and

11  that the foregoing represents a true and correct transcript of

12  the proceedings upon said hearing.

13

14          I further certify that I am neither counsel nor

15  related to the parties to the action, nor am I in anywise

16  interested in the result of said cause.

17  Pages 1 to 12, inclusive.
    Dated:  April 24, 2020.
18

19

20                         _____
                           Melanie Wilkins
21                         Registered Merit Reporter
                           Certified Realtime Reporter
22                         Official Court Reporter
                           United States District Court
23                         Southern District of Alabama
                           113 St. Joseph Street
24                         Mobile, Alabama  36602
                           (251) 690-3371
25
```